**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

LEAGUE OF WOMEN VOTERS OF THE
UNITED STATES
1233 20th Street, NW, Suite 500
Washington, DC 20036;

LEAGUE OF WOMEN VOTERS
EDUCATION FUND
1233 20th Street, NW, Suite 500
Washington, DC 20036;

Case No. _____

LEAGUE OF WOMEN VOTERS OF
COLORADO
110 16th Street Mall, Suite 1326
Denver, CO 80202;

LEAGUE OF WOMEN VOTERS OF
NEW JERSEY
204 West State Street
Trenton, NJ 08608;

LEAGUE OF WOMEN VOTERS OF NEW
JERSEY EDUCATION FUND
204 West State Street
Trenton, NJ 08608;

LEAGUE OF WOMEN VOTERS OF
SARATOGA COUNTY
P.O. Box 1029,
Saratoga Springs, NY 12866;

LEAGUE OF WOMEN VOTERS OF
THE CHARLESTON AREA
P.O. Box 20173
Charleston, SC 29413; and

LEAGUE OF WOMEN VOTERS OF
MILWAUKEE COUNTY
6737 W Washington Street, Suite 2218
West Allis, WI 53214,

*Plaintiffs*,

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES
5900 Capital Gateway Drive,
Prince George's County,
Camp Springs, MD 20746;

JOSEPH B. EDLOW, *in his official
capacity as Director of the United States
Citizenship and Immigration Services*
5900 Capital Gateway Drive,
Prince George's County,
Camp Springs, MD 20746;

U.S. DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King Jr. Avenue SE
Washington, D.C. 20528; and

KRISTI NOEM, *in her official capacity
as the Secretary of the Department of
Homeland Security*
2707 Martin Luther King Jr. Avenue SE
Washington, D.C. 20528,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      As the United States Citizenship and Immigration Services ("USCIS") has stated, "naturalized citizens are . . . an important part of our democracy." USCIS, *Should I Consider U.S. Citizenship?*, https://perma.cc/XPJ9-SZ7T (last accessed Nov. 17, 2025). By becoming citizens, naturalized Americans "have a voice in how our nation is governed." *Id.* Naturalization ceremonies are empowering, joyful celebrations of American democracy, and after these ceremonies, new Americans are eligible to register to vote.

2.      For decades, the League of Women Voters, including state and local Leagues across the country, had been a trusted partner of USCIS in helping hundreds of thousands of new voters register to vote at administrative naturalization ceremonies. The League has always conducted this work in a nonpartisan manner, with a single goal: to ensure that new Americans have a voice in our democracy. Registering new voters—including new Americans—is a core part of the League's mission to empower voters and defend democracy.

3.      On August 29, 2025, USCIS arbitrarily and capriciously changed course and barred nonpartisan groups like the League from participating in administrative naturalization ceremonies. Under previously existing USCIS rules, the League and other nonpartisan organizations had been able to offer voter registration assistance at administrative naturalization ceremonies for decades. That was all upended by USCIS's August 2025 rule (hereinafter, "Voter Registration Ban," "Ban," or "the challenged rule").

4.      The August 2025 Voter Registration Ban is procedurally and substantively unlawful. USCIS did not follow the notice and comment requirements of the Administrative Procedure Act ("APA") before barring the League and other nongovernmental organizations from providing critical, nonpartisan voter registration assistance to new citizens. USCIS's stated

rationale for the Voter Registration Ban further flouts the APA's prohibition on arbitrary and capricious agency action.

5.      The Voter Registration Ban also violates the League's First Amendment rights. The Ban discriminates—based on viewpoint, content, and the identity of the speaker—against speech promoting the right to vote for new citizens, and tramples on the League's freedom of association.

6.      This Court should strike down USCIS's Voter Registration Ban and ensure that new citizens are able to access the franchise and that the League can exercise its protected First Amendment rights of speech and association without discrimination.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to hear this case under 28 U.S.C. § 1331 because the claims in this action arise under the laws the United States, namely, under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

8.      This Court has authority to issue declaratory and injunctive relief in this action under 28 U.S.C. §§ 2201 and 2202, as well as under 5 U.S.C. § 705.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b) because more than one Defendant resides in this district. USCIS and its Director are headquartered in the District of Maryland, *id*. § 1391(e)(1)(A), and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, *id.* § 1391(e)(1)(B).

## PARTIES

**Plaintiffs**

10.     **Plaintiff League of Women Voters ("LWV")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Washington, D.C., which promotes political responsibility by encouraging Americans to participate in the electoral process. Founded in 1920

as an outgrowth of the struggle to win voting rights for women, LWV now has more than a million members and supporters and is organized in every state and in the District of Columbia across more than 750 communities. LWV is composed of two branches: the League of Women Voters of the United States ("LWVUS") and the League of Women Voters Education Fund ("LWVEF"). LWVUS encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education, and advocacy. LWVUS is a 501(c)(4) social welfare organization. LWVEF is a 501(c)(3) organization that registers and provides voters with election information through VOTE411.org, candidate forums, and debates. LWVUS and LWVEF work with state and local Leagues in all 50 states and the District of Columbia.

11.    As part of its mission, LWV—with state and local Leagues[1]—operates one of the longest-running and largest nonpartisan voter registration efforts in the nation. LWV's core mission includes increasing the number of eligible citizens who register to vote and expanding the American electorate to create a democracy that reflects the diversity of the country.

12.    No other organization has registered more new citizen voters at naturalization ceremonies than the League. Doing this work allows the League to communicate its beliefs that it is crucial for new Americans to have a voice in our democracy and that registering to vote is the most powerful way to accomplish this goal.

13.    The leadership and volunteers of state and local Leagues, including Plaintiffs here, have been devastated by the Voter Registration Ban. Registering new citizens to vote at

---

[1] Affiliates of the League of Women Voters are referred to as state or local "Leagues" as opposed to chapters or branches. The "League" refers to the entire organization.

naturalization ceremonies is not only deeply moving; it is also a form of service that motivates many people to become active and involved members of the League.

14. USCIS's Voter Registration Ban harms the League and violates its members' rights. By impeding the League's critical voter engagement work, the Ban infringes on the League's First Amendment speech and association rights and does so without any reasoned basis and without engaging in the formal notice and comment process required by federal law.

15. **Plaintiff League of Women Voters of Colorado ("LWVCO")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Denver, Colorado. LWVCO is an independently incorporated 501(c)(3) organization, as well as a state affiliate of LWV, with approximately 2,400 members. LWVCO also has multiple local Leagues—including the League of Women Voters of Arapahoe and Douglas Counties ("Arapahoe and Douglas League"); the League of Women Voters of Boulder County ("Boulder League"); the League of Women Voters of Denver County ("Denver League"); the League of Women Voters of Estes Park ("Estes Park League"); the League of Women Voters of Larimer County ("Larimer League"); and the League of Women Voters of Greeley-Weld ("Greeley-Weld League") (collectively, "Colorado Leagues")—all of which have provided voter registration and education services to new citizens at administrative naturalization ceremonies.

16. LWVCO was founded in 1928 to ensure that every person has the desire, the right, the knowledge, and the confidence to participate in democracy. Pursuant to this mission, LWVCO facilitates voter registration drives on behalf of its local Leagues and promotes policies that enable LWVCO to register all eligible Coloradans to vote.

17. Voter registration at administrative naturalization ceremonies is a cornerstone of LWVCO and many local Colorado Leagues' work. Since 2017, LWVCO and local Colorado

Leagues registered more than 6,000 naturalized citizens to vote at more than 200 administrative naturalization ceremonies across the state. Throughout this time, LWVCO coordinated with its local Leagues to assist them in providing voter registration at naturalization ceremonies.

18. **Plaintiff League of Women Voters of New Jersey ("LWVNJ")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Trenton, New Jersey. LWVNJ includes independently incorporated 501(c)(3) and 501(c)(4) organizations, and is a state affiliate of LWV. LWVNJ has 1,558 members across 29 local Leagues, including the League of Women Voters of Burlington County ("Burlington League"), the League of Women Voters of the Montclair Area ("Montclair League"), and the League of Women Voters of the Greater Princeton Area ("Princeton League"), which have all provided voter registration and education services at administrative naturalization ceremonies.

19. LWVNJ was founded in 1920, with a mission to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy. Pursuant to this mission, LWVNJ registers voters, provides voters with nonpartisan election information, and conducts educational forums, candidate forums, and debates.

20. Prior to implementation of the Voter Registration Ban, LWVNJ and its local Leagues operated successful voter registration services at naturalization ceremonies. The Burlington League began doing so in 2017. In 2022 and 2023, LWVNJ fostered relationships with additional USCIS field offices, which allowed the Princeton and Montclair Leagues to start providing voter registration services at administrative naturalization ceremonies. In 2025 alone, these three local Leagues attended 194 ceremonies, reaching 5,688 new citizens and registering 2,583 new citizens to vote.

21.    **Plaintiff League of Women Voters of Saratoga County ("the Saratoga League")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Saratoga Springs, New York. The Saratoga League is an independently incorporated 501(c)(4) organization and a local affiliate of the League of Women Voters of New York State ("LWVNYS") and LWV. The mission of the Saratoga League is to empower voters to ensure that every person has the right, knowledge, and confidence to participate in our democracy. To that end, in concert with both LWVNYS and LWV, the Saratoga League registers and provides voters with election information, organizes candidate forums, and encourages its more than 300 members to educate their fellow citizens about, and lobby for, government and social reform legislation.

22.    The Saratoga League has been engaged in registering voters since its inception over a century ago.[2] Since 2013, the Saratoga League has provided voter registration and education services at an administrative naturalization ceremony held every Fourth of July. Starting in 2023, the Saratoga League began attending a second administrative naturalization ceremony held annually in September and has, since then, attended two such ceremonies a year. These ceremonies take place mainly in the Saratoga National Historical Park, a public U.S. National Park Service ("NPS") site. The Saratoga League has registered between 11 and 20 newly naturalized citizens at each of these administrative naturalization ceremonies.

23.    **Plaintiff League of Women Voters of the Charleston Area ("the Charleston League")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in Charleston, South Carolina. The Charleston League was founded in 1947 and is an independently incorporated 501(c)(3) organization and a local affiliate of the League of Women Voters of South

---

[2] The Saratoga League held its first organizing convention in June 1920, and the current Saratoga League was reestablished in 1965.

Carolina and LWV. The mission of the Charleston League, and its over 200 members and volunteers, is to promote political responsibility through informed and active participation of citizens in government, and to act on issues of importance to the League's principles. To further its mission, the Charleston League hosts candidate forums and debates, educates the public on elections and voting, and assists new voters with registering to vote.

24.    As part of its mission to expand civic participation, the Charleston League has attended and provided voter registration and education services at administrative naturalization ceremonies since 2003. While the ceremony schedule has changed over the years—with ceremonies occurring anywhere from once a week in 2015, to up to four times a week as of 2025— the Charleston League has reliably provided voter registration assistance and education at the majority of administrative naturalization ceremonies in Charleston County for decades. Approximately 25 new citizens have naturalized at each ceremony, such that the Charleston League has provided voter registration assistance and education to thousands of new citizens over the years.

25.    **Plaintiff League of Women Voters of Milwaukee County ("the Milwaukee League")** is a nonprofit, nonpartisan, grassroots membership organization headquartered in West Allis, Wisconsin. The Milwaukee League is an independently incorporated 501(c)(3) organization and a local affiliate of the League of Women Voters of Wisconsin and LWV; it serves Milwaukee County. The mission of the Milwaukee League, and its approximately 450 members and volunteers, is to educate eligible Wisconsin voters about the voting process and elections, including assisting with voter registration and absentee ballot requests, providing nonpartisan information on elections and candidates, and hosting candidate forums. The Milwaukee League further endeavors to engage citizens in democracy through public policy education and advocacy.

7

26.     As part of its work to reach naturalized citizens, the Milwaukee League has been providing voter registration assistance and education at naturalization ceremonies for over 50 years. In 2024, the Milwaukee League members and volunteers assisted 1,204 new citizens at administrative naturalization ceremonies, including assisting with 304 voter registrations and providing educational information to another 590 naturalized citizens about how to complete a voter registration application on their own time. In 2025, prior to the Voter Registration Ban, Milwaukee League members and volunteers attended more than 70 administrative naturalization ceremonies held at a USCIS field office, where members and volunteers assisted 83 new citizens with voter registration and provided 1,768 new citizens with information to register on their own.

**Defendants**

27.     The United States Citizenship and Immigration Services ("USCIS") is a federal agency housed in the Department of Homeland Security and is responsible for processing naturalization applications and establishing related policies.

28.     Joseph B. Edlow is Director of the United States Citizenship and Immigration Services. He is sued in his official capacity.

29.     The Department of Homeland Security ("DHS") is a cabinet-level agency of the United States, responsible for immigration and customs. 6 U.S.C. § 111.

30.     Kristi Noem is the Secretary of the Department of Homeland Security. She is sued in her official capacity.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

**I.      Federal law grants USCIS authority over administrative naturalization ceremonies.**

31.     Congress provided the Attorney General with the authority and responsibility to make rules and regulations regarding the naturalization process, including the oath of allegiance.

8 U.S.C. § 1421(a) (1990); 8 C.F.R. §§ 310.1(a), 310.3, 1421, 1443, 1448. Congress further mandated that the Attorney General must distribute information concerning the benefits of citizenship and must seek community-group assistance in doing so. 8 U.S.C. § 1443(h). The Attorney General's powers regarding naturalization have since been delegated to DHS and USCIS.

32.    To obtain U.S. citizenship via naturalization, an applicant must take an oath of allegiance to the United States in a public ceremony. 8 U.S.C. § 1448(a); 8 C.F.R. § 337.1(a). Naturalization ceremonies are required by law to be public. In an administrative naturalization ceremony, USCIS administers the oath of allegiance. 8 C.F.R. § 310.3(a).

33.    The USCIS Policy Manual ("Manual") is the agency's centralized repository for USCIS's immigration policies, including the administrative naturalization process. *See* USCIS Policy Manual, Vol. 12, Part J, Chapter 5 (2025). In Chapter 5, the Manual creates procedures regarding administrative naturalization ceremonies, including, as relevant here, voter registration services.

## II.    Nonpartisan nongovernmental organizations have provided voter registration at naturalization ceremonies for decades.

34.    Since USCIS first began administering administrative naturalization ceremonies, it had permitted nongovernmental organizations to provide voter registration services to newly naturalized citizens.

35.    In an effort to standardize voter registration services across the country, in 2011, USCIS—after providing notice and allowing public comment—revised its Manual to require staff overseeing administrative naturalization ceremonies to ensure that every newly naturalized citizen was provided the opportunity to register to vote at the conclusion of the naturalization ceremony. Ex. A, U.S.C.I.S. PM-602-0014 (Dec. 16, 2010).

**A.    USCIS's rules regarding voter registration services provided by nongovernmental organizations have been consistent for the last decade.**

36.    Since 2011, the rules regarding voter registration services provided by nongovernmental organizations at such ceremonies had mostly remained unchanged. At all times, the rules had required that participating organizations be "both non-profit and non-partisan." USCIS, PM-602-0014.1, at 7-8 (Sept. 20, 2011).

37.    Nongovernmental organizations seeking to provide voter registration services at administrative naturalization ceremonies were required to request to participate in writing at least 60 days prior to the ceremony. *Id.* at 8. This request had to include a statement that those participating in the registration process were trained on how to properly register voters. *Id.* The rules also placed limitations on nongovernmental organizations' behavior at the ceremonies by prohibiting them from engaging in partisanship or discriminating on any basis in whom they registered to vote. *Id.* at 8-9.

38.    USCIS field leadership was required to provide "equal, non-preferential opportunities to all qualified and approved nongovernmental organizations." USCIS Policy Manual, Vol. 12, Part J, Chapter 5, Section F(3) (2018). The rules also provided that USCIS could revoke participation of a particular nongovernmental organization if they failed to abide by the set requirements. *Id.* at Part J, Chapter 5, Section F(4).

39.    In 2021, to effectuate the requirement that all newly naturalized citizens had access to voter registration services at the end of their naturalization ceremony, the Manual prioritized voter registration services provided by nongovernmental organizations, or state and local election officials, over those provided by USCIS. USCIS Policy Manual, Vol. 12, Part J, Chapter 5, Section F(1) (2021). The Manual directed that any questions from newly naturalized citizens regarding

voting and voter registration should be referred to the local governmental or nongovernmental organization offering voter registration services on-site. *Id.* at Part J, Chapter 5, Section F(2).

40.     This continued until August 2025 when USCIS, without any notice or comment, completely reversed existing practice by banning all nongovernmental organizations from providing any voter registration services at administrative naturalization ceremonies.

**B.     The League has been a longstanding trusted nonpartisan partner to USCIS providing voter registration services at naturalization ceremonies.**

41.     The League and its members have volunteered at naturalization ceremonies for decades, working closely with immigration officials to promote civic participation by providing on-the-spot voter registration education and assistance for new citizens, nonpartisan voter education materials, and answers to questions about how new Americans can get involved in civic life.

42.     In 2008, LWV created a guide, *Engaging New Citizens as New Voters: A Guide to Naturalization Ceremonies*, which details how Leagues can provide voter registration services at naturalization ceremonies. In 2012, LWV began providing local and state Leagues with grant funding and strategic support to register new citizens at naturalization ceremonies. In 2014, LWV released a toolkit designed to support various Leagues in their work to engage new citizens as first-time voters. And in 2016, LWV launched a nationwide grant-funding effort to support state and local Leagues in assisting newly naturalized citizens to register to vote, ultimately resulting in tens of thousands of new registrants at hundreds of naturalization ceremonies nationwide. This work became an official project of LWVEF known as the New Citizen Voter Registration Project.

43.     LWV's New Citizen Voter Registration Project is a critical part of the organization's efforts and mission to promote voter registration among all eligible American citizens to vote. LWV employs three full-time staff members who regularly dedicate their time to supporting the

New Citizen Voter Registration Project. In 2016, League members and volunteers participated in more than 220 naturalization ceremonies, assisting more than 19,000 new Americans in registering to vote. That number has continued to grow ever since: in 2017, more than 700 League members and volunteers participated in 450 naturalization ceremonies, where they assisted more than 25,000 new Americans in registering to vote. In 2018, the League participated in 762 naturalization ceremonies and registered over 28,000 new Americans to vote, and by 2022, the League's work to assist new citizens in registering to vote resulted in Leagues across the country registering more than 37,000 new citizens at nearly 800 naturalization ceremonies. In total in 2022, 1,272 League members and volunteers participated in voter registration at naturalization ceremonies, spending over 7,000 hours preparing for and attending those ceremonies. In addition to the 37,000 new citizens registered that year, League members and volunteers distributed over 51,000 voter education materials and provided more than 22,000 voter registration applications for new citizens to take home to eligible family and friends. Since 2022, LWV has provided approximately $190,000 in grant funding to 75 state and local Leagues as part of its New Citizen Voter Registration Project.

44.     Beyond its New Citizen Voter Registration Project, LWV has provided a total of $1.9 million in funding over the last five years to more than half of the state Leagues across the country, through LWV's Making Democracy Work and Democracy Truth Project grants. Many state Leagues then distribute this funding to local Leagues to support their voter registration activities, including work to reach, educate, and help to register new citizens.

45.     The League has always conducted its work at naturalization ceremonies in a proudly nonpartisan manner. Moreover, League members and volunteers often step in where

12

election officials lack capacity, making sure critical voter registration services reach those who need them and who would not otherwise receive assistance without the League's efforts.

**III.     USCIS abruptly changed its longstanding policy permitting nonpartisan, nongovernmental organizations to provide voter registration services at naturalization ceremonies.**

46.      On August 29, 2025, USCIS abruptly issued a "policy alert" that it was revising its rules regarding voter registration services offered to new citizens at naturalization ceremonies. USCIS's new rule provides that only USCIS field officers and state and local election officials are permitted to provide voter registration services at administrative naturalization ceremonies. *Policy Alert: Voter Registration at Administrative Naturalization Ceremonies*, USCIS (Aug. 29, 2025), https://perma.cc/9EAA-KTBH.

47.      If state and local election officials are unavailable, USCIS field staff are to provide voter registration applications but are not responsible for collecting or submitting such applications or engaging in "any other activities related to voter registration." USCIS Policy Manual, Vol. 12, Part J, Chapter 5, Section F(1) (2025).

48.      USCIS's Voter Registration Ban no longer permits nongovernmental organizations like the League to distribute and collect voter registration applications, provide any voter registration and education services, or participate in any way in administrative naturalization ceremonies. *Id*.

49.      In issuing the Ban, USCIS stated that it was doing so "consistent with Executive Order 14148, Initial Recissions of Harmful Executive Orders and Actions executed on January 20, 2025, and Section 9 of Executive Order 14248, Preserving and Protecting the Integrity of American Elections." *Policy Alert: Voter Registration at Administrative Naturalization Ceremonies*, USCIS (Aug. 29, 2025), https://perma.cc/9EAA-KTBH (citing 90 Fed. Reg. 8237 (Jan. 28, 2025) and 90 Fed. Reg. 14005 (Mar. 28, 2025)). But the Ban itself does not explain why or in what way either

13

Executive Order necessitates changing—let alone without required notice and comment—a decades-long USCIS rule allowing nonpartisan, nongovernmental organizations to provide voter registration and education services to new citizens at administrative naturalization ceremonies.

50. In detailing "Additional Considerations," the Ban claims, incorrectly, that USCIS "does not primarily rely on nongovernment organizations for voter registration services"—*but see infra* ¶¶ 65, 74, 84, 96 (discussing various Leagues as the only providers of voter registration and education services at administrative naturalization ceremonies prior to the Ban)—and asserts that USCIS has faced an "administrative burden . . . to ensure that those nongovernmental organizations who provide voter registration services are nonpartisan." *Id.* The Ban does not identify any existing problems with the nonpartisanship of nongovernmental organizations providing voter registration services at administrative naturalization ceremonies.

51. Prior to issuance of the Ban, USCIS already had a process that nonpartisan, nongovernmental organizations must complete to request to provide voter registration services at a USCIS naturalization ceremony. As of 2023, organizations had to complete USCIS Form N-401, the Voter Registration Services Attestation, which required representatives of nongovernmental organization to attest, *inter alia*, that "[t]he organization will not participate in any political activity (such as: any activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group; or advocacy for particular referenda or other political proposition), partisan or otherwise, at the ceremony, regardless of the physical location of the ceremony and whether the ceremony takes place on federal or nonfederal property." *Voter Registration Services Attestation*, USCIS Form N-401, Dep't of Homeland Sec., USCIS, https://perma.cc/E39R-9FYX (Aug. 17, 2023 ed.). Before 2023, nonpartisan, nongovernmental organizations had to request in writing to participate in administrative naturalization ceremonies.

14

52.     The Ban does not explain how or in what ways the existing USCIS process, including the attestation on USCIS Form N-401, was inadequate to guarantee the nonpartisanship of nongovernmental organizations requesting to provide voter registration and education services at administrative naturalization ceremonies.

53.     Further, restricting voter registration assistance solely to state and local election officials at administrative naturalization ceremonies contradicts the Ban's purported justification of ensuring nonpartisanship of those providing voter registration and education services to new citizens, as state and local election officials in numerous states are themselves partisan actors elected on a partisan basis, or at least include partisan actors. *See, e.g.*, Colo. Rev. Stat. § 1-4-502 (2025) (prescribing the methods of nomination for partisan candidates, including county officers such as county clerks responsible for voter registration); N.Y. Const., art. II, § 8 (requiring election boards and officers to have equal representation from the two major political parties, with members chosen as the legislature directs based on nominations from those parties); Wis. Stat. § 7.20(2) (2025) (requiring boards of election commissioners to represent both the majority party and "the next highest party in the county," with members selected, as the legislature directs, by other partisanly elected local officials).

54.     Shortly after announcement of the Voter Registration Ban, on November 5, 2025, DHS, in conjunction with Federal Protective Services ("FPS"), announced the accelerated implementation of regulations intended to make it easier to charge people with "obstructing access to federal property." *See DHS Announces Advanced Charging Authority to Address Rioter Violence at Federal Buildings, Protecting Law Enforcement and Taxpayer Property*, Dep't of Homeland Sec. (Nov. 5, 2025), https://perma.cc/D7R4-MTHE. These new regulations give FPS enhanced charging authority to "address violations occurring both *on and off* [federal] property to the extent

it affects federal property and the persons thereon." *Id.* (emphasis added). The regulations set criminal penalties for any violations, which would qualify as a Class C misdemeanor, punishable by up to 30 days in jail, a fine of up to $5,000, or both. *Id.* The regulations prohibit vaguely defined conduct, such as "obstructing access to federal property" and "impeding the performance of official duties of Federal employees." *Id.* This development causes Plaintiffs uncertainty as to their ability to access even the outside of buildings where administrative naturalization ceremonies take place.

**IV.    USCIS's Voter Registration Ban impairs the League's voter registration activities, particularly its ability to assist new citizens in registering to vote.**

55.    Voter registration and education are the foundations of the League's work, as the League believes our democracy is strongest when the voices of all Americans are heard and represented. As such, the League is committed to promoting civic participation by helping new citizens understand and become active members of the American political community.

56.    In September 2025, LWV distributed a survey to all local and state Leagues across the country to understand the impact of USCIS's Voter Registration Ban on League efforts and activities. To date, a total of 184 local and state Leagues have responded.

57.    Survey results reveal that, in the past five years alone, approximately 54 percent of responding Leagues have provided voter registration assistance and education services at USCIS-hosted naturalization ceremonies. The results of this work are staggering. In 2024, there were 2,789 League events at or near naturalization ceremonies, with members and volunteers assisting a total of 122,141 newly naturalized citizens—roughly 8 percent of all new citizens that year—in registering to vote.[3]

---

[3] Data are drawn from the League's New Citizens Voter Registration Project and its September 2025 survey of state and local Leagues.

58.     In 2025, meanwhile, prior to the Ban, 80 state and local Leagues across the country provided voter registration services at 864 administrative naturalization ceremonies, where League members and volunteers assisted 24,201 newly naturalized citizens in registering to vote. In total, based on 85 responding Leagues, to date in 2025, there were 1,819 League events at or near naturalization ceremonies with volunteers assisting a total of 77,698 new citizens in registering to vote. Since USCIS's Voter Registration Ban, numerous Leagues have already been forced to cancel voter registration activities at upcoming administrative naturalization ceremonies. To date, Leagues across the country have had to cancel at least 166 planned events at administrative naturalization ceremonies, where League members and volunteers planned to register roughly 10,000 new voters. Approximately $17,000 worth of volunteer time—488 hours—and more than $6,600 for materials were already invested for these now-cancelled events.

**V.      USCIS'S Voter Registration Ban impairs the voter registration activities of state and local Leagues, particularly their ability to assist new citizens in registering to vote.**

59.     USCIS's Voter Registration Ban burdens not only the national League but also the voter registration activities of state and local Leagues, including LWVCO and affiliated local Colorado Leagues, LWVNJ and affiliated local New Jersey Leagues, the Saratoga League, the Charleston League, and the Milwaukee League.

**A.      LWVCO**

60.     LWVCO first began providing voter registration and education services at administrative naturalization ceremonies in 2017. LWVCO then coordinated with local Leagues, including the Arapahoe and Douglas League, Boulder League, Denver League, Estes Park League, Larimer League, and Greeley-Weld League, to facilitate the provision of voter registration and education services at administrative naturalization ceremonies across the state. The Colorado Leagues have engaged in voter registration and voter education at these ceremonies ever since.

17

Since 2017, LWVCO and the Colorado Leagues registered more than 6,000 naturalized citizens to vote at more than 200 administrative naturalization ceremonies across the state.

61.    After the abrupt announcement of USCIS's Voter Registration Ban, LWVCO immediately began diverting resources away from other voter registration work to be able to provide support to the Colorado Leagues. This includes coordinating with state election officials to explore whether League members and volunteers could be deputized to be able to continue registering voters at administrative naturalization ceremonies as representatives of the state. There is no guarantee, however, that state election officials will agree to this arrangement with LWVCO. As a result, all of LWVCO and the Colorado Leagues' voter registration work at administrative naturalization ceremonies has been halted. Additionally, LWVCO has expended resources urging state election officials to send their own staff to register voters at administrative naturalization ceremonies. But given that LWVCO's volunteers far outnumber the number of available election officials, even if election officials are able to attend—which itself is not guaranteed—there is no true replacement for LWVCO's work at naturalization ceremonies. Moreover, a number of Colorado Leagues, including the Arapahoe and Douglas League, Denver League, and Larimer League, have reported that, after issuance of the Ban, they have either been informed directly or otherwise to not expect that local or state election officials will have staff, capacity, or funding to be able to attend every administrative naturalization ceremony, meaning that without the League present, voter registration and education services will not be provided to new Americans after at least some administrative naturalization ceremonies except by USCIS, if at all. *See* USCIS Policy Manual, Vol. 12, Part J, Chapter 5, Section F(1) (2025).

62.    Administrative naturalization ceremonies are the most effective means for LWVCO and its members and volunteers to reach and associate with naturalized citizens—as well as an

18

important draw for volunteers themselves to join the League. At these ceremonies, League volunteers not only assist individuals in registering to vote, but provide nonpartisan educational materials created by LWVCO that offer information about voting in Colorado. Being prohibited from attending and providing voter registration and education services at administrative naturalization ceremonies will drastically reduce LWVCO and the Colorado Leagues' ability to recruit and retain members and reach naturalized citizens, in turn, reducing significantly the number of eligible Americans LWVCO and the Colorado Leagues can help register to vote.

**B.      LWVNJ**

63.      An important part of the mission of LWVNJ and many of its local Leagues is providing services to the millions of naturalized citizens who reside in New Jersey. LWVNJ has been providing voter registration services at administrative naturalization ceremonies through its local Leagues since 2017.

64.      The Burlington League, over the last nine years, with three years off for COVID, amassed a team of 46 volunteers dedicated to staffing administrative naturalization ceremonies. Since 2017, the Burlington League has registered an astounding 16,475 new citizens to vote, provided another 5,604 new citizens with paper registration forms to complete at home, and provided either registration assistance or education for over 22,000 new citizens. In 2025, before USCIS's Voter Registration Ban was announced, the Burlington League attended 132 administrative naturalization ceremonies, providing voting assistance or education to 2,366 new citizens and registering 2,241. Similarly, in 2025 before the Ban, the Montclair League, which serves the Newark area, attended eleven ceremonies, providing registration assistance or education

19

to approximately 100 to 200 new citizens per ceremony, while the Princeton League attended 51 ceremonies, registering 342 new citizens to vote and otherwise assisting 2,222 new citizens.

65.    At ceremonies held in Cranbury, Mount Laurel, and Newark, LWVNJ's local Leagues were regularly the only ones providing voter registration assistance. Across all three USCIS field offices, there were never any local or state election officials present to provide voter registration services.

66.    USCIS's Voter Registration Ban has had a swift and devastating impact on LWVNJ and local Leagues' mission. The Burlington League, for example, was planning to attend ceremonies on the very day that the Ban was announced before they received a call from the USCIS Mount Laurel Field Office directing them not to show up that day—or in the future.

67.    The challenged rule diminishes LWVNJ's ability to reach and engage with new citizens. LWVNJ and its local Leagues have spent substantial time and effort considering alternative methods for reaching new citizens, all of which present serious logistical, safety, and efficacy concerns. USCIS field office parking lots or nearby sidewalks are unfeasible locations due either to the federal or private ownership of parking lots or to the inefficacy of reaching new citizens on the sidewalk as they exit the USCIS building after a ceremony. For some field offices, such as USCIS's office in downtown Newark, setting up to register voters on the sidewalk would require significant planning for permitting and would require local League members to avoid blocking public walkways while attempting to flag down new citizens exiting the building.

68.    Moreover, LWVNJ has considered alternative community events which they could attend or host to reach new citizens. LWVNJ has determined, however, that this alternative lacks any certainty that they would be able to reach even close to as many new citizens as they were previously interacting with at administrative naturalization ceremonies. This approach would also

20

require LWVNJ to divert significant staff and volunteer time, attention, and energy away from existing projects to attempt to effectively reach new citizens.

69.     For the Burlington, Montclair, and Princeton Leagues—as well as LWVNJ—the challenged rule threatens to diminish their ability to recruit and retain members and volunteers. Administrative naturalization ceremonies were a particularly popular volunteer opportunity, leading many volunteers to get more involved in and committed to their local Leagues' mission. Without this volunteer opportunity, all three local Leagues have a serious concern that they will continue to miss out on critical opportunities to recruit and retain new members and volunteers.

70.     Moreover, for new citizens at administrative naturalization ceremonies, there will be a deficit of civic education and voter registration resources. Upon information and belief, state or local election officials do not have the capacity to cover the hundreds of administrative ceremonies that local Leagues attended each year.

71.     The challenged rule further impacts some local Leagues' access to grant funding. At least one local New Jersey League was receiving grant funding to support its efforts to reach new citizens. Local Leagues—as well as LWVNJ—will struggle to attract similar grants in the future without a reliable or feasible method for reaching new citizens.

**C.     Saratoga League**

72.     The Saratoga League has provided voter registration and education services at administrative naturalization ceremonies for more than a decade, with those ceremonies held at the Saratoga National Historical Park, a public U.S. National Park Service site. Prior to the Voter

21

Registration Ban, the Saratoga League registered 11 to 20 newly naturalized citizens at each of those administrative naturalization ceremonies.

73. Members and volunteers of the Saratoga League have taken great pride over the years in participating in and registering and educating voters at administrative naturalization ceremonies. The opportunity to assist new citizens in registering to vote is a significant draw for Saratoga League members and volunteers, who have found work with new citizens to be patriotic and inspiring.

74. Prior to USCIS's issuance of its Voter Registration Ban, the Saratoga League had never been rejected or barred from providing voter registration and education services to new citizens at administrative naturalization ceremonies. In fact, before the Voter Registration Ban, the Saratoga League was the only organization providing voter registration and education services at administrative naturalization ceremonies. Upon information and belief, local election officials will not have staff, capacity, or funding to be able to attend administrative naturalization ceremonies, meaning that fewer new citizens will receive the vital assistance that they need to register to vote.

75. The Saratoga League is directly impacted by USCIS's Voter Registration Ban. Most immediately, the Saratoga League had planned to provide voter registration and education services to new citizens at the next scheduled administrative naturalization ceremony, set to occur on September 17, 2025, at the Saratoga National Historical Park. The Saratoga League had already planned to engage volunteers for this ceremony, and those volunteers had already spent funds to purchase patriotic books to give to children accompanying their parents or other relatives to the ceremony. The Saratoga League had also purchased American flags to give to new citizens.

76. On September 2, 2025, the Saratoga League was notified of USCIS's Voter Registration Ban by LWVUS, and an NPS employee later confirmed that, based on instruction

22

from USCIS, the Saratoga League could not participate in the September 17, 2025 ceremony, or any future administrative naturalization ceremonies, even though such ceremonies would continue to be held in an otherwise publicly accessible national park. Based on past voter registration data, the Saratoga League would have helped register an estimated 11 to 20 naturalized citizens at the September 17 ceremony alone.

77.     The Saratoga League members and volunteers are devastated by the inability to participate in the September 17 and future administrative naturalization ceremonies. They consider it an honor and an important responsibility to assist new Americans in registering to vote and educating them about the value of civic participation. New and returning members who volunteer to provide services at administrative naturalization ceremonies come away feeling more connected to the League's work and are inspired to get more involved thereafter. News of the Ban likewise has caused Saratoga League volunteers to fear ramifications for the League and the voters they assist if they attempt to provide registration services at or near naturalization ceremonies of any kind. USCIS's Voter Registration Ban thus burdens the Saratoga League's ability to attract and recruit new members and volunteers, who have been motivated to contribute to the League's work with naturalized citizens and can no longer do so.

78.     In its voter registration work at administrative naturalization ceremonies, the Saratoga League also offers new citizens the opportunity to become members of or volunteer with the League. Being barred from attending these ceremonies burdens the Saratoga League's ability to reach and associate with naturalized citizens as new potential members and volunteers.

79.     The Saratoga League has no viable alternative locations near or outside the park in which it could conduct voter registration activities, as the Saratoga National Historical Park is in a rural area with nothing adjacent but the entrance road, where it would not be safe or effective for

the Saratoga League to hold events. Moreover, whereas NPS would provide the Saratoga League with the schedule for upcoming administrative naturalization ceremonies, the Saratoga League does not expect to receive future scheduling notices because of the Ban. The failure to provide information about the location and timing of administrative naturalization ceremonies effectively makes it impossible for the Saratoga League to plan with any certainty voter registration activities to reach newly naturalized Americans through such ceremonies.

80.     Because of the Voter Registration Ban, the Saratoga League will be forced to divert more resources from its voter registration-focused activities to attempt to reach and continue providing voter registration and education services for new American citizens, which are likely to be less efficient and effective.

81.     Thus, being prohibited from attending administrative naturalization ceremonies will reduce drastically the Saratoga League's ability to reach naturalized citizens and, in turn, reduce the number of eligible Americans the Saratoga League can help register to vote.

### D.     Charleston League

82.     In recent years, the Charleston League has attended between one and four administrative naturalization ceremonies a week for most weeks of the year, with each ceremony resulting in the naturalization of approximately 25 new American citizens. As a result, the Charleston League has successfully registered hundreds of new Americans to vote each year, and distributed voter education materials to many more new citizens. Indeed, in 2025, before USCIS's Voter Registration Ban, the Charleston League attended more than 125 administrative naturalization ceremonies, resulting in the registration of more than 1,200 new citizens to vote.

83.     At each ceremony, Charleston League volunteers would set up a table in the waiting room outside the ceremony, where they would greet applicants for U.S. citizenship and their family

members and supporters. After the conclusion of each ceremony, Charleston League volunteers would then assist newly naturalized citizens, and occasionally their eligible family members and friends, with registering to vote. Charleston League volunteers would provide naturalized citizens with the League's nonpartisan voter information materials and answer questions from applicants and other ceremony attendees regarding voter registration and the voting process. Moreover, because many new Americans who naturalize through the USCIS Charleston Field Office come from all over South Carolina, as well as Georgia, the Charleston League always came prepared with voter registration materials for both states.

84.     The Charleston League was surprised by the Ban, having never before been rejected or barred from providing voter registration and education services to new citizens at the conclusion of any administrative naturalization ceremonies. Moreover, prior to issuance of the Ban, the Charleston League was the only organization to regularly provide voter registration and education services at administrative naturalization ceremonies. After issuance of the Ban, local election officials have indicated that they do not plan to attend most administrative naturalization ceremonies, presumably because they lack the capacity to do so and because many applicants do not reside in Charleston County and, thus, local election officials could not actually assist them in registering to vote. As a result, without the League present, voter registration and education services will not be provided to new Americans after these administrative naturalization ceremonies except by USCIS, if at all.

85.     The Charleston League and its members and volunteers are devastated that they are now prevented from assisting new Americans in registering to vote at administrative naturalization ceremonies. By offering voter registration at such ceremonies, the Charleston League and its members engaged in expressive activity to communicate their views that providing new citizens

25

the opportunity to register to vote realizes the vision of democracy intended by our country's founders, and the dream of applicants for U.S. citizenship to participate in democracy.

86.     Indeed, volunteering to register new Americans after administrative naturalization ceremonies has been a meaningful source of engagement and connection for new and returning Charleston League members and volunteers who are inspired to get more involved in the League's work thereafter, and who may not do so in the future without this avenue for participation.

87.     The Voter Registration Ban also harms the Charleston League's ability to offer new citizens, and their family members and supporters, the opportunity to become members of or volunteer with the League. The Ban thus hinders the Charleston League's ability to reach and associate with naturalized citizens as new potential members and volunteers.

88.     Because of the Voter Registration Ban, the Charleston League has been forced to expend significant time and effort attempting to devise alternative ways to reach newly naturalized citizens. The Charleston League sought to become ambassadors of the Charleston County Board of Voter Registration and Elections ("BVRE") as part of their Voter Ambassador training outreach program, but was told by the BVRE that even though some LWV volunteers are trained as Ambassadors, they would not be allowed to register new citizens at administrative naturalization ceremonies because they would not be considered government employees. The Charleston League is being forced to expend even more resources to explore other ways to reach newly naturalized citizens to provide them with voter registration and education services.

89.     To date, the Charleston League has not identified any feasible alternative options to provide voter registration and education services to new citizens—especially for those who reside in Georgia and other parts of South Carolina. There are no other community events, gatherings, or spaces at which all or nearly all the attendees would be new citizens. In sum, the

26

Voter Registration Ban will reduce drastically the Charleston League's ability to reach naturalized citizens and, in turn, the number of new citizens the Charleston League can help register to vote.

### E.     Milwaukee League

90.     The Milwaukee League has provided voter registration assistance to new American citizens at naturalization ceremonies for over 50 years. To assist and provide such services to as many new citizens as possible, in 2023, the Milwaukee League specifically applied for and was granted permission to attend administrative naturalization ceremonies held at the USCIS Milwaukee Field Office. From 2024 until the abrupt announcement of the Voter Registration Ban, the Milwaukee League regularly provided voter registration assistance and education services at these administrative naturalization ceremonies.

91.     As a result of these efforts, in 2024, the Milwaukee League members and volunteers assisted 1,204 new citizens at administrative naturalization ceremonies, including assisting with 304 voter registrations of new citizens and providing educational information to another 590 naturalized citizens about how to complete a voter registration application on their own time. In 2025, prior to the Voter Registration Ban, the Milwaukee League provided voter registration assistance to new citizens at 16 administrative naturalization ceremonies held at USCIS's office in January and February. After February 2025, the Milwaukee League distributed voter registration information at 55 more administrative naturalization ceremonies, all of which were held at the USCIS office in downtown Milwaukee. Across all ceremonies in 2025 before the Ban, Milwaukee League members contributed 97.5 volunteer hours, assisting 83 new citizens with voter registration and providing 1,768 new citizens with information to register on their own.

92.     On September 3, 2025, however, the Supervisory Immigration Services Officer in the Milwaukee Field Office emailed the Milwaukee League that "regrettably" USCIS had

27

"received updated guidance" that no longer permits nongovernmental organizations to provide voter registration and education services at administrative naturalization ceremonies. Subsequent emails from USCIS to the Milwaukee League clarified that the USCIS Milwaukee Field Office "*must* follow the guidance" and would therefore (1) refuse to allow League members and volunteers to distribute any voter registration or educational materials at administrative naturalization ceremonies and (2) refrain from sharing the schedule for or dates of any future administrative naturalization ceremonies with the Milwaukee League. USCIS staff stressed, however, that they "would certainly be willing to allow the League of Women Voters to participate in ceremonies in the future if the guidance that we received changes," as USCIS had "enjoyed a good working relationship with the League in the past, and may again sometime in the future."

93.    Milwaukee League members and volunteers are devastated by the inability to provide voter registration and education services at future administrative naturalization ceremonies. Prior to USCIS's Voter Registration Ban, the Milwaukee League and its members engaged in expressive activity to communicate their view that it is an important responsibility to assist new Americans in registering to vote and educating them about the value of civic participation. New and returning members who volunteer to provide services at administrative naturalization ceremonies come away feeling more connected to the Milwaukee League's work and are inspired to get more involved thereafter but, because of USCIS's Voter Registration Ban, may not do so in the future without this avenue for participation.

94.    The Voter Registration Ban also harms the Milwaukee League's ability to offer new citizens, and their family members and supporters, the opportunity to become members of or volunteer with the League. The Ban thus hinders the Milwaukee League's ability to reach and associate with naturalized citizens as new potential members and volunteers.

95. The Milwaukee League has no viable alternative locations near or outside USCIS's Milwaukee Field Office in which it could conduct voter registration activities. To the extent the Milwaukee League could set up on sidewalks outside the commercial office building—which is itself uncertain—doing so would present various logistical and safety concerns. USCIS often holds upwards of ten administrative naturalization ceremonies a day, such that setting up on the sidewalk would require Milwaukee League volunteers, many of whom are older, to spend many hours per day outside during the winter months of January through April, when USCIS holds a significant number of ceremonies. Weather and safety considerations would further diminish the Milwaukee League's ability to recruit volunteers for these events, given that the Milwaukee League cannot guarantee the conditions under which volunteers would be providing service. Sidewalk registration would also diminish the Milwaukee League's ability to effectively track registration data and strain their ability to reach every newly naturalized citizen leaving each ceremony. Finally, whereas USCIS used to provide advance notice of any upcoming ceremony, USCIS officials have stopped providing the Milwaukee League with any information about the schedule of upcoming administrative naturalization ceremonies since issuance of the Ban, further hindering the Milwaukee League's ability to plan voter registration activities to reach eligible Americans newly naturalized at administrative naturalization ceremonies.

96. Before the Ban, the Milwaukee League was the only organization providing voter registration and education services at administrative naturalization ceremonies. Upon information and belief, local election officials will not have staff, capacity, or funding to be able to attend administrative naturalization ceremonies. As a result, without the Milwaukee League present, voter registration and education services will not be provided to new Americans after at least some

administrative naturalization ceremonies except by USCIS, if at all. *See* USCIS Policy Manual, Vol. 12, Part J, Chapter 5, Section F(1) (2025).

97.     Since announcement of USCIS's Voter Registration Ban, the Milwaukee League's Board has already spent approximately 50 hours of member and volunteer time (1) exploring possible alternatives for reaching and providing services to new citizens in the future, and (2) discussing with local election officials the possibility of deputizing Milwaukee League members and volunteers so they may continue providing voter registration services at administrative naturalization ceremonies. The Ban has thus forced the Milwaukee League to divert significant time and energy from other activities to understand how, if at all, they can continue to serve as many new citizens as they were prior to the Ban.

## CLAIMS

## <u>COUNT ONE</u>

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Rulemaking without Proper Procedure**

98.     Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

99.     The Administrative Procedure Act provides a remedy to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). When an agency issues a legislative rule, the APA mandates that such a rule undergo statutorily prescribed notice and comment procedures. 5 U.S.C. § 553(a)–(c). "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

30

While interpretative rules are not required to undergo notice and comment under the APA, legislative rules are. *Ibid*.

100.   USCIS's Voter Registration Ban is a legislative rule. "[A] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018) (citation modified).

101.   The Ban impacts the substantive rights of organizations including Plaintiffs by prohibiting them from providing voter registration and education services at administrative naturalization ceremonies conducted by USCIS. The Ban is also a substantive change and complete departure from USCIS' decades-long policy permitting such participation by nonpartisan nongovernmental organizations, including by Plaintiffs. The Ban establishes a binding prohibition for USCIS agency personnel such that they are no longer permitted to allow nonpartisan organizations like plaintiffs to participate in administrative naturalization ceremonies. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (explaining that a legislative rule "modifies or adds to a legal norm based on the agency's own authority").

102.   USCIS created and imposed the Voter Registration Ban without notice and comment as required by the APA. 5 U.S.C. § 553. Accordingly, Defendants have acted without observance of procedure required by law. 5 U.S.C. § 706(2)(D) (agency action must be set aside where implemented "without observance of procedure required by law").

## COUNT TWO

### Administrative Procedure Act, 5 U.S.C. § 706(2) – Arbitrary and Capricious

103.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

104. The APA imposes various duties on agencies, such as explaining the bases for their decisions, especially when they change longstanding rules, regulations and policies, and statutory interpretations. The Administrative Procedure Act, 5 U.S.C. § 706(2), provides that a Court "shall hold unlawful and set aside agency action" that is "arbitrary [and] capricious."

105. "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) Indeed, "[u]nder *State Farm*, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made." *Id.* (citation modified).

106. Agency actions are arbitrary and capricious when they lack a sufficient and reasoned "factual basis." *AFL-CIO v. Fed. Labs. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022). An agency is required to "examine the relevant data and articulate [ ] satisfactory explanation[s] for its action[s] including a rational connection between the facts found and the choice made." *Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (citation modified). A court "may not supply a reasoned basis for the agency's action the agency itself has not given." *State Farm*, 463 U.S. at 43. That an agency has made "factual assertions without support, or fail[ed] to consider facts at all" means that a challenged action is arbitrary and capricious. *American Federation of Teachers v. Dep't of Educ.*, No. 25-civ-628, 2025 WL 2374697, at *22 (D. Md. Aug. 14, 2025).

32

107.    USCIS's issuance of the Voter Registration Ban is arbitrary and capricious because defendants have failed to adequately justify their actions, which are illogical or irrational, and have failed to consider key aspects of the issue, reasonable alternatives, and the substantial reliance interests at stake.

## COUNT THREE

### Infringement of Free Speech U.S. Const. amend. I

108.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

109.    The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] [of] freedom of speech." U.S. Const. amend. I.

110.    "[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association—go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'" *See League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

111.    USCIS's Voter Registration Ban regulates core protected political speech and other activity "sufficiently imbued with elements of communication." *Spence v. Washington*, 418 U.S. 405, 409 (1974). Efforts that "expend resources 'to broaden the electorate to include allegedly under-served communities[]' qualify as expressive conduct which implicates the First Amendment freedom of association." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 223 (M.D.N.C. 2020).

33

112.    The Voter Registration Ban impacts and chills Plaintiffs' core political speech because it impacts and chills their ability to register voters. The Ban has been applied to prevent Plaintiffs' voter registration activities at public USCIS administrative naturalization ceremonies. *See* 8 U.S.C. § 1448(a) (requiring persons admitted to citizenship to take oath "in a public ceremony"); USCIS Policy Manual, Vol. 12, Part J, Chapter 4 (2025) ("An applicant must appear in person at a public ceremony"). Plaintiffs have been prevented from conducting registration not only within USCIS offices, but in surrounding public areas. *See Project Vote/Voting for Am., Inc. v. Dickerson*, 444 F. App'x 660, 664 (4th Cir. 2011) (finding that Plaintiffs succeeded in "[seeking] to open [] public forums as a means of promoting the right to vote, and we have consistently held that voter registration restrictions receive strict scrutiny because such restrictions affect a fundamental right" and were therefore entitled to reasonable attorneys' fees) (citation modified); *Ctr. for Immigrant Democracy v. Shewairy*, No. 1:04-cv-22326-AJ (S.D. Fla. Sept. 16, 2004) (granting a temporary restraining order to plaintiffs holding DHS's prohibition of voter registration on public sidewalk outside of naturalization ceremony was unconstitutional).

113.    The proper test to determine the constitutionality of restrictions on core political speech is strict scrutiny. *Meyer*, 486 U.S. at 420; *McIntyre v. Ohio*, 514 U.S. 334, 346 (1995); *see also Earls v. N.C. Jud. Stds. Comm'n*, 703 F. Supp. 3d 701, 722 (M.D.N.C. 2023) (holding core political speech under First Amendment is entitled to strict scrutiny review). Such "regulations of core political speech" do not require courts to "determine burden first" because "restrictions on core political speech so plainly impose a 'severe burden.'" *Buckley*, 525 U.S. at 208. Strict scrutiny requires that the Voter Registration Ban be narrowly tailored to a compelling state interest. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

114. The Voter Registration Ban is not supported by a compelling state interest sufficient to justify its restrictions on Plaintiffs' rights to free speech. Further, the rule drastically changes the status quo that has existed for years and is not narrowly tailored to serve any interest.

115. The Voter Registration Ban is also violative of the First Amendment because it is a content- and viewpoint-based restriction on speech based upon the identity of the speaker. Viewpoint-based restrictions are prohibited outright, *Rosenberg v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995), and content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citation omitted).

116. The Voter Registration Ban targets and restricts speech promoting voter registration for new citizens. This is undoubtedly a viewpoint and content-based restriction on speech. The Voter Registration Ban restricts speech on only one topic: the importance of voter registration for new citizens.

117. The Ban also targets speech based on the identity of the speaker. The First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). While state and local election officials, where available and willing, may continue to participate in administrative naturalization ceremonies to offer voter registration, nonpartisan, nonprofit organizations like the League cannot. As the Supreme Court has noted, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.*

118. The League proudly espouses that naturalized citizens are entitled to all the benefits and responsibilities of citizenship, and that message is what the Plaintiffs here communicated day

in and day out for many years by registering new citizens at administrative naturalization ceremonies. By denying the League "the right to address their chosen audience on matters of public importance," Defendants have impermissibly sought "to limit discussion" of the importance of new citizen voting and civic participation. *See F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 384 (1984).

## COUNT FOUR

**Infringement of Associational Rights U.S. Const. amend. I**

119.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

120.    The First Amendment "[a]ccord[s] protection to collective effort on behalf of shared goals" and recognizes a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "An organization's attempt to broaden the base of public participation . . . is conduct 'undeniably central to the exercise of the right of association.'" *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1202 (D.N.M. 2010) (citing *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214–15 (1986)). "Organized voter-registration activities necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register." *Am. Ass'n of People With Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1229 (D.N.M. 2008).

121.    Plaintiffs "wish to speak and act collectively with others" by engaging in efforts to register new citizens as voters. *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012). They do so by assisting voters with the completion, collection, and submission of voter registration applications at USCIS administrative naturalization ceremonies.

Plaintiffs' ability to undertake such efforts are critical to maintaining and growing their own membership, as assisting new citizens with voter registration is a uniquely motivating and deeply moving form of engagement and service for many of Plaintiffs' members.

122. The Voter Registration Ban restricts and chills Plaintiffs' associational activities with prospective voters at public administrative naturalization ceremonies, *see* 8 U.S.C. § 1448(a) (requiring persons admitted to citizenship to take oath "in a public ceremony"); USCIS Policy Manual, Vol. 12, Part J, Chapter 4 (2025) ("An applicant must appear in person at a public ceremony"). The practical effect of the Ban, in some cases, has been to eliminate Plaintiffs' ability to associate with new citizens via voter registration altogether.

123. Moreover, the Ban has been applied to prevent Plaintiffs' voter registration activities not only within USCIS offices, but in surrounding public areas. Such severe associational burdens are subject to strict scrutiny. *Clingman v. Beaver*, 544 U.S. 581, 586 (2005); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Hargett*, 400 F. Supp. 3d at 722 ("[L]aws that govern the political process surrounding elections—and, in particular, election-related speech and association— go beyond merely the intersection between voting rights and election administration, veering instead into the area where 'the First Amendment has its fullest and most urgent application.'") (quoting *Eu*, 489 U.S. at 223).

124. The Voter Registration Ban is not supported by a compelling state interest sufficient to justify its restrictions on Plaintiffs' association rights. Further, the rule drastically changes the status quo that has existed for years and is not narrowly tailored to serve any interest.

## COUNT FIVE

**Administrative Procedure Act, 5 U.S.C. § 706(2) – Agency Action Contrary to Free Speech Rights Under U.S. Const. amend. I**

125.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

126.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Voter Registration Ban unconstitutionally infringes on Plaintiffs' First Amendment right to freedom of speech at public administrative naturalization ceremonies. *See* 8 U.S.C. § 1448(a) (requiring persons admitted to citizenship to take oath "in a public ceremony"); USCIS Policy Manual, Vol. 12, Part J, Chapter 4 (2025) ("An applicant must appear in person at a public ceremony"). The Voter Registration Ban impacts and chills Plaintiffs' core political speech because it impacts and chills their ability to register voters. And the Ban discriminates—based on viewpoint, content, and the identity of the speaker—against speech promoting the right to vote for new citizens. *See supra* ¶¶ 108-18.

127.    Because USCIS's Voter Registration Ban restricts and chills Plaintiffs' First Amendment free speech rights, the Restriction is subject to strict scrutiny and must be narrowly tailored to address a compelling state interest. The Voter Registration Ban is not supported by a compelling state interest sufficient to justify its restrictions on Plaintiffs' rights to free speech. Further, the law drastically changes the status quo that has existed for years and is not narrowly tailored to serve any interest. As such, the Restriction violates Plaintiffs' First Amendment right to freedom of speech.

128.    USCIS's Voter Registration Ban is contrary to the First Amendment of the United States Constitution and is therefore unlawful under the APA.

## COUNT SIX

### Administrative Procedure Act, 5 U.S.C. § 706(2) – Agency Action Contrary to Associational Rights Under U.S. Const. amend. I

129.    Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

130.    The Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Voter Registration Ban unconstitutionally infringes on Plaintiffs' First Amendment right to freedom of assembly in public spaces. 8 U.S.C. § 1448(a) (requiring persons admitted to citizenship to take oath "in a public ceremony"); USCIS Policy Manual, Vol. 12, Part J, Chapter 4 (2025) ("An applicant must appear in person at a public ceremony").

131.    The Voter Registration Ban restricts and chills Plaintiffs' associational activities with prospective new citizen voters, and in some cases eliminates their association via voter registration altogether. *See supra* ¶¶ 119-24. Such severe associational burdens are subject to strict scrutiny. *See supra* ¶¶ 123-24. The Voter Registration Ban is not supported by a compelling state interest sufficient to justify its restrictions on Plaintiffs' association rights. Further, the law drastically changes the status quo that has existed for years and is not narrowly tailored to serve any interest.

132.    USCIS's Voter Registration Ban is contrary to the First Amendment of the United States Constitution and is therefore unlawful under the APA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment, including using its equitable powers and authority pursuant to 5 U.S.C. § 705 to enter interim, preliminary, and permanent orders:

A.  Holding unlawful and setting aside the Voter Registration Ban as agency action that is contrary to law as a rulemaking without proper procedure under 5 U.S.C. § 706(2)(D);

B.  Holding unlawful and setting aside the Voter Registration Ban as agency action that is arbitrary and capricious under 5 U.S.C. § 706(2);

C.  Holding unlawful and setting aside the Voter Registration Ban as agency action that contravenes federal statute and the Constitution;

D.  Declaring pursuant to 28 U.S.C. § 2201 that the Voter Registration Ban violates the First Amendment to the U.S. Constitution;

E.  Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Voter Registration Ban and from refusing to make public the schedule and location of administrative naturalization ceremonies;

F.  Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 28 U.S.C. § 2412 and other applicable laws; and

G.  Granting such other and further relief as the Court deems just and proper.


Dated: November 18, 2025                    Respectfully submitted,

40

/s/ Bruce V. Spiva
Bruce V. Spiva (D. MD. Bar No. 17523)
Danielle Lang*
Anna Baldwin*
Alexandra Copper*
Valencia Richardson*
Renata O'Donnell*
Rachel Appel*
Daniel Brophy*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
bspiva@campaignlegalcenter.org
dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
acopper@campaignlegalcenter.org
vrichardson@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
rappel@campaignlegalcenter.org
dbrophy@campaignlegalcenter.org

* *Pro hac vice* application forthcoming

41