**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL CONFERENCE OF JEWISH WOMEN, GREATER NEW ORLEANS SECTION, | |
| Plaintiffs, | No. 1:25-cv-03675-ABA |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, et al., | |
| Defendants. | |
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:25-cv-03777-ABA |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................4

I.    Statutory and Regulatory Background ...........................................................4

II.   Factual Background ......................................................................................10

ARGUMENT ....................................................................................................................11

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ............12

      A.    Plaintiffs Lack Standing to Seek Injunctive Relief. ...............................12

            1.    Plaintiffs' Alleged Harm Is Neither Actual nor
                  Imminent, nor Caused by USCIS' Change in Policy ...................12

            2.    Plaintiffs' Generalized Grievances Do Not Confer
                  Standing ........................................................................................16

            3.    Plaintiffs' Diversion of Resources Does Not Confer
                  Standing ........................................................................................18

            4.    NCJW-NO Plaintiffs Lack Standing for their Fifth
                  Amendment Claims .......................................................................18

            5.    NCJW-NO Has Not Established Associational Standing .........20

      B.    The 2025 Policy Manual Update and Alert Do Not Violate the First
            Amendment ..............................................................................................21

      C.    The 2025 Policy Manual Update and Alert Do Not Violate the Fifth
            Amendment ..............................................................................................26

      D.    Plaintiffs Are Not Likely to Succeed on their APA Claim ......................28

            1.    Defendants' Decision to Allow or Not to Allow Non-
                  Governmental Organization Participation in
                  Naturalization Ceremonies is Committed to Agency
                  Discretion by Law .........................................................................28

            2.    Plaintiffs Fail to Make a Showing That Defendants'
                  Actions Triggered Any Statutory Notice and Comment
                  Requirement. .................................................................................31

            3.    Defendants' Decision to Disallow Non-Governmental
                  Organization Participation in Naturalization
                  Ceremonies was not Arbitrary and Capricious .........................33

II.     PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE
        HARM........................................................................................................36

III.    THE BALANCE OF EQUITIES DOES NOT TIP IN PLAINTIFFS'
        FAVOR. ...................................................................................................39

IV.     SCOPE OF RELIEF SHOULD BE LIMITED TO INJURED
        PARTIES ...................................................................................................40

CONCLUSION .................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Adderley v. Florida,*
   385 U.S. 39 (1966)..................................................................................................22

*Am. Chemistry Council v. Dep't of Transp.,*
   468 F.3d 810 (D.C. Cir. 2006).................................................................................21

*Ashby v. Isle of Wight Cnty. Sch. Bd.,*
   354 F. Supp. 2d 616 (E.D. Va. 2004).......................................................................24

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,*
   419 U.S. 281 (1974)................................................................................................34

*California v. Texas,*
   593 U.S. 659 (2021)................................................................................................16

*Carney v. Adams,*
   592 U.S. 53 (2020)...............................................................................................2, 17

*Casa De Maryland v. U.S. Dep't of Homeland Sec.,*
   924 F.3d 684 (4th Cir. 2019) .............................................................................34, 35

*Chamber of Com. of U.S. v. EPA,*
   642 F.3d 192 (D.C. Cir. 2011).................................................................................21

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979)................................................................................................32

*City of Columbus v. Kennedy,*
   796 F. Supp. 3d 123 (D. Md. 2025).........................................................................41

*Clapper v. Amnesty Int'l USA, et al.,*
   568 U.S. 398 ...................................................................................................... 13, 16

*Cnty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998)........................................................................................... 27, 28

*Cornelius v. NAACP Legal Def. & Educ. Fund,*
   473 U.S. 788 (1985).................................................................................22, 23, 24, 26

*Di Biase v. SPX Corp.,*
   872 F.3d 224 (4th Cir. 2017) ............................................................................. 36, 38

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) ..........................................................................................11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)................................................................................... 32, 33, 34

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)......................................................................................34

*FEC v. Akins,*
  524 U.S. 11 (1998)........................................................................................17

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..........................................................................2, 14, 15, 18

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015)....................................................................18

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)......................................................................................15

*Heckler v. Chaney*,
  470 U.S. 821 (1985)............................................................................... 28, 29

*Heffron v. Int'l Soc'y. for Krishna Consciousness, Inc.*,
  452 U.S. 640 (1981)..................................................................................2, 13

*Holbrook v. Tennessee Valley Authority*,
  48 F.4th 282 (4th Cir. 2022) .................................................................. 29, 30

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013)......................................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).....................................................................................21

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
  892 F.3d 613 (4th Cir. 2018) .....................................................................12

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) ............................................................................... 22, 23

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) .....................................................................36

*Kenny v. Wilson*,
  885 F.3d 280 (4th Cir. 2018) .....................................................................12

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004)..................................................................................................... 3, 19, 20

*Lance v. Coffman*,
  549 U.S. 437 (2007)...................................................................................................17

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................................................37

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)................................................................................................. 30, 32

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)................................................................................................. 12, 16

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018)............................................................................................ 22, 24, 25, 26

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
  463 U.S. 29 (1983).....................................................................................................34

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ................................................................................... 36, 39

*Murthy v. Missouri*,
  603 U.S. 43 (2024)......................................................................................................14

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................................39

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)................................................................................................... 32, 33

*Perry Educ. Ass'n v. Perry Loc. Educators Ass'n*,
  460 U.S. 37 (1983)...................................................................................................23, 24, 25

*Pharm. Coal. for Patient Access v. United States*,
  125 F.4th 947 (4th Cir. 2025) ....................................................................................28

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)....................................................................................................23

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
  872 F.2d 75 (4th Cir. 1989)...................................................................................... 36, 37

*Republican Nat'l Comm. v. N.C. Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024) ....................................................................................15

*Rochin v. California,*
   342 U.S. 165 (1952)........................................................................................28

*Roe v. Dep't of Def.,*
   947 F.3d 207 (4th Cir. 2020) ........................................................................38

*Satanic Temple, Inc. v. Rokita,*
   ---F.4th---, 2026 WL 34486 (7th Cir. Jan. 6, 2026) ....................................21

*Smith v. Bayer Corp.,*
   564 U.S. 299 (2011)........................................................................................40

*Speed Mining Inc. v. Fed. Mine Safety and Health Review Comm'n,*
   528 F.3d 310,at  (4th Cir. 2008) ...................................................................31

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)........................................................................................12

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024)........................................................................................41

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)................................................................................ 21, 40

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025)................................................................................ 40, 41

*United States v. Grace,*
   461 U.S. 171 (1983)........................................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)........................................................................................27

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
   435 U.S. 519 (1978)........................................................................................33

*Warth v. Seldin,*
   422 U.S. 490 (1975)..........................................................................12, 17, 18, 19

*White Coat Waste Project v. Greater Richmond Transit Co.,*
   35 F.4th 179 (4th Cir. 2022) ...................................................................23, 24

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................11, 36, 39

*Wood v. Moss,*
   572 U.S. 744 (2014)........................................................................................22

**Statutes**

5 U.S.C. § 553 ...................................................................................................................32

5 U.S.C. § 701 ...................................................................................................................28

5 U.S.C. § 705 ...................................................................................................................41

5 U.S.C. §§ 551-59, 701-06 ...............................................................................................1

5 U.S.C. §§ 7321-26............................................................................................................8

6 U.S.C. § 271 .....................................................................................................................5

6 U.S.C. § 291 .....................................................................................................................5

6 U.S.C. § 557 .....................................................................................................................4

8 U.S.C. § 1421 ...................................................................................................................4

8 U.S.C. § 1443 ...........................................................................................................*passim*

8 U.S.C. § 1448 ...............................................................................................5, 28, 29, 31

The Immigration Act of 1990,
  Pub. L. No. 101-649, 104 Stat. 4978 ...........................................................................4

**Regulations**

8 C.F.R. part 337 ...............................................................................................................5

8 C.F.R. § 2.1 .....................................................................................................................5

8 C.F.R. § 310.1 .................................................................................................................5

8 C.F.R. § 337.2 ..............................................................................................................5, 6

Immigr. & Naturalization Serv., Exec. Office for Immigr. Rev., *Inspection & Expediated
  Removal of Aliens; Detention & Removal of Aliens; Conduct of Removal Proceedings; Asylum
  Procedures*, 62 Fed. Reg. 10312 (Mar. 6, 1997)......................................................6, 8

**Other Authorities**

League of Women Voters, *About Us*,
  https://www.lwv.org/about-us.......................................................................................10

League of Women Voters, *Expanding Voter Access*,
  https://www.lwv.org/voting-rights/expanding-voter-access.............................................38

Nat'l Council of Jewish Women, *Mission*,
https://www.ncjw.org/about/mission/ ...............................................................38

NCJW-NO,
https://www.ncjwneworleans.org/.......................................................... 10, 11

NCJW-NO, *About*,
https://www.ncjwneworleans.org/about/......................................................... 11

USCIS, Model Plan for Administrative Naturalization Ceremonies, Policy Mem. No. PM-602-0014.1 (Sep. 20, 2011) (2011 Mem.)..................................................*passim*

USCIS, Policy Alert No. PA-2025-21 (Aug. 29, 2025) (2025 Alert).............................*passim*

USCIS Policy Manual, https://www.uscis.gov/policy-manual........................................ 8, 10

**INTRODUCTION**

Defendant U.S. Citizenship and Immigration Services (USCIS) has discontinued its practice of inviting nongovernmental entities to provide voter registration services at administrative naturalization ceremonies when state and local authorities are not able to attend. It memorialized this change in policy by updating the USCIS Policy Manual (at Volume 12, Part J, Chapter 5, Section H) and issuing Policy Alert No. PA-2025-21 (Aug. 29, 2025) (collectively referred to as "the 2025 Alert" herein).  This modest change does not harm new citizens' access to applications to register to vote, as applications and information will continue to be provided by state or local election officials, or USCIS staff at the end of administrative naturalization ceremonies.

Plaintiffs, the League of Women Voters (LWV)[1] and the National Council of Jewish Women, Greater New Orleans Section (NCJW-NO), have filed separate motions for a preliminary injunction restraining USCIS and its co-defendants[2] from enforcing the 2025 Alert.[3]  One or both plaintiffs contend that the 2025 Alert violates the First and Fifth Amendments and the substantive and procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-59, 701-06.[4]  Plaintiffs are unlikely to succeed on the

---

[1] The body of the LWV's complaint names the League of Women Voters Education Fund and the League of Women Voters of the United States, Colorado, New Jersey, Saratoga County, the Charleston Area, and Milwaukee County as plaintiffs.  Compl., *League of Women Voters of the U.S. v. USCIS*, No. 8:25-cv-0377-ABA (LWV), (D. Md. Nov. 18, 2025), ECF No. 2 ¶¶ 10, 15, 18, 21, 23, 25.  The caption of the LWV's complaint names the League of Women Voters of New Jersey Education Fund as another plaintiff*, id.*, but the body of the complaint does not refer to the Fund.

[2] Defendants other than USCIS are the Department of Homeland Security, the Secretary of Homeland Security, and the Director of USCIS.  *Id.*  ¶¶ 28-30; *NCJW-NO*, Am. Compl. (D. Md. Dec. 5, 2025), ECF No. 17 ¶¶ 23-25.

[3] Pl. Mem. in Supp. of their Motion for Prelim. Inj. (LWV Mot.), ECF No. 21-1 at 1; NCJW-NO, Mot. for Prelim. Inj. (Dec. 17, 2025), ECF No. 20 at 1.

[4] LWV Compl., ECF No. 2 ¶¶ 4-5; Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. (NCJW-NO

merits for their claims for several reasons.

First, Plaintiffs lack standing for all of their claims. Plaintiffs have sustained no First Amendment injury, and thus have no standing, because "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (collecting cases). In short, Plaintiffs have no legally protected interest in expressing their views at a specific time in a specific forum (after administrative naturalization ceremonies at USCIS field offices). Plaintiffs have also not sustained any actual First Amendment injury because they retain the ability to promulgate their message at judicial naturalization ceremonies and the many other public fora available to them. Nor can Plaintiffs establish standing based upon their organizational interest in seeing that newly naturalized citizens are encouraged or registered to vote, as this alleged harm constitutes a generalized grievance on which all or a large class of citizens might have standing. Standing cannot be maintained on this basis. *Carney v. Adams*, 592 U.S. 53, 58 (2020). Plaintiffs also cannot establish standing on the basis of alleged harms to their missions or on a diversion of resources theory in light of the Supreme Court's recent decision in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

Assuming *arguendo* that Plaintiffs do have a legally protected interest in participating in administrative naturalization ceremonies, Plaintiffs are unlikely to succeed on their First Amendment claims because the 2025 Alert imposes a reasonable, viewpoint-neutral restriction on their activities. Longstanding precedent makes clear that administrative naturalization ceremonies are nonpublic forums, thus the relevant restrictions need only be viewpoint neutral

---

Mot.) (Dec. 17, 2025), ECF No. 20-1 at 2.

and reasonable, as they are here.

The NCJW-NO Plaintiff lacks standing to bring, and are unlikely to be successful on, their Fifth Amendment claims. NCJW-NO's Fifth Amendment claims are asserted *on behalf of* the naturalized citizens they aim to engage at administrative naturalization ceremonies— individuals with whom they lack a close relationship and who face no impediment to bringing these claims in their own right. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Lack of third-party standing notwithstanding, NCJW-NO fails to identify any individual whose ability to vote or register to vote was impeded in any way by their organization's absence at administrative naturalization ceremonies as a result of the 2025 Alert. As such, NCJW-NO does not allege any actual injury on which standing for these claims could be based. Under similar reasoning, NCJW-NO's Fifth Amendment claims are also unlikely to succeed on the merits.

Plaintiffs' APA claims also lack merit and are unlikely to be successful. The decision not to engage nongovernmental organizations to provide voter information at administrative naturalization ceremonies is exempt from APA review because it is committed to the agency's discretion by law. Even if the decision were reviewable, it is not arbitrary and capricious. USCIS should be afforded the utmost deference in its determination that the administrative costs of engaging NGOs for the ceremonies that take place at USCIS field offices exceed the benefits they provide to the ceremonies and the citizens naturalized therein. USCIS's decision is reasonable and reasonably explained. Further, USCIS was not required to engage in notice-and-comment rulemaking prior to issuing the 2025 Alert. Nor is the 2025 Alert, for the reasons discussed herein, contrary to constitutional right or otherwise unlawful.

The remaining equitable factors also do not tip in Plaintiffs' favor. Plaintiffs cannot demonstrate standing to seek prospective relief, much less an immediate and imminent threat

of irreparable harm that would justify the extraordinary remedy of a preliminary injunction. By contrast, an injunction requiring Plaintiffs to provide voter registration services would interfere with the government's ability to conduct appropriate administrative naturalization ceremonies and lead to confusion with competing federal, state, and non-governmental entities attempting to provide newly naturalized citizens with voter registration information. Nothing in the Constitution, federal law, or the APA requires that non-governmental organizations play an active role in distributing voter registration information during administrative naturalization ceremonies.

For these reasons, and as explained further below, the motions for preliminary injunction should be denied.

## BACKGROUND

### I.     Statutory and Regulatory Background

The Immigration Act of 1990, requires the Attorney General to "broadly distribute information concerning the benefits which persons may receive under this subchapter and the requirements to obtain such benefits." Pub. L. No. 101-649, 104 Stat. 4978, § 406 (codified at 8 U.S.C. § 1443(h)). The Act further specifies that the Attorney General "shall seek the assistance of appropriate community groups, private voluntary agencies, and other relevant organizations." *Id.* This function was formally delegated by the Attorney General to the Department of Homeland Security ("DHS") and its subagency, U.S. Citizenship and Immigration Services (USCIS), which is responsible for processing naturalization applications and scheduling naturalization ceremonies. *See* 8 U.S.C. § 1421(a) (providing the Attorney General with "[t]he sole authority to naturalize persons as citizens of the United States[.]"); 6 U.S.C. § 557 (replacing statutory references to other departments, commissions, or agencies whose functions were transferred pursuant to Title VI, Chapter 1 establishing the

4

Department of Homeland Security with the "Secretary, other official, or component" of Homeland Security "to which such function is so transferred"); 8 C.F.R. § 2.1 (vesting the Secretary of Homeland Security with the authority to administer and enforce the immigration laws); 8 C.F.R. § 310.1(a), (b) (delegating the authority of the Attorney General to "naturalize persons as citizens of the United States" to the "Commissioner of the Immigration and Naturalization Service").[5]  After establishment of the USCIS, the agency began administering naturalization ceremonies.

There are two types of naturalization ceremonies.  In administrative naturalization ceremonies, USCIS administers the oath of allegiance.  Judicial naturalization ceremonies are ceremonies "where a federal, state or local court administers the Oath of Allegiance."[6]  This case challenges only the conduct of administrative naturalization ceremonies.

8 U.S.C. § 1448 sets forth the statutory requirements and procedures for naturalization.  In addition, the statute provides that the "Attorney General shall prescribe rules and procedures to ensure that the ceremonies conducted by the Attorney General for the administration of oaths of allegiance under this section are public, conducted frequently and at regular intervals, and are in keeping with the dignity of the occasion."  *Id.* § 1448(c).  The regulations implementing section 1448 are found at 8 C.F.R. § 337.  The first regulations were issued in 1957 and were mostly recently updated in 2011.  Among other things, the regulations set forth the content of the oath of allegiance and minimum requirements for naturalization ceremony.  *See* 8 C.F.R. § 337.2.  The regulations require that the ceremony

---

[5] *See also* 6 U.S.C. § 291(a) (abolishing the Immigration and Naturalization Service); 6 U.S.C. § 271 (establishing the Bureau of Citizenship and Immigration Services, commonly known as U.S. Citizenship and Immigration Services ("USCIS"), and providing that the Director shall perform such functions as are provided or transferred to them by law.)
[6] USCIS Policy Mem. No. PM-602-0014.1 at 1 n.1 (Sept. 20, 2011); NCJW-NO Mot., Appendix of Exhibits, ECF No. 20-2 at App. 149 n.1.

must be "public," take place at "a time and place designated by USCIS or [the Executive Office for Immigration Review] within the United States," and "be conducted at regular intervals as frequently as necessary to ensure timely naturalization." *Id.* Beyond these basic requirements, neither section 1148 nor the implementing regulations provide any specific instructions governing the ceremony itself.

To fill that gap, USCIS issued internal policy guidance in 2011 that sets forth detailed procedures for conducting administrative naturalization ceremonies. The guidance was issued through a Policy Memorandum titled "Model Plan for Administrative Naturalization Ceremonies" (2011 Mem.).[7] USCIS did not publish a notice in the Federal Register proposing the issuance of the 2011 Memorandum but posted a draft of the 2011 Memorandum on its website and solicited informal comment about the draft before issuing the memorandum. *See* Ex. 1, Stiefel Decl. ¶ 13.

The 2011 Memorandum addresses a broad range of topics regarding the conduct of administrative naturalization ceremonies, ranging from the check-in process to guest speakers to the music that is played. The 2011 Memorandum sought to "standardize the naturalization ceremony experience" by directing "USCIS offices" to take the following actions at "all administrative ceremonies": (1) play *Faces of America*, a video; (2) play the Star Spangled Banner, either by recording or live; (3) have the master of ceremonies present opening or welcoming remarks; (4) have a designated official read aloud a list of the countries represented by the birthplaces of the naturalization candidates; (5) administer the Oath of Allegiance to the naturalization candidates; (6) have field leadership or a guest speaker present keynote remarks; (7) play *Presidential Congratulatory Remarks*, a video; (8) recite the Pledge of

---

[7] *Id.*

Allegiance; (9) have field leadership or the master of ceremonies present concluding remarks; and (10) have field leadership and staff present certificates of naturalization to the naturalized U.S. citizens.[8]

The 2011 Memorandum declared that "[a]ll newly naturalized citizens will have the opportunity to receive a voter registration application at administrative naturalization ceremonies" because "[t]he ability to vote in federal elections is a right and responsibility that comes with U.S. citizenship."[9]  The 2011 Memorandum said, however, that "the mechanism for distribution [of voter registration applications] may vary by ceremony location," provided that the distribution takes place "in every case . . . only after the conclusion of the ceremony," and listed the following "in preferential order" as the "options for distribution": (1) "State or local government election offices"; (2) "Non-governmental organizations . . . if qualified and approved according to the criteria identified below"; and (3) USCIS.[10]  The 2011 Memorandum specified, however that "USCIS is not responsible for the collection of applications or any other activities related to voter registration."[11]

The 2011 Memorandum made clear that "voter registration services by the state or local election office is the optimal mechanism" for distributing information to newly naturalized citizens.  Non-governmental organizations were permitted to provide such services only "[i]f state or local election officials are unable to participate." 2011 Mem. at 8.  In that event, "interested non-governmental groups may seek the privilege of offering voter registration services at the conclusion of administrative naturalization ceremonies." *Id.*

To participate as a substitute for absent state or local officials, the 2011 Memorandum

---

[8] 2011 Mem. at 5-6; NCJW-NO Mot., ECF No. 20-2 at App. 153-54.

[9] 2011 Mem. at 7; NCJW-NO Mot., ECF No. 20-2 at App. 155.

[10] 2011 Mem.  at 7; NCJW-NO Mot., ECF No. 20-2 at App. 155.

[11] 2011 Mem.  at 7; NCJW-NO Mot., ECF No. 20-2 at App. 155.

set forth various criteria that non-governmental organizations must satisfy. The 2011 Memorandum provided that "non-governmental organizations and their representatives . . . [m]ust not participate in any political activity, partisan or otherwise, while participating in voter registration activities during administrative naturalization ceremonies, regardless of whether the ceremonies take place on federal or non-federal property."[12] Defining the term "[p]olitical activity" as "activity directed toward the success or failure of a political party, candidate for partisan political office, or partisan political group . . . [or as] advocacy for particular referenda or other political propositions," the 2011 Memorandum said that "a non-governmental group participating in voter registration activities at an administrative naturalization ceremony may not provide information for or against a state immigration law or proposition" and that the activities of such an organization "while participating must also comply with the Hatch Act, 5 U.S.C. §§ 7321-26."[13]

The 2011 Memorandum was incorporated into USCIS's newly-created Policy Manual in 2013 when the agency consolidated various memoranda and policies into a centralized online repository. *See* USCIS Policy Manual, https://www.uscis.gov/policy-manual.

USCIS issued the 2025 Alert on August 29, 2025. Captioned "Voter Registration at Administrative Naturalization Ceremonies," the 2025 Alert "supersede[d] any related prior guidance" by providing the following "effective immediately": "[O]nly state and local election officials are permitted to provide voter registration services at the conclusion of an administrative naturalization ceremony. Nongovernmental entities are not permitted to provide voter registration services at USCIS facilities during naturalization ceremonies." The 2025 Alert acknowledged that "previous USCIS policy and practice" had permitted

---

[12] *Id.* at 7, 8; NCJW-NO Mot., ECF No. 20-2 at App. 155, 156.

[13] 2011 Mem. at 8; NCJW-NO Mot., ECF No. 20-2 at App. 156.

"nongovernmental organizations were permitted to provide voter registration applications and general information at administrative naturalization ceremonies" but said that "the use of nongovernmental organizations was sporadic and varied based upon location" and that "USCIS staff previously provided voter registration applications and information at naturalization ceremonies in the event state and local election offices were not available to do so."[14]  The 2025 Alert therefore said that USCIS was "discontinuing the practice of permitting [the] attendance of [nongovernmental organizations] at naturalization ceremonies" because "USCIS does not primarily rely on nongovernment organizations for voter registration services" and because "ensur[ing] that those nongovernmental organizations who provide voter registration services are nonpartisan" placed an "administrative burden on USCIS."[15] To be sure, the USCIS never has primarily relied on nongovernment organizations for voter registration services.[16]

In reaching this decision, USCIS concluded that this change "in no way impacts new citizens' access to information and applications to register to vote, as this information will continue to be provided by state or local election officials, or USCIS staff at the end of naturalization ceremonies."   USCIS also found that "there is a reduced need for nongovernmental organizations to assist new citizens with collecting and submitting their voter registration applications" because of the proliferation online voter registration in most states." 2025 Alert at 3.

The 2025 Alert was issued when the USCIS Policy Manual was updated to include the new policy regarding to NGO participation in in naturalization ceremonies.  *See* USCIS

---

[14] 2025 Alert at 1-2; NJCW-NO Mot., ECF No. 20-2 at App. 3.

[15] 2025 Alert at 2; NJCW-NO Mot., ECF No. 20-2 at App. 3.

[16] *Id.* at 2; NCJW-NO Mot., ECF No. 20-2 at App. 4; *see also* Ex. 2, Young Decl. ¶ 8.

9

Policy Manual, Vol. 12, Pt. J., Ch. 5, at https://www.uscis.gov/policy-manual/volume-12-part-j.

## II.     Factual Background

The LWV and NCJW-NO both purport to be non-partisan organizations.[17] The LWV says on its website that it "is a nonpartisan, grassroots nonprofit dedicated to empowering everyone to fully participate in our democracy" and that it is "engage[d] in advocacy, education, litigation, and organizing to protect every American's freedom to vote."[18] The LWV's mission has expanded to include "expanding voter access, fighting voter suppression, money in politics, redistricting, safe and fair elections" as well as "social and economic justice through the lenses of health care, the environment, immigration reform, and the Census."[19]

The NCJW-NO identifies itself on its website as "a grassroots organization of volunteers and advocates who turn progressive ideals into action" that "strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms."[20] The NCJW-NO states that they have historically been "dedicated to improving the quality of life for women, children, and families, and to safeguarding individual rights and freedoms both in the U.S. and Israel."[21] Today, their mission includes "advanc[ing] the well-being and status of women, advanc[ing] the well-being of children and families, enhanc[ing] the quality of Jewish life, ensur[ing] individual and civil

---

[17] *See, e.g.*, LWV Mot. at 1 (referring to "nonpartisan, nongovernmental groups like the League"); NCJW-NO, Am. Compl., ¶ 4 (referring to "a host of nonpartisan organizations – including [NCJW-NO]").

[18] League of Women Voters, *About Us*, https://www.lwv.org/about-us (last accessed Dec. 31, 2026).

[19] *Id.*

[20] NCJW Greater New Orleans, https://www.ncjwneworleans.org/ (last accessed Jan. 13, 2026).

[21] *Id.*

10

rights, and support[ing] a secure Israel and the well-being of all its people."[22]

The League says in its complaint that it has "more than a million members and supporters" and that affiliates of the League in the following areas have provided "voter registration and education services at administrative naturalization ceremonies" since the following dates: Colorado, 2017; Burlington County, New Jersey, 2017; Montclair Area, New Jersey, 2022 or 2023; Greater Princeton Area, New Jersey, 2022 or 2023; Saratoga County, New York, 2013; Charleston Area, South Carolina, 2003; and Milwaukee County, Wisconsin, 1975 or earlier.[23]  NCJW-NO says it has "approximately 800 members."[24]

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The plaintiff bears the burden of demonstrating those requirements. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

As set forth below, Plaintiffs are not entitled to the preliminary injunctions for which they have moved because they are unlikely to succeed on the merits and because the balance of equities does not tip in their favor.

---

[22] NCJW Greater New Orleans, *About*, https://www.ncjwneworleans.org/about/ (NCJW Webpage) (accessed Jan. 13, 2026).
[23] *See generally* LWV Mot.; LWV Compl. ¶¶ 10, 17, 20, 22, 24, 26, ECF No. 2.
[24] NCJW-NO, *About*, https://www.ncjwneworleans.org/about/ (NCJW Webpage) (last accessed Jan. 13, 2026).

I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

   A.   **Plaintiffs Lack Standing to Seek Injunctive Relief.**

   "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" that "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To meet Article III's standing requirement, "a plaintiff must sufficiently allege the three elements identified by the Supreme Court [in *Spokeo*]. That is, a plaintiff must allege that they have: '(1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 619-20 (4th Cir. 2018) (citing *Spokeo,* 578 U.S. at 338). "The injury-in-fact requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "Injury in fact is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Spokeo*, 587 U.S. at 339). The burden of sufficiently establishing these three elements falls on the party invoking federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

      1.   **Plaintiffs' Alleged Harm Is Neither Actual nor Imminent, nor Caused by USCIS' Change in Policy**

   An "injury in fact" for standing purposes must be "concrete and particularized," "actual or imminent" and not "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Threatened injury must be "certainly impending" or present a "substantial risk." *Clapper v. Amnesty Int'l USA,* 568 U.S 398, 410, 414 n.5. These are high standards, and a mere "objectively reasonable likelihood" is not sufficient. *Id.* at 410.

   Both Plaintiffs complain that USCIS' change in policy infringes their First Amendment

12

rights to express their views and to freely associate.  NCJW-NO Compl. ¶ 29-30, ECF No. 1; LWV Compl. ¶ 120-24.  Neither is the case.  The NCJW Plaintiffs allege that the new policy prevents them from engaging in expressive conduct intended to "welcome[] new citizens, affirm[] their equal status, and encourage[] them to register and vote."  NCJW-NO Mot. at 24.  The LWV Plaintiffs allege that the new policy completely "blocks their ability, and that of their members and volunteers, to communicate their views that assisting new Americans in registering to vote is an important civic responsibility." LWV Mot. at 28.  Neither is an injury in fact sufficient to establish Plaintiffs' standing.

First, Plaintiffs lack standing to bring their First Amendment claims because they do not have a constitutionally protected interest in engaging in speech at administrative naturalization ceremonies.  "[T]he irreducible constitutional minimum of standing contains three elements" and the first of those elements is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest . . .[.]"  "It is . . . common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."  *Heffron*, 452 U.S. at  647 (collecting cases).  Simply put, Plaintiffs lack standing as they have no legally protected interest in expressing their message at administrative naturalization ceremonies.

Furthermore, no Plaintiff's speech has been unconstitutionally restricted by the government.  To obtain an injunction, "there must be at least one plaintiff with standing to seek an injunction. This requires a certain threshold showing: namely, that a particular defendant pressured a particular [plaintiff] to censor a particular topic before that [plaintiff] suppressed [their] speech on that topic."  *Murthy v. Missouri*, 603 U.S. 43, 61 (2024).   All Plaintiffs here—and indeed any nonprofit organization—have only been barred from expressing their message at administrative naturalization ceremonies, during or immediately

following the ceremonies wherever they are held.  Plaintiffs have not been censored or "chilled" from expressing their views about the importance of voting and voter registration for new citizens or on any particular topic. Although Plaintiffs make little mention of this fact in their memoranda and declarations, they may still participate in judicial naturalization ceremonies and deliver the very same message the restriction of which they base their First Amendment claims on here in that forum and any other forum excluding administrative naturalization ceremonies.  *See, e.g.,* LWV Mot., Ex. 10, Decl. Of Margaret "Peg" Schrader ("Milwaukee Decl."), ECF No. 21-13; LWV Mot., Ex. 12, Decl. Of Karen Anne Crowley ("LWV-WA Decl."), ECF No. 21-15; NCJW-NO Mot., Ex. 2, Decl. of Joy Willig, ¶ 12, 24 (stating that NCJW-NO's voter registration efforts also target individuals who have just turned 18 and that NCJW-NO participates in judicial naturalization ceremonies "a few times a year"); *see also* Ex. 2, Young Decl. ¶¶ 7, 9. Therefore, Plaintiffs fail to establish a First Amendment injury-in-fact and lack standing to raise their First Amendment claims.

Plaintiffs also complain that USCIS' change in policy bars their organizations' abilities to fulfill their missions.  LWV Mot. at 28; NCJW-NO Mot. at 34.  Plaintiffs cannot establish standing on the "intensity of [their] interest" in participating in naturalization ceremonies, nor can they establish standing on their opposition to Defendant's decision not to invite their participation.  *See All. for Hippocratic Med.*, 602 U.S. at 394 (citations omitted).  Plaintiffs must show "far more than simply a setback to the organization's abstract social interests." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).  Seeing that newly naturalized citizens are assisted with voter registration and encouraged to vote at naturalization ceremonies is precisely the type of "abstract social interest" on which Plaintiffs may not base standing.

Plaintiffs further allege that they have expended extensive resources to find alternative venues to promote voting and voter registration among new citizens.  The Supreme Court has

14

recently and firmly rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. If that were enough, it "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* Thus, the Supreme Court has distinguished (and rejected) a diversion of resources theory from the "unusual" situation where a defendant provided false information that directly impaired an organization's ability to engage in its related core business activities, as in *Havens Realty. Id.* at 395–96 (distinguishing between the facts before the Court and the Court's opinion in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Unlike in *Havens*, the 2025 Alert does not directly prevent or impair Plaintiffs from engaging in their core activities. At most, each organization is making an "uncompelled choice to expend resources." *Republican Nat'l Comm. v. N.C. Bd. of Elections,* 120 F.4th 390, 396 (4th Cir. 2024). And as the Fourth Circuit recently confirmed, an organization cannot "spend its way into standing." *Id.* Accordingly, Plaintiffs' diversion of resources theory also fails. *See All. for Hippocratic Med.*, 602 U.S. at 394 (noting that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action," where plaintiff was an advocacy organization and it diverted resources to engage in a core business activity).

LWV Plaintiffs also allege that the new policy "burden[s] Plaintiffs' ability to attract, recruit, and retain members and volunteers." LWV Mot. at 28. But that injury is not fairly traceable to USCIS' new policy. Rather, it would be the consequence of the "unfettered choices" made by "independent actors" that are not before the Court. *Lujan*, 504 U.S. at 562 (citation omitted). Because LWV's alleged injury is tied to the decisions of unnamed individuals—prospective members who choose not to join LWV—they face an even higher

15

bar to establish standing.  An injury suffices for Article III standing only if it is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* at 560 (citation modified).  "Where a causal relation between injury and challenged action depends upon the decision of an independent third party" (*e.g.*, an unknown individual's decision not to become a member of LWV), "standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Lujan*, 504 U.S. at 562); *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

Where causation hinges upon the choices of third parties, a plaintiff must adduce facts to show that those choices "have been or will be made in such a manner as to produce causation and permit redressability of injury."  *Lujan*, 504 U.S. at 562.  Plaintiffs have not satisfied that higher burden.  Plaintiffs have not presented any evidence to show that the 2025 Alert has a direct causal impact on the LWV Plaintiffs' "ability to attract, recruit, and retain members and volunteers."  LWV Mot. at 28.  This argument rests on a speculative chain of attenuated possibilities regarding the motivations why certain individuals may choose not to join LWV.

For that reason, LWV's theory fails both the traceability and redressability prongs of the standing analysis.  It is entirely speculative that the 2025 Alert is the cause of any membership reduction and, moreover, there is no evidentiary basis on which to conclude that the requested injunction, if issued, would somehow cause unnamed individuals to suddenly join LWV.

### 2.  Plaintiffs' Generalized Grievances Do Not Confer Standing

In addition to the standing requirement of an "injury in fact," the doctrine of standing

also holds that "a grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an injury in fact." *Carney*, 592 U.S. at 58. "In other words, a plaintiff cannot establish standing by asserting an abstract 'general interest common to all members of the public,' . . . 'no matter how sincere' or 'deeply committed' a plaintiff is to vindicating that general interest on behalf of the public." *Id.* at 59 (quoting *Lance v. Coffman*, 549 U.S. 437 (2007) and *Hollingsworth v. Perry*, 570 U.S. 693, 706-7 (2013)); *see also Warth*, 422 U.S. at 499 ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.").

Plaintiffs appear to base their standing to bring their claims on a general interest in seeing that newly naturalized citizens are encouraged to vote and provided the opportunity to register. But Plaintiffs are not conferred standing on the basis of their generalized grievance that newly naturalized citizens are not being encouraged or registered to vote by *their* organizations. *Cf. FEC v. Akins*, 524 U.S. 11, 21–25 (1998) (finding standing where a group of voters suffered concrete, though widespread, harm when they were prevented from accessing publicly disclosable voting-related material). Indeed, any American citizen could assert support for voting rights and, as such, it is a generalized grievance that does not warrant this Court's exercise of jurisdiction over Plaintiffs' claims. *See Warth*, 422 U.S. at 499.

In any event, the naturalized citizens that Plaintiffs claim an interest in encouraging and registering to vote are not, nor will they be, discouraged from voting or denied the ability to register to vote by the 2025 Alert. Quite the opposite. Naturalized citizens are still provided voter registration information at naturalization ceremonies. *See* Ex. 2, Young Decl. ¶ 10.[25]

---

[25] The Federal government also maintains a website specifically for new citizens to register to vote that contains step-by-step instructions on how to register, allows individuals to check their registration status online, and also links to a listing of local election offices. *See* U.S.

Neither the LWV Plaintiffs nor the NCJW-NO Plaintiff can base their standing on a generalized policy interest in promoting voting rights access by newly naturalized citizens.

### 3. Plaintiffs' Diversion of Resources Does Not Confer Standing

Plaintiffs' allegation that they have had to expend resources to find other ways to reach new citizens also does not confer standing.    To show the requisite injury-in-fact, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation omitted).    And, as the Supreme Court recently clarified, the notion that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect." *All. for Hippocratic Med.*, 602 U.S. at 395.    Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike." *Id.*

### 4. NCJW-NO Plaintiffs Lack Standing for their Fifth Amendment Claims

The NCJW-NO Plaintiff lacks standing to raise their Fifth Amendment discrimination and substantive due process claims.  Plaintiff alleges that the 2025 Alert "depriv[es] some new citizens of services critical to facilitating their democratic participation" and "diminish[es] the franchise for a protected class[.]"  NCJW-NO Mot. at 20, 22. Because NCJW-NO raises these claims *on behalf of* the new citizens they seek to engage at naturalization ceremonies, they must demonstrate third party standing.  They do not, and cannot, do so.

As a threshold matter, NCJW-NO would fail to satisfy the elements of Article III standing with respect to its Fifth Amendment claims, even if raised on its own behalf.  NCJW-NO fails to identify a single naturalized citizen who was prevented from voting or registering to vote by their organization's absence at naturalization ceremonies.  The absence of such

Election Assistance Comm., *Voting as a new U.S. citizen,* https://vote.gov/guide-to-voting/new-united-states-citizen (accessed January 14, 2026).

18

evidence is fatal to their claim and shows there is neither an actual injury nor that such injury was caused by the 2025 Alert. Plaintiff also fails to establish that the relief they request in their motion is necessary to redress this injury—*i.e.*, that an injunction would prevent the government from interfering in newly naturalized citizens' exercise of the franchise, which Plaintiff does not claim the government is doing. Thus, even if NCJW-NO were seeking to vindicate their own rights, it would lack all three Article III standing requirements for their Fifth Amendment claims.

Here, however, NCJW-NO asserts its Fifth Amendment claims on the basis of the constitutional rights of the newly naturalized citizens they claim are being deprived in some way of the right to vote or the ability to register to vote. "A party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski,* 543 U.S. at 129 (2004) (quoting *Warth*, 422 U.S. at 490). However, "there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Id.* at 129-130. The Supreme Court has "limited this exception by requiring that a party seeking third-party standing make two additional showings. . .[(1)] whether the party asserting the right has a 'close' relationship with the person who possesses the right [and (2)] whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130 (internal citations omitted). The NCJW-NO Plaintiff cannot satisfy either requirement for this limited exception.

First, NCJW-NO does not maintain a "close relationship" with newly naturalized citizens. In *Kowalski*, the Supreme Court assessed whether an attorney-client relationship could constitute such a close relationship. *Id.* at 131. The Court identified two cases in which it found third-party standing based on an "*existing* attorney-client relationship" but held that a "*hypothetical* attorney-client relationship" was "quite distinct." *Id.* (emphasis added). *Kowalski*

19

also distinguished petitioners in that case – attorneys seeking to invoke the rights of hypothetical, future clients – from attorneys "involved in the representation of *known* claimants." *Id.* NCJW-NO is similarly situated to petitioners in *Kowalski*. They lack the necessary "close relationship" with a hypothetical, unidentified, recently naturalized citizen and therefore cannot establish the "close relationship" required for third-party standing.

Second, NCJW-NO has not demonstrated that naturalized citizens would be unable to advance their own constitutional rights to vote or register to vote. If they were, one wonders why NCJW-NO did not assemble a group of naturalized citizens who were harmed by the 2025 Alert to raise their Fifth Amendment claims. No such evidence is in the record, presumably because no newly naturalized citizen has been deprived of a constitutionally protected interest as a result of the 2025 Alert. Nevertheless, there is nothing preventing a naturalized citizen from raising a Fifth Amendment equal protection or substantive due process claim in a challenge to the 2025 Alert themself. Accordingly, NCJW-NO lacks third-party standing to assert these claims.

### 5. NCJW-NO Has Not Established Associational Standing

An organization may establish associational standing by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). NCJW-NO contends that it has associational standing by generally asserting the rights of its members, claiming that such members have been barred from providing voter registration information at naturalization ceremonies. *See* NCJW-NO Mot. at 13. Yet they fail to specifically identify any such members of their organizations. This is inadequate to establish standing. Indeed, "[w]hen a petitioner

20

claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Comm. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). "Rather, the petitioner must specifically identify members who have suffered the requisite harm." *Id.* (citation omitted); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact . . . . At the very least, the identity of the party suffering an injury in fact must be firmly established."). A contrary holding "flouts the Supreme Court's instruction" that organizational plaintiffs seeking establish associational standing must 'identify or 'name' members who have suffered the requisite harm." *Satanic Temple, Inc. v. Rokita*, ---F.4th---, 2026 WL 34486, at *5 (7th Cir. Jan. 6, 2026) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009)). Without knowing the identity of their members and the specific features of their injuries, Plaintiffs' allegations are inherently speculative.

Even if NCJW-NO had identified a specific member, the general injuries they assert are no different from the injuries to the organization itself, which fail to establish standing for the reasons explained above.

### B. The 2025 Policy Manual Update and Alert Do Not Violate the First Amendment.

"It is uncontested and uncontestable that government officials may not exclude from public places persons engaged in peaceful expressive activity solely because the government actor fears, dislikes, or disagrees with the views those persons express." *Wood v. Moss*, 572 U.S. 744, 756-57 (2014). "It is equally plain that the fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views 'whenever and however and wherever they please.'" *Id.* at 757 (quoting *United States v. Grace*, 461 U.S. 171, 177-78 (1983)). "Even protected speech is not equally permissible in all places and at all

times." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799 (1985).

"The Government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Grace*, 461 U.S. at 178 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800.

The Supreme Court employs a "forum-based approach" to "assess[] restrictions that the government seeks to place on the use of its property." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). This approach "recognize[s] three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Id.* "In a traditional public forum – parks, streets, sidewalk, and the like – the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* "The same standards apply in designated public forums – spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose.'" *Id.* (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469-70 (2009)). "In a nonpublic forum, on the other hand – a space that 'is not by tradition or designation a forum for public communication' – the government has much more flexibility to craft rules limiting speech." *Id.* at 11-12 (quoting *Perry Educ. Ass'n v. Perry Loc. Educators Ass'n*, 460 U.S. 37, 46 (1983)). "The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because

22

public officials oppose the speaker's view.'" *Id.* at 12 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). "'Public property which is not by tradition or designation a forum for public communication' is a nonpublic forum, where the government has wider latitude to limit speech." *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 (4th Cir. 2022) (quoting *Perry Educ. Ass'n*, 460 U.S. at 46).

"Limitations on expressive activity conducted on this last category of property" thus "must survive only a much more limited review." *Krishna Consciousness*, 505 U.S. at 679. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* at 809.

"Control over access to a nonpublic forum can be based," moreover, "on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 806. The government thus "may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Minn. Voters*, 585 U.S. at 12. What the government must avoid in imposing such restrictions is "confusing line-drawing problems." *Id.* at 18. "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16. A statute prohibiting "political apparel" at polling places is thus invalid if the statute does not define the term "political" and the "interpretations the State has provided in official guidance and representations to this Court" are "haphazard." *Id.* at 16-17. A policy of a local agency prohibiting "political ads" on public

23

buses is likewise invalid if, "[w]hen taken together, [the agency's] vaguely defined policies and even vaguer unwritten rules make it impossible for a reasonable person to identify what violates their advertising policy and what does not." *White Coat Waste Project*, 35 F.4th at 201.

Administrative naturalization ceremonies are nonpublic forums. "The government creates a designated public forum 'only by intentionally opening a nontraditional forum for public discourse.'" *Id.* at 197 (quoting *Cornelius*, 473 U.S. at 802). Here, USCIS has not intentionally opened up administrative naturalization ceremonies to general public discourse. The only member of the public permitted to speak at an administrative naturalization ceremony is a guest speaker selected by USCIS to provide keynote remarks.[26] The content of the ceremony is tightly scripted and controlled by USCIS. An administrative naturalization ceremony is therefore "a space that 'is not by tradition or designation a forum for public communication,'" *see Minn. Voters*, 585 U.S. at 11 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). Accordingly, it is nonpublic forum. *See Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616, 629 (E.D. Va. 2004) (holding that high school graduation ceremony is a non-public forum because school tightly controlled the content of the ceremony, preventing it from being a public fora where a multiplicity of views on various topics can be expressed and exchanged).

The 2025 Alert constitutes a permissible restriction on expression at a nonpublic forum because the 2025 Alert does not create any "confusing line-drawing problems." *See Minn. Voters*, 585 U.S. at 18. No one has to wonder whether a particular nongovernmental organization is permitted under the 2025 Alert to "provide voter registration services" at administrative naturalization ceremonies because the 2025 Alert does not permit any nongovernmental organization to provide those services.[27] Further, the 2025 Alert is

---

[26] *See* 2011 Mem. at 5-6; NCJW-NO Mot., ECF No. 20-2, at App. 153-54,
[27] *See* 2025 Alert at 1; NCJW-NO Mot., ECF No. 20-2, at App. 2,

viewpoint neutral, prohibiting all nongovernmental organization from participation regardless of any particular views such organizations may have on voting rights.

The 2025 Alert is also a permissible restriction on expression at a nonpublic forum because the 2025 Alert is "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *See Minn. Voters*, 585 U.S. at 12 (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). Three things support this conclusion. First, the 2011 Memorandum expressed a preference for "[s]tate or local government election officials" over "[n]on-governmental organizations" as a mechanism for distributing voter applications at administrative naturalization ceremonies.[28] The 2025 Alert retains that preference by providing henceforth that "only state and local election officials are permitted to provide voter registration services at the conclusion of an administrative naturalization ceremony."[29]

Second, USCIS said when it issued the 2025 Alert that "ensur[ing] that those nongovernmental organizations who provide voter registration services are nonpartisan" had created an "administrative burden" for USCIS.[30] That statement is supported by the complexity and incompleteness of the definition of "political activity" contained in the 2011 Memorandum[31] and by the observation of the Supreme Court that "the term 'political' . . . can be expansive." *Minn. Voters*, 585 U.S. at 17.

Third, USCIS said when it issued the 2025 Alert that the use of nongovernmental organizations to "provide voter registration applications and general information at administrative naturalization ceremonies" has been "sporadic and varied based upon location" and that "USCIS does not primarily rely on nongovernment organizations for voter

---

[28] 2011 Mem. at 7; NCJW-NO Mot., ECF No. 20-2 at App. 155.
[29] *See* 2025 Alert at 1; NCJW-NO Mot., ECF No. 20-2 at App. 2.
[30] *Id.* at 2; NCJW-NO Mot., ECF No. 20-2 at App. 3.
[31] *See* 2011 Mem. at 8; NCJW-NO Mot., ECF No. 20-2 at App 156.

registration services."[32]  The League confirms the accuracy of those assertions by pointing to limited areas of the country in which its affiliates allegedly have provided "voter registration and education services at administrative naturalization ceremonies" and by pointing to the varying periods of time during which they allegedly have done so.[33]

The 2025 Alert thus controls "access to a non-public forum" through the use of distinctions in "subject matter and speaker identity" that are "reasonable in light of the purposes served by the forum and are viewpoint neutral."  *See Cornelius*, 473 U.S. at 806.  No merit therefore exists to Plaintiffs' contention that the 2025 Alert is invalid under the First Amendment.

## C. The 2025 Policy Manual Update and Alert Do Not Violate the Fifth Amendment.

Plaintiffs are unlikely to prevail on their Fifth Amendment equal protection and substantive due process claims because they lack third-party standing to bring them.  *See supra* 18-20.  Plaintiffs' lack of standing fully disposes of this claim and the Court need not go further.  However, even if the Court were to consider the merits, NCJW-NO's equal protection and substantive due process claims are not likely to succeed.

Plaintiffs attempt to demonstrate that the underlying motivation for the 2025 Alert is unconstitutionally discriminatory but completely fail to identify how the new policy burdens the ability of naturalized citizens to vote.  A Fifth Amendment equal protection claim requires claimants demonstrate both that the official action was motivated by "racially discriminatory intent or purpose" and has a "racially disproportionate impact[.]" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977).  The NCJW-NO Plaintiff makes several

---

[32] *Id.* at 2; NCJW-NO Mot., ECF No. 20-2 at App. 3.
[33] *See* LWV Compl.*,* ¶¶ 10, 17, 20, 22, 24, 26.

conclusory statements that the 2025 Alert "make[s] it harder for naturalized citizens to become voters" and "deprive[s] some new citizens of services critical to facilitating their democratic participation." *See* NCJW-NO Mot., at 18, 20. Assuming newly naturalized citizens are a protected class, NCJW-NO's blanket assertions fail to explain how the 2025 Alert has disparately impacted newly naturalized citizens in any way. Plaintiffs fail to identify any instance in which a newly naturalized citizen has been prevented or discouraged from voting or registering to vote. Nor do they explain how such an occurrence would be the direct result of their organization's absence at an administrative naturalization ceremony, particularly when other governmental entities are available to provide voter services. Such conclusory allegations, unsupported by any facts, are insufficient and demonstrate that Plaintiffs are unlikely to succeed on their Fifth Amendment equal protection claim, notwithstanding the reality that they do not have standing to bring it.

Next, the NCJW-NO Plaintiff's Fifth Amendment substantive due process claim is also unlikely to succeed on the merits as the agency action at issue here does not constitute an action so arbitrary that it "shock[s] the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "In a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." The decision not to seek the assistance of a particular outside organization to disseminate voter registration information or provide assistance at naturalization ceremonies clearly does not rise to this level. *See id.* at 848, n. 8; *cf. Rochin v. California*, 342 U.S. 165, 172 (1952) (holding that "[i]llegally breaking into the privacy of the petitioner, struggl[ing] to open his mouth and remove what was there, forcibl[y] extract[ing] [] his stomach's contents—this course of proceeding by agents of government to obtain evidence" is "conduct that shocks the conscience.").

27

As such, the NCJW-NO Plaintiff's Fifth Amendment claims are unlikely to succeed for a multitude of reasons, including lack of standing.

### D. Plaintiffs Are Not Likely to Succeed on their APA Claim

#### 1. Defendants' Decision to Allow or Not to Allow Non-Governmental Organization Participation in Naturalization Ceremonies is Committed to Agency Discretion by Law

The USCIS's decision to not to seek the assistance of non-governmental organizations during administrative naturalization ceremonies to meet the requirements of 8 U.S.C. § 1443(h) and 8 U.S.C. § 1448 is a determination that is committed to agency discretion by law.

The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review.  *Id.* (citation omitted); *see Pharm. Coal. for Patient Access v. United States*, 125 F.4th 947, 964 (4th Cir. 2025).

Here, the statutes that require USCIS to distribute information about United States citizenship and conduct naturalization ceremonies do not expressly preclude judicial review. *See* 8 U.S.C. §§ 1443(h), 1448.  Thus, the Court must consider whether there is a meaningful standard by which it can determine whether USCIS appropriately exercised its discretion.  "If no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Chaney,* 470 U.S. at 830.  "The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance."  *Id.* at 834.

28

Combining the relevant Supreme Court precedents on the issue of nonreviewability, the Fourth Circuit in *Holbrook v. Tennessee Valley Authority*, 48 F.4th 282 (4th Cir. 2022), devised a two-part inquiry to determine whether an agency action is of the kind that is committed to agency discretion. First, the Court must consider "whether an agency action is the kind of action that has traditionally been committed to agency discretion." *Id.* at 290. "Once we are in a traditional category, the 'presumption of reviewability' under the APA flips, and the agency action becomes 'presumptively unreviewable.'" *Id.* at 289 (quoting *Chaney*, 470 U.S. at 831-832). Second, this presumption of nonreviewability can be overcome where Congress has provided "'guidelines for the agency to follow in exercising its enforcement powers,' by 'setting substantive priorities, or by otherwise circumscribing an agency's power.'" *Id.* at 293 (quoting *Chaney,* 470 U.S. at 833). "Because the question is about what Congress did, it amounts to a question of statutory interpretation." *Id.*

As to the first inquiry, "[n]o clean rule materializes for determining whether an agency action is the kind of action that has traditionally been committed to agency discretion." *Id.* However, one such area the Supreme Court has identified is agency actions that "involve 'complicated balancing of a number of factors which are peculiarly within [the agency's] expertise, . . . especially decisions that involve resource allocation and the need for flexibility to 'adapt to changing circumstances.'" *Id.* at 290 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192-193 (1993)). This is precisely the type of agency action USCIS has taken here. Congress transferred the function of administering naturalization (to include naturalization ceremonies) to the USCIS and, as such, the USCIS is entitled to exercise a substantial degree of discretion in carrying out administrative naturalization ceremonies. Issuance of the 2025 Alert involved a consideration of agency resources, public access to voter information and registration applications, and the reliance interests of new citizens on NGO assistance. *See* 2025 Alert.

29

The action also involved resource allocation decisions and represented the agency's adaptation to changing circumstances (*e.g.,* the availability of online voter registration in most states). *Id.* Thus, the 2025 Alert is of the type of agency action traditionally committed to agency discretion and is presumptively unreviewable.

As to the second inquiry, the statute directing USCIS to seek the assistance of "appropriate community groups, private voluntary agencies, and other relevant organizations" in distributing information about U.S. citizenship or naturalization does not provide any clear guidance or instruction sufficient to overcome the presumption of unreviewability. Section 1443(h) directs that USCIS "shall seek the assistance" of outside groups, volunteer agencies, and other organizations, but it is not specific as to *what* information should be provided about citizenship or naturalization, nor *whom* should provide it. *See* 8 U.S.C. § 1443(h). It does not say whether state and local governments are or are not "relevant organizations" within the meaning of the statute. *See id.* It also does not prohibit USCIS from determining that it can satisfy the statute's mandate to "broadly distribute information concerning the benefits" of citizenship itself and the "assistance" of outside organizations is unnecessary. *See id.* The statute provides no upper or lower bound on the number of outside organizations from which USCIS must seek assistance. *See id.* Nothing in the statute provides a clear limit or guideline as to how USCIS is to carry out the requirement to "seek the assistance" of outside organizations. *Id.* As such, the presumption that USCIS decision not to seek Plaintiffs' specific assistance with respect to voter information and registration is presumptively unreviewable.

Similarly, 8 U.S.C. § 1448 provides no judicially enforceable limitations on how USCIS conducts administrative naturalization ceremonies. Congress has simply provided that such ceremonies must be "public, conducted frequently and at regular intervals, and are in keeping

30

with the dignity of the occasion." *Id.* § 1448(d). Congress left the manner in which ceremonies are conducted entirely to the discretion of USCIS. Whether USCIS invites guest speakers, plays certain music, or enlists outside authorities to distribute information about voter registration are matters that fall exclusively within the exercise of the agency's discretion. Congress's silence with respect to those issues "leaves th[e] [C]ourt with no manageable standard to apply[]" in assessing how ceremonies should be conducted. *Speed Mining, Inc. v. Fed. Mine Safety and Health Review Comm'n*, 528 F.3d 310, 317 (4th Cir. 2008) (citation omitted) (concluding that the Federal Mine Safety and Health Act provided no manageable standard to apply to the Secretary's exercise of enforcement discretion because the Act provided "no direction" regarding which mine operator (*i.e.* owner-operator, lessee-operator, supervisor, independent contractor, etc.) should receive a citation for a violation of the Act).

### 2. Plaintiffs Fail to Make a Showing That Defendants' Actions Triggered Any Statutory Notice and Comment Requirement.

The APA requires agencies issuing substantive rules except in certain situations to publish "[g]eneral notice of proposed rulemaking . . . in the Federal Register," 5 U.S.C. § 553(b), and, subsequently, to give "interested persons an opportunity to participate in the rule making through submission of written data, views or arguments with or without opportunity for oral presentation." *Id.* § 553(c). Plaintiffs contend that the 2025 Alert is invalid because USCIS did not comply with "the notice and comment requirements" of §§ 553(b) and (c) before issuing the 2025 Alert.[34] Plaintiffs are mistaken for two reasons.

First, the APA provides that 5 U.S.C. § 553(b)(A) "does not apply to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." "'[G]eneral statements of policy'" are "'statements issued by an agency

---

[34] LWV Compl. ¶ 4.

to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). The 2025 Alert was a document by which USCIS "'advise[d] the public prospectively of the manner in which [it] propose[d] to exercise [its] discretionary power'" over administrative naturalization ceremonies. *See id.*, 508 U.S. at 197 (quoting *Chrysler Corp.*, 441 U.S. at 302 n.31). The 2025 Alert was therefore a "'general statement[] of policy" for which USCIS was not required to publish a general notice of proposed rulemaking in the Federal Register. *See id.*

Second, "the APA 'make[s] no distinction . . . between initial agency action and subsequent agency action undoing or revising that action.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)). The APA is therefore "correctly read . . . to mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Id.* USCIS did not publish a general notice of proposed rulemaking in the Federal Register for the 2011 Memorandum.[35] USCIS therefore had no duty to publish a general notice of proposed rulemaking in the Federal Register for the 2025 Alert.

The APA, moreover, "'sets forth the full extent of judicial authority to review executive agency action for procedural correctness.'" *Id.*, 575 U.S. at 102 (quoting *Fox Television Stations*, 566 U.S. at 513). "'Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.'" *Id.* (quoting *Vt Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 524 (1978)). The discretion "'to grant additional procedural rights'" that USCIS possessed, *see id.,* means that USCIS had no

---

[35] *See* Ex. A, Stiefel Decl. ¶ 13.

duty to post a draft of the 2025 Alert on its website and solicit informal public comment on the draft, as it did for the 2011 Memorandum.[36]

Indeed, if 2025 Alert is a "substantive rule" subject to notice and comment, then *a fortiori* so was enacting the 2011 policy in the first place. Critically, though, the 2011 policy also was not adopted through notice and comment procedures. So even on Plaintiffs' own theory, the 2011 policy would be void *ab initio*—leaving Plaintiffs without a remedy. *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 n.9 (4th Cir. 1995) (noting that if the interim rule at issue were a substantive rule, as the plaintiff claimed, then it would have been invalid from the date of its issuance for failure to comply with the APA's notice requirements; finding that interim rule was a policy statement not subject to notice and comment).  Accordingly, an agency's decision to change its position does not subject the agency's new decision to a higher procedural standard than the initial policy. *See Perez*, 575 U.S. at 102 ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretative rule, it is also not required to use those procedures when it amends or repeals that interpretative rule.").

### 3. Defendants' Decision to Disallow Non-Governmental Organization Participation in Naturalization Ceremonies was not Arbitrary and Capricious

To the extent that Defendants' actions are reviewable by this Court, Plaintiffs are unlikely to succeed in challenging those actions as arbitrary and capricious because, as explained herein, those actions are discretionary and committed entirely to the agency. Plaintiffs appear to challenge the way in which the agency may carry out its exclusive responsibility to administer naturalization ceremonies, which involve the consideration of factors including agency resources and changed circumstances.  Plaintiffs arbitrary and capricious claims are unlikely to succeed for this reason.

---

[36] *Id.*

Nonetheless, if this Court were to determine it could review the 2025 Alert, "[j]udicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Under the narrow standard of review for agency action, a court must merely assess whether "an agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. at 513 (2009) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983)).  And a court "should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* at 513-14 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281 (1974)).  This permissive standard applies even when, as here, an agency changes its position.  *Id.* at 514.  In the context of a change in position, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Id.* at 515. "[T]he agency must show that there are good reasons for the new policy.  But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.*; *see also Casa De Maryland v. U.S. Dep't of Homeland Sec.,* 924 F.3d 684, 703-4 (4th Cir. 2019) ("'At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons for the new policy.'" (citation omitted)).  The 2025 Alert meets this lenient standard.

The 2025 Alert advances several, well-founded reasons for its change in policy. First, the 2025 Alert observes that "the use of nongovernmental organizations was sporadic and varied based upon the location." *See id.* at 2.  As the sole authority for administering naturalization ceremonies and approving outside organizations' participation in these ceremonies, USCIS is in the best position to make this determination and is entitled to

deference.

Second, the 2025 Alert states that "USCIS staff previously provided voter registration applications and information at naturalization ceremonies in the event state and local election offices were not available to do so." *Id.* This undercuts Plaintiffs' argument that the 2025 Alert will undermine the uniformity of the availability voting and voter registration information to newly naturalized citizens. Such information is uniformly provided to new citizens at naturalization ceremonies, regardless of who provides it.

Third, USCIS considered that it "does not primarily rely on nongovernment organizations for voter registration services" and "the administrative burden on USCIS to ensure that those nongovernmental organizations who provide voter registration services are nonpartisan" in its decision to issue the 2025 Alert. *Id.* These considerations reflect a careful weighing of the value to the agency of permitting NGOs to participate in naturalization ceremonies against the resource-burden on the agency of coordinating NGO participation and ensuring that those organizations are nonpartisan.

Fourth, USCIS considered that "[t]his change in no way impacts new citizens' access to information and applications to register to vote" because new citizens have access to voter registration information as "this information will continue to be provided by state or local election officials, or USCIS staff at naturalization ceremonies," and is also available from publicly available online sources." *Id.* at 3.

Finally, USCIS considered the reliance interests of nongovernmental organizations in participating in naturalization ceremonies and determined that those interests were outweighed by the administrative costs that their participation poses to the agency. *Id.* These reasons "satisfactorily explain[]" USCIS' decision and provide "enough clarity that its path may reasonably be discerned." *Casa De Maryland*, 924 F.3d at 703 (quoting *Jimenez-Cedillo v.*

35

*Sessions*, 885 F.3d 292, 297 (4th Cir. 2018) (quotation omitted)).  Where such an explanation is provided, a court must uphold the agency's decision.  *See id.*

Here, USCIS provides more than is required to exceed the standard for arbitrary-and-capricious review and Plaintiffs are unlikely to succeed on these claims.

## II.   PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

Plaintiffs have failed to establish that a preliminary injunction is necessary to prevent irreparable harm, which is alone grounds to deny their motion for preliminary injunction.  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter,* 555 U.S. at 24 (citation omitted).  A party seeking a preliminary injunction thus must demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief[.]"  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 20).   "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "cannot be fully rectified by the final judgment after trial."  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted).

As an initial matter, Plaintiffs' delay in bringing this lawsuit undercuts their claim for preliminary injunctive relief.  The 2025 Alert took effect on August 29, 202, yet Plaintiffs waited nearly *four months* before filing this lawsuit and seeking emergency relief.  Because "an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989)

In any event, Plaintiffs have not carried their burden to establish irreparable injury.  Plaintiffs allege harms from the 2025 Alert that include their per se irreparable harm based upon the likelihood of success of their constitutional claims, the loss of the opportunity to

36

"help new citizens register to vote at the moment they become eligible," and impairment of their organizational missions. *See* NCJW-NO Mot., ECF No. 20-1 at 34; LWV Mot., ECF 21-2 at 27-9. As explained above, Plaintiffs have not suffered an irreparable harm with respect to their First Amendment claims. *See supra* 13-14. Plaintiffs, further, have no legally protected interest in speech or association at administrative naturalization ceremonies. *See id.* And finally, Plaintiffs' speech has not been censored or "chilled" by the 2025 Alert and all Plaintiffs remain free to express their views and engage with newly naturalized citizens in any other forum. *See id.*

Plaintiffs have also not demonstrated irreparable harm to their organizational missions. Plaintiffs cite *League of Women Voters of United States v. Newby* 838 F.3d 1, 6 (D.C. Cir. 2016), for the proposition that any impediment to an organization whose primary mission is to register voters is sufficient to establish both standing and irreparable harm. But *Newby* is inapposite here. In *Newby*, plaintiffs challenged the decision of the Commissioner of the Election Assistance Commission (EAC) to add a proof-of-citizenship requirement to several states' state-specific federal voter registration forms, which caused registrants to believe they could not register to vote in federal elections without providing proof of citizenship. *See id.* at 6 (D.C. Cir. 2016). The Court found that, because of the decision to add a proof of citizenship requirement to the state-specific instructions, plaintiffs—the League of Women Voters, in that case—satisfied the irreparable harm requirement because the "new obstacles unquestionably [made] it more difficult for the Leagues to accomplish their primary mission of registering voters[.]" *See id.* at 9 (citation omitted). The D.C. Circuit further clarified that the harm is "irreparable because after the registration deadlines for the [November 2016] election pass, there can be no do over and no redress." *Id.* (citation modified). This is far different than the harm that Plaintiffs allege here. First, Plaintiffs have not identified any

37

imminently impending voter registration deadline after which the harm to Plaintiffs' missions would be irreparable during the pendency of this litigation.  Second, Plaintiffs' abilities to encourage and assist members of the voting public writ large in registering to vote is not harmed by the 2025 Alert.  In other words, Plaintiffs' broader missions with respect to "expanding voter access"[37] and "safeguarding individual rights and freedoms"[38] have not been significantly and irreparably harmed by their inability to participate in a subset of naturalization ceremonies.   Moreover, Plaintiffs still retain the ability to further their mission by communicating the importance of voter participation and assisting newly naturalized citizens in registering to vote at judicial naturalization ceremonies or providing these services to new citizens in any venue other than during or immediately after an administrative naturalization ceremony.  As such, Plaintiffs' missions are not irreparably harmed by the 2025 Alert in the same way or by the same magnitude as the plaintiffs in *Newby* were harmed by the EAC's decision in that case.

Additionally, the LWV argues that the 2025 Alert burdens their "ability to attract, recruit, and retain members and volunteers," caused them to forfeit "significant volunteer and monetary resources," and forced them to "expend time, effort, and resources to devise alternative ways to reach newly naturalized Americans."  LWV Mot., ECF 21-2 at 28-9.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough." *Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citing *Di Biase*, 872 F.3d at 230). Any additional money, time, energy, or other resources that Plaintiffs have had to expend to expand membership or

---

[37] League of Women Voters, *Expanding Voter Access*, https://www.lwv.org/voting-rights/expanding-voter-access  (last visited Jan. 14, 2026)
[38] Nat'l Council of Jewish Women, *Mission*, https://www.ncjw.org/about/mission/ (last visited (Jan. 14, 2026)

volunteership, or to find alternative ways to engage new citizens, are not irreparable harms. The same goes for volunteer or monetary resources that were allegedly forfeited as a result of the 2025 Alert—such harms are not irreparable. Furthermore, the loss of the ability to "attract, recruit, and retain" members is not an irreparable harm as the LWV or the NCJW-NO cannot demonstrate that the 2025 Alert so thoroughly impairs their membership that it "threatens the party's very existence." *See Mountain Valley Pipeline, LLC*, 915 F.3d 197, 218 (4th Cir. 2019). Here, no Plaintiff has demonstrated that they face the certain and imminent end of their organizations, through loss of membership or otherwise. Had Plaintiffs alleged this prospective harm, the causal link between the 2025 Alert and the organizations' continued existence would be far too tenuous as participation in naturalization ceremonies is but one part of both the LWV's and the NCJW-NO's broad organizational missions. *See supra* 10-11.

In sum, Plaintiffs have failed to "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (citation omitted). Plaintiffs' alleged harms are either not cognizable or are not irreparable and they are not entitled to the extraordinary remedy of a preliminary injunction.

## III.    THE BALANCE OF EQUITIES DOES NOT TIP IN PLAINTIFFS' FAVOR.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the preliminary injunction that Plaintiffs seek would disrupt the USCIS's efforts to ensure uniformity in the administration of naturalization ceremonies at USCIS Field Offices and interfere with the agency's decisions with respect to the allocation of resources. Further, an injunction could lead to confusion with competing federal, state, and non-governmental entities attempting to provide newly naturalized citizens with voter registration

39

information.

## IV.      SCOPE OF RELIEF SHOULD BE LIMITED TO INJURED PARTIES

Finally, if the Court is inclined to grant Plaintiffs' motion, it should limit any injunction to the members of the organizations that Plaintiffs have identified and that have standing to challenge the 2025 Alert. The Court cannot directly grant a universal injunction. *Trump v. CASA, Inc.,* 606 U.S. 831*,* 856 (2025) ("*CASA*").  Nor can it indirectly do so by extending relief to nonparties who are represented by a party, other than through class certification under Rule 23 or properly established associational standing. Plaintiffs have not sought or obtained class certification. *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("[A] properly conducted class action . . . can come about in federal courts in just one way—through the procedure set out in Rule 23."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-500 (2009) ("[T]he Court has required plaintiffs claiming [an] organizational standing to identify members who have suffered the requisite harm."). Plaintiffs cannot end-run all three of those limits—*CASA*, Rule 23, and associational standing requirements—by obtaining an injunction requiring the government to withhold application of the 2025 Alert from individuals or organizations that are unknown to the government.

Limiting a remedy to the members Plaintiffs have identified for standing purposes appropriately leaves the breadth of the remedy Plaintiffs can receive in its own hands. Therefore, should this Court grant Plaintiffs' motion, Plaintiffs should be required to identify those members to which this Court's relief should apply. Nothing prevents Plaintiffs from naming as many of its local affiliates, members, and volunteers as it wishes so that each can benefit from any relief the Court orders. Likewise, nothing prevents Plaintiffs' affiliates, members, or volunteers from seeking to litigate this case as a class action. What courts cannot do is enjoin the USCIS from applying the 2025 Alert to any organization or individual who is

40

currently seeking or will seek to participate in an administrative naturalization ceremony when the government does not know the identity of those organizations or individuals, because Plaintiff has not identified them. In the event relief is granted, the Court should make clear that Defendants are enjoined from enforcing the 2025 Alert only with respect to the organizational affiliates, members, and/or volunteers that Plaintiffs have identified to the government for purposes of standing.

The same limitations apply to Plaintiffs' alternative request for stay under § 705 of the APA. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 139 (D. Md. 2025) (citation omitted), *appeal filed*, No. 25-2012, (4th Cir. 2025). A stay under § 705 is therefore subject to the same equitable limits as a preliminary injunction. The Supreme Court recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted), *on remand to* No. 22-5730 , 2024 WL 3469513, (6th Cir. 2024). The plain language of § 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" tailored "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," *id.*, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties with standing before the Court. *See CASA*, 606 U.S. at 841.

## V.    THE COURT SHOULD STAY ANY PRELIMINARY INJUNCTION AND REQUIRE PLAINTIFFS TO SUBMIT A BOND AS SECURITY.

If the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General. *See* Fed. R. App. P. 8(a).

41

For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken*, 556 U.S. at 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

Finally, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Particularly given that the relief requested by Plaintiffs could hinder Defendants' ability to administrative naturalization ceremonies consistent with the agency's current policies, the Court should consider the implications of any order prohibiting the USCIS from implementing its policy objectives.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated:  January 14, 2026                          Respectfully submitted,

                                                  BRETT A. SHUMATE
                                                  Assistant Attorney General

                                                  ANDREW I. WARDEN
                                                  Assistant Branch Director
                                                  Civil Division, Federal Programs Branch

                                                  */s/ Ryan Underwood*
                                                  RYAN M. UNDERWOOD
                                                  (D.C. Bar No. 1656505)
                                                  DAVID M. GLASS
                                                  (D.C. Bar No. 544549)
                                                  *Trial Attorneys*

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel. (202) 305-1952
Email: ryan.m.underwood2@usdoj.gov

*Attorneys for Defendants*

43