# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LEAGUE OF WOMEN VOTERS OF
THE UNITED STATES*, et al.*,

    *Plaintiffs,*

    v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,

    *Defendants.*

Civil Action No. 25-cv-3777-ABA

## MEMORANDUM OPINION

When people become naturalized as United States citizens, they are entitled, like any other U.S. citizen whether naturalized or U.S.-born, to exercise the right to vote. For decades, nonprofits have assisted United States Citizenship and Immigration Services ("USCIS") with providing voter registration services after many administrative naturalization ceremonies. USCIS has issued a new policy effectively banning all nongovernmental organizations from providing voter registration services at administrative naturalization ceremonies (the "Voter Assistance Ban" or the "Ban").

The League of Women Voters of the United States, including several of its state and local Leagues across the country (collectively, the "League Plaintiffs") and the National Council of Jewish Women, Greater New Orleans Section ("NCJW"), have sued to challenge that policy, and have filed motions for a preliminary injunction enjoining or staying it.[1] Defendants have filed a motion to dismiss. For the reasons explained below,

---

[1] They filed separate lawsuits, which the Court later consolidated under the above-captioned case (Case No. 25-cv-3777). Therefore, unless otherwise specified, all cited ECF Nos. are to filings in Case No. 25-cv-3777. "Plaintiffs" herein refers to all plaintiffs from both cases.

the motions for preliminary injunction will be granted based on Plaintiffs' First Amendment free speech and APA claims and NCJW's Fifth Amendment equal protection claim, and the Court will issue a stay of the Ban pending final review. The motion to dismiss will be granted as to NCJW's substantive due process claim and otherwise will be denied.

**Table of Contents**

I.    BACKGROUND............................................................................................................3
   A.    USCIS policies regarding NGO assistance at administrative naturalization ceremonies .................................................................................................................3
   B.    These cases .........................................................................................................9
II.   STANDARD OF REVIEW ..................................................................................... 13
   A.    Motion for Preliminary Injunction ..................................................................... 13
   B.    Motion to Dismiss ............................................................................................ 14
III.  DISCUSSION............................................................................................................. 15
   A.    Standing .......................................................................................................... 15
     1.    Direct Standing........................................................................................... 15
     2.    Associational Standing ................................................................................ 21
   B.    First Amendment Claims.................................................................................23
     1.    Free Speech................................................................................................23
     2.    Associational Rights ....................................................................................40
   C.    Fifth Amendment Claims.................................................................................42
     1.    Equal Protection Claim ............................................................................... 42
     2.    Substantive Due Process Claim....................................................................48
   D.    APA Claims ......................................................................................................52
     1.    Notice and Comment..................................................................................56
     2.    Arbitrary and Capricious..............................................................................60
     3.    Contrary to Constitutional Right.................................................................. 67
   E.    Remaining Preliminary Injunction Factors........................................................ 67
     1.    Irreparable Harm .......................................................................................68
     2.    Balance of Equities and Public Interest ........................................................71
   F.    Remedy............................................................................................................ 72
   G.    Bond ................................................................................................................ 74

H.   Request for Stay of Injunction ............................................................ 75

IV.  CONCLUSION ....................................................................................... 76

## I.    BACKGROUND[2]

When a person completes the process to become approved for U.S. citizenship,

the final step is a naturalization ceremony, a "public ceremony before the Attorney

General or a court" where the new citizen, among other things, takes the Oath of

Allegiance. 8 U.S.C. § 1448(a). Some new citizens are sworn in during naturalization

ceremonies at a federal court; those ceremonies are not at issue in this case. 8 U.S.C. §

1448(c); 8 C.F.R. § 337.8. Most new citizens participate in "administrative"

naturalization ceremonies, in which USCIS or an Immigration Judge administers the

Oath of Allegiance. 8 C.F.R. § 337.2. This case involves the process at administrative

naturalization ceremonies for educating new citizens about their right to vote.

### A.    USCIS policies regarding NGO assistance at administrative naturalization ceremonies

For decades, pursuant to both informal and formal policies, nongovernmental

organizations ("NGOs") have supported administrative naturalization ceremonies by,

---

[2] For purposes of Defendants' motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). For purposes of Plaintiffs' motion for preliminary injunction, the Court does not assume the allegations are true, but rather must decide whether Plaintiffs have established a likelihood of success on the merits. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, the relevant facts are largely undisputed. Where disputes of fact become relevant to the analysis—such as disputes regarding whether Plaintiffs' continued provision of voter registration services creates an administrative burden for USCIS—the evidence presented by both sides is discussed and, where necessary for adjudicating the preliminary injunction motions, the facts as described are those the Court finds based on the evidence in the preliminary injunction record.

among other things, providing voter registration services. Case No. 25-cv-3777 (hereinafter "*League*"), ECF No. 2 ¶ 26.

On December 16, 2010, USCIS issued an interim policy change to standardize the procedure regarding voter registration services to newly naturalized citizens at administrative naturalization ceremonies. ECF No. 53-3 at 124–137 (USCIS, PM-602-0014 (Dec. 16, 2010)); *League*, ECF No. 2 ¶ 35.[3] This interim policy change provided for a one-month informal comment period until January 20, 2011 and noted that it would be in effect until further notice. ECF No. 53-3 at 124 (PM-602-0014). USCIS officially implemented the policy on September 20, 2011. ECF No. 53-3 at 107–122 (USCIS, PM-602-0014.1 (Sept. 20, 2011)) (the "2011 Policy"); *League*, ECF No. 2 ¶ 35; *see* ECF No. 27-1, Declaration of Nathaniel I. Stiefel ¶ 13. The 2011 Policy also provided guidance for USCIS to evaluate potential guest speakers at naturalization ceremonies who "may be a civic, governmental, or military leader, a Member of Congress, a judge, a DHS official, or person whom USCIS's leadership deems appropriate for the occasion." ECF No. 53-3 at 112 (Section 75.3(e)).

The 2011 Policy required that USCIS ensure that at administrative naturalization ceremonies "[a]ll newly naturalized citizens . . . receive a voter registration application." *Id*. at 113 (Section 75.3(f)). The 2011 Policy described "[t]he options for distribution of voter registration applications" as the following (listed in "preferential order"):

- State or local government election offices may distribute and collect voter registration applications for an Election Official to review and officially register the individual to vote;

---

[3] Citations to page numbers for case documents are to the page number provided in the ECF header, not the page number native to the document itself.

- Non-governmental organizations may distribute and collect voter registration applications for an Election Official to review and officially register the individual to vote (if qualified and approved according to the criteria identified below); or
- In the absence of the above options, USCIS will provide voter registration applications to all new citizens – USCIS is not responsible for the collection of applications or any other activities related to voter registration.

*Id.*

The 2011 Policy further emphasized the preference for state or local election officials to provide the voter registration services but stated that "[i]f state or local election officials were unable to participate, all interested non-governmental groups may seek the privilege of offering voter registration services at the conclusion of administrative naturalization ceremonies." *Id.* at 114 (Section 75.3(f)). "To qualify, non-governmental organizations must be both non-profit and non-partisan" and "be deemed qualified by USCIS Field Leadership." *Id.* USCIS could grant approval "on a one-time or standing basis" and could "remove[]" approval "at any time if the participation requirements . . . are not met." *Id.*

USCIS amended this section of its Policy Manual in January 2013. ECF No. 53-3 at 1. The 2013 version includes all of the above quoted language from the 2011 Policy, with only minor capitalization changes and one sentence moved to a footnote. *Id.* at 1–13 & n. 754 (Part J, Chapter 5(D) & (E)). Other than a few minor grammatical changes,[4] the USCIS Policy Manual effective as of June 28, 2017 included all the same substantive

---

[4] For example, "All newly naturalized citizens will have the opportunity to receive a voter registration application" in the 2011 Policy was revised to "All newly naturalized citizens must be given the opportunity to register" in the 2017 Policy.

information as the quoted language from the 2011 Policy. ECF No. 53-3 at 17–42 (Part J, Chapter 5(D) &(F)).

On August 29, 2025, USCIS issued the policy at issue here: a new policy alert effectively banning all NGOs from providing voter registration services at administrative naturalization ceremonies. ECF No. 53-3 at 52–54 (USCIS, PA-2025-21 (Aug. 29, 2025)); ECF No. 53-3 at 55–91 (USCIS Policy Manual current as of February 3, 2026) (collectively, hereinafter referred to as the "Voter Assistance Ban"). The policy alert did not provide for a comment period and specified that it was effective immediately. ECF No. 53-3 at 52 (PA-2025-21). USCIS stated that, going forward, "only state and local election officials are permitted to provide voter registration services at the conclusion of an administrative naturalization ceremony" and emphasized that "[n]ongovernmental entities are not permitted to provide voter registration services at USCIS facilities during naturalization ceremonies." *Id.*

The policy alert offered the following justification for the Voter Assistance Ban, in a section entitled "Administrative Procedure Act (APA)":

> Although under previous USCIS policy and practice nongovernmental organizations were permitted to provide voter registration applications and general information at administrative naturalization ceremonies, the use of nongovernmental organizations was sporadic and varied based upon the location. In addition, USCIS staff previously provided voter registration applications and information at naturalization ceremonies in the event state and local election offices were not available to do so. Given USCIS does not primarily rely on nongovernment organizations for voter registration services, and the administrative burden on USCIS to ensure that those nongovernmental organizations who provide voter registration services are nonpartisan, USCIS is discontinuing the practice of permitting their attendance at naturalization ceremonies.

> This change in no way impacts new citizens' access to information and applications to register to vote, as this information will continue to be provided by state or local election officials, or USCIS staff at the end of naturalization ceremonies. In addition, with the availability of online voter registration in most states, there is a reduced need for nongovernmental organizations to assist new citizens with collecting and submitting their voter registration applications. See, for example, vote.gov/guide-to-voting/new-united-states-citizen. USCIS does not believe that aliens or nongovernmental organizations have any reliance interests related to representatives of nongovernmental organizations being present at naturalization ceremonies, but even if they do, USCIS interests in judiciously deploying limited agency resources while ensuring fair and impartial voter registration services at ceremonies outweigh any such reliance interests.

*Id.* at 53—54. The policy alert also stated that the changes were made pursuant to "Executive Order 14148, Initial Recissions of Harmful Executive Orders and Actions and Section 9 of Executive Order 14248, Preserving and Protecting the Integrity of American Elections." *Id.* (citing 90 F.R. 8237 (Jan. 20, 2025) (revoking Executive Order 14019, Promoting Access to Voting); 90 F.R. 14005 (Mar. 28, 2025)).

On the same day as the policy alert, USCIS internally distributed Leadership Guidance #41-25 notifying its officials that the Policy Manual had been revised "to limit voter registration services at administrative naturalization ceremonies to state and local election officials to emphasize the nonpartisan nature of services offered to new citizens" and that "[n]ongovernmental organizations will no longer be allowed to provide these services at administrative ceremonies." ECF No. 53-3 at 104–105; *see also* ECF No. 53-3 at 61–62 (USCIS Policy Manual, Part J, Chapter 5(F)(1), removing the option for nongovernmental organizations to provide voter assistance services in the Policy

Manual). In addition, "civic leader" was removed from the list of potential guest speakers at the ceremony. *See id.* at 59 (Part J, Chapter 5(D)).

As noted above, USCIS cited as the basis for the Voter Assistance Ban two executive orders—Executive Order 14148 (Jan. 20, 2025) and Executive Order 14248 (Mar. 25, 2025)—which revoked Executive Order 14019 (Mar. 7, 2021) or ordered agencies to cease implementing it. *See* Exec. Order No. 14148, Initial Recissions of Harmful Executive Orders and Actions, 90 F.R. 8237, 8238 (Jan. 20, 2025) (Sec. 2(aa)); Exec. Order No. 14248, Preserving and Protecting the Integrity of American Elections, 90 F.R. 14005, 14009 (Mar. 25, 2025) (Sec. 9). Specifically, Section 9 of Executive Order 14248 of March 25, 2025 instructs the heads of all agencies to cease any agency action implementing Executive Order 14019 of March 7, 2021 ("Promoting Access to Voting") as Executive Order 14019 had been revoked by Executive Order 14148 and required the heads of the agencies to file a report describing their compliance. 90 F.R. 14005, 14009 (Sec. 9). Section 3 of Executive Order 14019 had instructed agencies to "consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process." 86 F.R. 13623, 13623 (Sec. 3). It further had instructed agencies to "evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation[, including] . . . soliciting and facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises." *Id.* at 13623–24 (Sec. 3(a), (a)(iii)(C)).

Prior to the implementation of the Ban in August 2025, government officials made several public comments regarding voting by newly naturalized citizens. For example, in 2022 during the presidential campaign, then-future Vice President J.D.

Vance accused Democrats of encouraging an "invasion" of immigrants to "bring a large number of new voters to replace the voters we already have." Case No. 25-cv-3675 (hereinafter, "*NCJW*"), ECF No. 17-1 ¶ 63.[5] In 2024, then-future Department of Homeland Security Secretary (then South Dakota Governor) Kristi Noem, when referring to the U.S.-Mexico border, claimed that "The White House has [an] invasion happening on purpose and it is to remake the foundation of this country." *Id*. ¶ 64.[6]

On August 13, 2025 (sixteen days before the Ban), USCIS Director Joseph Edlow stated his view that the "long-term plan [of the Biden administration] was to grant some sort of mass amnesty, make them all citizens, and then spread them out to try to change demographics elsewhere throughout the country." *Id*. ¶ 65.[7]

### B.    This case

Plaintiffs are various 501(c)(3), 501(c)(4), and volunteer organizations across the United States.  *NCJW*, ECF No. 17 ¶ 11; *League*, ECF No. 2 ¶¶ 10, 15, 18, 21, 23, 25. For over fifty years, Plaintiffs have provided voter registration services at administrative naturalization ceremonies. *League*, ECF No. 2 ¶ 26. For example, since 2003, staff or members of the League of Women Voters of the Charleston Area have provided voter

---

[5] Steve Peoples, *Republican Senate candidates promote 'replacement' theory*, PBS, May 17, 2022, https://www.pbs.org/newshour/politics/republican-senate-candidates-promote-replacement-theory.

[6] CBS News, *South Dakota Gov. Kristi Noem calls on Nikki Haley to exit 2024 race*, at 4:56–5:02 (YouTube, Mar. 5, 2024), https://www.youtube.com/watch?v=yDBhxGmr-v8 [https://perma.cc/U888-9HJV].

[7] John Binder, *Exclusive—USCIS Director Joe Edlow Says Biden Plan was 'Mass Amnesty' to 'Change Demographics' of America*, Breitbart, Aug. 13, 2025, https://www.breitbart.com/politics/2025/08/13/exclusive-uscis-director-joe-edlow-says-biden-plan-was-mass-amnesty-to-change-demographics-of-america/ [https://perma.cc/6MD2-AMYS].

registration assistance at most administrative ceremonies held within Charleston County, South Carolina, occurring anywhere between once a week and four times a week. *Id.* ¶ 24. Since 2017, staff or members of the League of Women Voters of Colorado along with local Colorado Leagues have registered more than 6,000 naturalized citizens to vote at more than 200 administrative naturalization ceremonies. *Id.* ¶ 17. Since 2023, staff or members of the League of Women Voters of Saratoga County have attended at least two ceremonies per year and registered between 11 and 20 new citizens at each ceremony. *Id.* ¶ 22. In 2024, staff or members of the League of Women Voters of Milwaukee County assisted 304 new citizens in registering to vote and provided educational information for the completion of voter registration applications to another 590 citizens. *Id.* ¶ 26. In 2025 alone, prior to the Voter Assistance Ban, its staff or volunteers attended more than 70 ceremonies and registered 83 new citizens to vote, and three local Leagues in New Jersey attended 194 ceremonies and registered 2,583 new citizens to vote. *Id.* ¶¶ 20, 26.

Since 2018, NCJW's staff or members have attended two to three ceremonies per month and registered between thirty and fifty new citizens to vote at each ceremony, including during the COVID-19 pandemic. *NCJW*, ECF No. 17 ¶¶ 44–45. In addition to providing voter registration forms, NCJW provided new citizens with forms that highlighted which fields were required rather than optional and translated the form into four languages. *Id.* ¶ 48.

Plaintiffs filed these cases in November 2025. *NCJW*, ECF No. 1; *League,* ECF No. 2. Plaintiffs allege that the Voter Assistance Ban violates their free speech and associational rights under the First Amendment. *NCJW*, ECF No. 17 ¶¶ 106–109; *League,* ECF No. 2 ¶¶ 108–124. They allege the Voter Assistance Ban also violates the

Administrative Procedure Act ("APA") because it was not accompanied by a notice-and-comment procedure, is arbitrary and capricious, and constituted an agency action contrary to constitutional rights. *NCJW*, ECF No. 17 ¶¶ 110–127; *League*, ECF No. 2 ¶¶ 98–107, 125–132. In addition, NCJW in its case alleges that the Ban violates the Fifth Amendment as a matter of equal protection and substantive due process. *NCJW*, ECF No. 17 ¶¶ 97–105. Given that the two cases relate to the same government defendants and the same governmental actions, all parties jointly requested, and the Court granted, consolidation of the cases. ECF Nos. 24 & 26.

Plaintiffs have filed motions for a preliminary injunction requesting that the Court enjoin the Voter Assistance Ban or, alternatively, grant an administrative stay under the APA. *NCJW*, ECF No. 20; *League*, ECF No. 21. The government has filed a consolidated response to both motions, ECF No. 27, and Plaintiffs filed separate reply briefs, ECF Nos. 30 & 31. The government filed a motion to dismiss both complaints in their entirety. ECF No. 33. Plaintiffs filed separate response briefs, ECF Nos. 35 & 36, and the government filed a reply brief, ECF No. 42.

In its response to the preliminary injunction motions, the government contends that, under the Voter Assistance Ban, "[n]ewly naturalized citizens will continue to receive the same information about registering for voting that they have in the past." ECF No. 27-2, Declaration of Claudia F. Young ("Young Decl."), ¶ 12. Specifically, it asserts that "[n]ew citizens receive a Form M-767 which explains their rights as new citizens [as well as] a local voter registration form for the new citizen to complete and either hand in to a state or local official at the ceremony or via mail or online after the ceremony." *Id.* That form congratulates new citizens and includes "a list of some of the most important rights and responsibilities that all citizens—both Americans by birth

11

and by choice—should exercise, honor, and respect." Form M-767, *Important Information for New Citizens*.[8] The Form M-767 is not new but was revised in December 2025. *Id.* In pertinent part, it states as follows:

> **Register to Vote**
> As a new U.S. citizen, you may register to vote. You can register to vote by applying in person, by mail, at public assistance offices, or when you apply for or renew your driver's license. Visit the U.S. Election Assistance Commission's website at **vote.gov** for more information.

The referenced website, www.vote.gov, is managed by the U.S. Election Assistance Commission. The website contains information about how to register to vote or update voter registration, organized by state or territory, along with links to state election websites, and information about how to exercise the right to vote. At present, it offers at least some of that information in twenty languages (including English).[9]

On March 17, 2026, the Court held a hearing on all three motions and, shortly after, ordered the government to file the administrative record related to the APA claims, which it did on April 15, 2026. ECF Nos. 44, 45, 48, 53. The administrative record included (in chronological order):

- the 2010 Interim Policy Memorandum (December 16, 2010), ECF No. 53-3 at 124–137;

---

[8] https://www.uscis.gov/sites/default/files/document/flyers/M-767.pdf [https://perma.cc/4FUE-A95X] (December 2025).

[9] At present, the Election Assistance Commission lacks any Commissioners. *See* Erica L. Green & Dustin Volz, *Trump Administration Fires Members of Independent Election Group*, N.Y. Times (July 10, 2026), https://www.nytimes.com/2026/07/10/us/politics/trump-fires-election-assistance-commission-members.html [https://perma.cc/C726-ADEG].

- the 2011 Policy Memorandum (September 20, 2011), *id*. at 107–122;

- USCIS Policy Manual, Part J, Ch. 5 (Excerpt) (January 22, 2013), *id*. at 1–16;

- USCIS Policy Manual, Part J, Ch. 5 (Excerpt) (June 28, 2017), *id*. at 17–51;

- USCIS Form N-401 (August 17, 2023), *id*. at 103;

- Executive Order 14148 (January 28, 2025), *id*. at 92–96;

- Executive Order 14248 (March 28, 2025), *id*. at 97–102;

- 2025 Policy Alert (August 29, 2025), *id*. at 52–54;

- Leadership Guidance #41-25 (August 29, 2025), *id*. at 104–105; and

- USCIS Policy Manual, Part J, Ch. 5 (Excerpt) (February 3, 2026), *id*. at 55–91.[10]

The Court also ordered the parties to file supplemental briefs based on the administrative record, which they each did. ECF Nos. 48, 54, 55, 56.

## II.    STANDARD OF REVIEW

### A.    Motion for Preliminary Injunction

A preliminary injunction is a form of equitable relief intended to prevent irreparable harm while a lawsuit remains pending. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). To obtain a preliminary injunction, a plaintiff must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities

---

[10] Given that many of the documents in the administrative record also appear in the record of this case within various briefs, for consistency, the Court will only refer to the version of the documents within the administration record at ECF No. 53. To the extent either party refers to documents included in the administrative record, the Court will state the reference in terms of ECF No. 53.

tip in his favor; and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *League of Women Voters of N.C.*, 769 F.3d at 236; *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 168–69 (4th Cir. 2025) ("*Bessent II*"). The third and fourth factors merge when, as here, the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B.      Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative relief" by containing "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court reviewing a 12(b)(6) motion must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679.

### III.   DISCUSSION

#### A.   Standing

The Court begins by analyzing whether Plaintiffs have sufficiently alleged and are likely to have standing to sue. Plaintiffs are not themselves new citizens who are entitled to voter registration information. They are organizations that have traditionally provided that information at administrative naturalization ceremonies and that USCIS has now prohibited from doing so. The government argues that (1) Plaintiffs lack direct standing to bring their First Amendment claims, ECF No. 33-1 at 19–25, (2) NCJW lacks direct standing to bring its Fifth Amendment claims, *id.* at 25–27, and (3) NCJW lacks associational standing, *id.* at 27–28.

#### 1.   Direct Standing

"To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009), and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[S]tanding is usually easy to establish" where the challenged conduct includes "[g]overnment regulations that require or forbid some action by the plaintiff"; such actions "almost invariably satisfy both the injury in fact and causation requirements." *Id.* at 382 (citing *Lujan*, 504 U.S. at 561–62).

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract," and it "must be particularized," meaning that it "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Id.* at 381 (quoting

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021), and *Lujan*, 504 U.S. at 560 n.1). "[T]he injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Thus, this factor "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* "[T]o establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury— in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385.

"Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* at 394 (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State*, 454 U.S. 464, 486 (1982), and *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)) (internal citations omitted). "A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). While an organization plaintiff cannot establish standing based solely on a diversion of resources in response to a defendant's actions, it can establish standing by showing that a defendant's actions "directly affected and interfered with [its] core business activities." *Id.* at 395 (citing *Havens*, 455 U.S. 363); *see also D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 266–67 (4th Cir. 2026) (hereinafter, "*D.C.*"). An advocacy-based organization cannot establish standing where the challenged action, rather than imposing an impediment on its advocacy work, "compelled it 'to do the very thing it was formed to do,' which is advocate for" its members. *D.C.*, 171 F.4th at 267.

16

### a) Direct standing for Plaintiffs' First Amendment claims

Plaintiffs allege that the Voter Assistance Ban violates their First Amendment rights by restricting and chilling speech through voter registration assistance and associational activities with prospective voters and among their members at administrative naturalization ceremonies. *League*, ECF No. 2. ¶¶ 112, 122; *NCJW*, ECF No. 17 ¶ 109.

The government argues that Plaintiffs lack standing to assert these claims because "they do not have a constitutionally protected interest in engaging in speech at administrative naturalization ceremonies" and thus "have suffered no actual injury because there is no legally protected interest to violate." ECF No. 33-1 at 20; ECF No. 27 at 22. It further argues that the Voter Assistance Ban "in no way censors or 'chills' Plaintiffs from expressing their views about the importance of voting and voter registration for new citizens or on any topic more broadly." ECF No. 33-1 at 21; ECF No. 27 at 22–23. The government also argues that Plaintiffs' contentions that the Voter Assistance Ban bars their organizations' abilities to fulfill their missions, requires a diversion of resources, or Plaintiffs' "generalized interest in seeing that newly naturalized citizens are encouraged to vote and provided the opportunity to register" are insufficient to establish an injury in fact. ECF No. 33-1 at 21–22, 24; ECF No. 27 at 23–27. Finally, the government argues that the League Plaintiffs' standing to assert their freedom of association claim fails on traceability grounds because "an individual's decision to become a member of or volunteer on behalf of [the League] would be the consequence of an 'unfettered choice[]' made by an 'independent actor[]' that is not before the Court." ECF No. 33-1 at 22–23 (quoting *Lujan*, 504 U.S. at 562).

The League Plaintiffs contend that the government's "argument improperly conflates whether Plaintiffs have suffered a First Amendment *violation* with whether they have standing to *challenge* the Voter Assistance Ban." ECF No. 35 at 16 (emphasis in original); ECF No. 30 at 5. Plaintiffs further argue that they have standing to assert their First Amendment claims based on their allegations that their First Amendment activities have been chilled and that the Voter Assistance Ban "interfered with Plaintiffs' core organizational activities of encouraging and assisting new citizens to register to vote and [] has forced Plaintiffs to expend significant resources attempting to find other ways to reach new citizens." ECF No. 35 at 16–18; *see also* ECF No. 36 at 16–17. Finally, the League Plaintiffs assert that the government "misunderstands [their] association claim, which hinges not on whether new citizens choose to join the League or not, but rather on the fact that [League] Plaintiffs are cut off from any opportunity to associate with these individuals in the first place by virtue of being prohibited from attending and speaking at administrative naturalization ceremonies—the direct result of the Voter [Assistance] Ban." ECF No. 35 at 18.

Much of the government's standing argument improperly conflates the First Amendment merits analysis and the standing analysis. Focusing on standing, Plaintiffs allege multiple times in their respective complaints that voter registration assistance, particularly as related to newly naturalized citizens, is a core activity and mission of their respective organizations. *See League*, ECF No. 2 ¶¶ 2, 11; *NCJW*, ECF No. 17 ¶¶ 13, 18, 21, 117. Unlike in *D.C.*, Plaintiffs assert that the Ban impedes this core activity rather than merely causing them to shift how they support their members. 171 F.4th at 266–67. As such, Plaintiffs have shown more than just a "diversion of resources" but rather have sufficiently alleged an interference with core organizational activities, which is sufficient

to establish standing at this stage. *See Food & Drug Admin.*, 602 U.S. at 395 (citing *Havens*, 455 U.S. 363). Plaintiffs further allege that the Voter Assistance Ban chills or forecloses protected speech and associational activities and that their ability to participate in these First Amendment activities has ceased since the issuance of the Voter Assistance Ban. *See League*, ECF No. 2 ¶¶ 69, 79, 89, 112, 122; *NCJW*, ECF No. 17 ¶¶ 61, 109. The Fourth Circuit has "recognized that, to demonstrate injury in fact [for a First Amendment claim], it is sufficient to show that one's First Amendment activities have been chilled. . . . Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)) (internal quotations omitted). Therefore, Plaintiffs have sufficiently alleged and shown a likelihood of success in establishing an injury in fact based both on the interference with core business activities and the alleged chilling of First Amendment-protected activities.

While the government does not dispute that the speech injuries are traceable to the government's actions and would be redressable by the Court, it does contend that the League Plaintiffs' associational harms are not traceable to the Ban. ECF No. 33 at 22–23. But the League Plaintiffs sufficiently allege that their associational harms are a direct result of their inability to attend the naturalization ceremonies and associate with prospective voters. *See League*, ECF No. 2 ¶¶ 122–123. This is sufficient to allege traceability to the government's actions. Plaintiffs have sufficiently alleged and shown a likelihood of success in establishing standing as to their First Amendment claims.

### b)    Direct standing for NCJW's Fifth Amendment claims

NCJW alleges that the Voter Assistance Ban violates its Fifth Amendment rights of equal protection and substantive due process. *NCJW*, ECF No. 17 ¶¶ 97–105. The Fourth Circuit has held that "standing to assert that discriminatory government action violated the equal protection clause is not lacking simply because the plaintiff is not a member of a minority." *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1415 (4th Cir. 1983). Moreover, where a defendant is alleged to have discriminated on the basis of race or national origin and a plaintiff is harmed as a result of that discrimination, the plaintiff's harm need not have been of the same nature as the harm to the people discriminated against for that plaintiff to have standing to sue. *Id.* For example, in *Scott*, the Fourth Circuit held that the plaintiff, a real estate developer whose building permit for a proposed multi-family housing complex was denied based on alleged racial discrimination against his prospective tenants, had sufficiently alleged standing for his Fifth Amendment claims even though the plaintiff was not a member of the marginalized group. *Id.* at 1414–16.

The government contends that NCJW lacks standing for its Fifth Amendment claims on behalf of itself because it "fails to identify a single naturalized citizen who was prevented from voting or registering to vote by their organization's absence at naturalization ceremonies," and it "fails to establish that the relief they request in their complaint is necessary to redress the injury—*i.e.*, that a permanent injunction would prevent the government from interfering in newly naturalized citizens' exercise of the franchise." ECF No. 33-1 at 25–26. The government also contends that, insofar as NCJW is asserting the rights of third parties (i.e. newly naturalized U.S. citizens), it has

not satisfied the requirements for third-party standing. *Id.* at 26. NCJW contends that its Fifth Amendment claims are not raised on behalf of new citizens but rather are based on an injury to NCJW itself that was caused by discriminatory actions against individuals whom NCJW serves. ECF No. 36 at 18–19 (citing *Scott*, 716 F.2d at 1413–15).

Here, similar to *Scott*, NCJW has asserted that it was injured as a result of discrimination based on national origin. Specifically, NCJW asserts that the Voter Assistance Ban was motivated by discriminatory intent and that the Ban injured NCJW by excluding it from a forum for discriminatory reasons. *NCJW*, ECF No. 17 ¶¶ 99, 101, 104, 105; ECF No. 36 at 19. Under *Scott*, these allegations are sufficient for standing for NCJW's Fifth Amendment claims regardless of whether NCJW or its members are a part of the group discriminated against. 716 F.2d at 1415.

### 2.    Associational Standing

As an alternative to direct standing, organizational plaintiffs can establish associational standing based on injury to their members. *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Summers*, 555 U.S. at 497–98). To invoke associational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). "Associational standing does not expand a third party's rights but allows an organization to 'rais[e] [the] legal rights' of its members in their stead." *D.C.*, 171 F.4th at 266 (quoting *United*

21

*Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc. (UFCW)*, 517 U.S. 544, 557 (1996)) (alteration in original).

The government contends that NCJW failed to establish associational standing because it "fail[ed] to specifically identify any such members of [its] organization[]." ECF No. 33-1 at 28.[11] NCJW contends that this argument fails (1) because the requirement to identify specific injured members does not apply where the allegation is that "*all* the members of the organization are affected by the challenged [action]," *Summers*, 555 U.S. at 499 (emphasis in original), and (2) because it has filed a declaration from a member who attested to the harm the Voter Assistance Ban has had on her. ECF No. 36 at 17 (citing *NCJW*, ECF No. 20-2, Declaration of Joy Willing).

Although NCJW has sufficiently alleged direct standing to bring its First and Fifth Amendment claims, NCJW has also sufficiently alleged associational standing based on an interference with its members' ability to participate in voter registration assistance at the naturalization ceremonies, which was a core activity of the organization. Unlike in *D.C.*, NCJW has asserted that all of its members, including the one who provided a declaration, have had their First and Fifth Amendment rights violated and thus would individually have the right to pursue these claims. 171 F.4th at

---

[11] The League Plaintiffs appear to also assert associational standing. *See* ECF No. 21-1 at 17 ("The Voter Registration Ban also infringes Plaintiffs' ability, **and that of their members and volunteers**, to engage in expressive activity . . . .") (emphasis added). The government only argues that NCJW failed to establish associational standing. *See* ECF No. 33-1 at 28. Because the Court concludes that the League Plaintiffs have sufficiently alleged direct standing, *see* § III.A.1.a., *infra*, it need not reach the question of whether the League Plaintiffs also have associational standing or whether the government has forfeited an objection to the League Plaintiffs' associational standing.

266 (citations omitted). Therefore, NCJW has also sufficiently alleged associational standing for its claims.

### B.    First Amendment Claims

#### 1.    Free Speech

The First Amendment protects not only speech but also "conduct that is inherently expressive." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 65–66 (2006); *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (quoting *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974)) (holding that conduct implicates the First Amendment when it is "sufficiently imbued with elements of communication"). Courts have held that voter registration assistance constitutes expressive conduct to which First Amendment protections apply. *See, e.g., Tenn. State Conf of NAACP v. Hargett*, 420 F. Supp. 3d 683, 704 (M.D. Tenn. 2019) (holding that voter registration regulations are subject to protections under the First Amendment); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) ("Because the collection and submission of voter registration drives is intertwined with speech and association, . . . [it] comes with the protections of the First Amendment"); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006) ("[P]articipation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment.").

The government concedes that the Voter Assistance Ban affects speech and expressive conduct and thus implicates the First Amendment. *See* ECF No. 33-1 at 21 ("Each Plaintiff here . . . has only been barred from expressing their message at administrative naturalization ceremonies"). Instead, the government argues that, under the "forum-based approach," administrative naturalization ceremonies constitute a

23

*nonpublic* forum for which the government may reasonably restrict access and speech. *Id.* at 33–34.

The League Plaintiffs assert that the Voter Assistance Ban infringed upon their First Amendment free speech rights as it (1) regulated and chilled core protected political speech, and (2) restricted their speech based on content, viewpoint, and the identity of the speaker. *League*, ECF No. 2 ¶¶ 111, 112, 115, 117. The League Plaintiffs contend that each of these bases would result in the Ban being subject to strict scrutiny, which it cannot survive. *League*, ECF No. 21-1 at 29–33. NCJW contends that the Ban infringed upon its free speech rights based on viewpoint discrimination and fails to survive strict scrutiny. *NCJW*, ECF No. 17 ¶ 107; *NCJW*, ECF No. 20-1 at 32–36. Plaintiffs further contend that, even if strict scrutiny does not apply, the Voter Assistance Ban still violates their free speech rights under the reasonableness test. *League*, ECF No. 21-1 at 33–35; *NCJW*, ECF No. 20-1 at 36–38.

The Court addresses each of these claims in turn, starting with determining whether the Voter Assistance Ban is subject to strict scrutiny.

### a)      Determining the Level of Scrutiny

Because the government sometimes may set reasonable speech restrictions on property that it owns and controls, in order to determine whether the Voter Assistance Ban is constitutional, the Court must first determine what level of scrutiny applies. *See Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("*ISKCON*"). Regulations subject to strict scrutiny "survive only if they are narrowly drawn to achieve a compelling state interest." *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see Perry*, 460 U.S. at 45 (citing *Carey v. Brown*, 447 U.S. 455, 461 (1980) (holding that the government "must show that its regulation is

necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end")). "[A] law rarely survives such scrutiny." *Burson v. Freeman*, 504 U.S. 191, 200 (1992). Regulations subject to the "reasonableness" standard are permissible so long as they are "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018) (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

### (1)    Public vs. Nonpublic Forum

When a speech restriction or regulation applies only to a specific location, it implicates a "forum-based approach" to determine what standard applies to evaluating the regulation. *Minn. Voters*, 585 U.S. at 11 (citing *ISKCON*, 505 U.S. at 678). "Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums." *Id.* "In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id.* (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Designated public forums are "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose,'" and are subject to the same standard as traditional public forums. *Id.* (quoting *Pleasant Grove City*, 555 U.S. at 469–70). "A designated public forum is 'created by government designation . . . for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" *People for Ethical Treatment of Animals, Inc. v. Shore Transit*, 580 F. Supp. 3d 183, 190 (D. Md. 2022) (quoting *Cornelius*, 473 U.S. at 802). "In a nonpublic forum [controlled by the government], on

25

the other hand—a space that 'is not by tradition or designation a forum for public communication'—the government has much more flexibility to craft rules limiting speech." *Minn. Voters*, 585 U.S. at 11–12 (quoting *Perry*, 460 U.S. at 46). In a nonpublic forum, the government may regulate speech "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 12 (quoting *Perry*, 460 U.S. at 46) (internal quotations omitted).

Plaintiffs contend that administrative naturalization ceremonies are public or designated public forums as they "take place in a variety of forums, including canonical public forums, such as national parks, public libraries, and public schools" and the ceremonies "are required by law to be public." ECF No. 30 at 14; *League*, ECF No. 21-1 at 33; ECF No. 36 at 28–29.[12] The government contends that such ceremonies are nonpublic forums, focusing on who is permitted to speak during naturalization ceremonies themselves: "USCIS has not intentionally opened up administrative naturalization ceremonies to general public discourse" but rather "[t]he only member of the public permitted to speak at an administrative naturalization ceremony is a guest speaker selected by USCIS to provide keynote remarks." ECF No. 27 at 33 (citing ECF No. 53-3 at 111–112).

Although administrative naturalization ceremonies at times take place in traditional public forums (such as a national park), and in general any person who wishes to *attend* such a ceremony may do so, those features do not render the

---

[12] Plaintiffs also contend that the forum-based approach is immaterial as the Voter Assistance Ban violates any level of scrutiny. ECF No. 30 at 14; ECF No. 31 at 9; ECF No. 36 at 28–29.

naturalization ceremonies themselves "public forums" for First Amendment purposes. The government has not opened the *ceremonies*—i.e. who may participate in the ceremonies themselves—up to speech by the public. All versions of the USCIS Policy Manual have maintained the government's authority to select who serves as a guest speaker during the ceremony as well as impose restrictions on what that guest speaker may discuss. *See* ECF No. 53-3 at 11–12.

Plaintiffs respond that even if the naturalization ceremonies themselves are not public forums in the sense of who may be recognized as a speaker during the formal ceremony, the space surrounding the ceremony (but within the USCIS buildings or the other spaces where the USCIS ceremonies take place) are public forums because any person may *attend* the ceremonies. ECF No. 21-1 at 19 & n.19 (citing 8 U.S.C. § 1448(a) (referring to the naturalization ceremony as a "public ceremony")). The record does support the factual assertion that the "public" is permitted to attend naturalization ceremonies, in the sense that the new citizens may invite family and friends to observe the ceremony. *See e.g., Brown v. Holder*, 763 F.3d 1141, 1152 (9th Cir. 2014) (holding that an oath of allegiance given in a non-public setting is insufficient to qualify for citizenship). But a member of the public attending a naturalization ceremony as essentially a spectator or supporter does not necessarily render administrative ceremonies "public" in the sense of being "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius*, 473 U.S. at 802. These ceremonies are not "for use by the public at large" for speech of the nature that Plaintiffs have in mind. Plaintiffs do not contend, for example, that a local bakery may set up a table outside the ceremony advertising its baked goods or a group educating new citizens about matters unrelated to new citizens' newly acquired

rights and responsibilities. Other potential individuals or groups may have a claim to a right to be present akin to Plaintiffs' claim—an organization that might want to educate new citizens about their Second Amendment rights comes to mind. But because Plaintiffs have not shown a likelihood of success in establishing that administrative naturalization ceremonies are "public forums" for First Amendment purposes, the Court must consider them nonpublic forums. This means that, although the nature of the forum does not trigger strict scrutiny, any restriction on speech must be reasonable and viewpoint neutral. *See Minn. Voters*, 585 U.S. at 11–12.

### (2)   Political Speech Restriction

The next reason Plaintiffs contend the Ban is subject to scrutiny is that it limits "core political speech." *See, e.g.*, ECF No. 21-1 at 29. Generally, regulations "involv[ing] a limitation on political expression [are] subject to exacting scrutiny." *Meyer v. Grant*, 486 U.S. 414, 420 (1988) (citing *Buckley v. Valeo*, 424 U.S. 1, 45 (1976)). Political expression, also referred to as "core political speech," "involves 'interactive communication concerning political change.'" *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186 (1999) ("*Buckley*") (quoting *Meyer*, 486 U.S. at 422). In other words, for speech to qualify as "political expression," the content of the speech must involve "a matter of societal concern that [plaintiffs] have a right to discuss publicly without risking [] sanctions." *Meyer*, 486 U.S. at 421. But "the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Minn. Voters*, 585 U.S. at 12.

In *Meyer*, the Supreme Court held that circulating a petition regarding the deregulation of the trucking industry sought to achieve political change and addressed a

28

matter of public concern and thus constituted political speech. 486 U.S. at 421–22. In *Buckley*, the Supreme Court held that the requirement for individuals circulating ballot petitions to be registered voters "impose[d] a burden on political expression that the State has failed to justify." 525 U.S. at 194–95 (quoting *Meyer*, 486 U.S. at 428).

The League Plaintiffs assert that their voter registration efforts constitute "core political speech" because, when they register voters, "they communicate a message about the importance of political participation that is central to their mission." ECF No. 21-1 at 29–30. They further contend that their voter registration activities at USCIS ceremonies "'involve[] both the expression of a desire for [an engaged electorate] and a discussion of the merits of [voting].'" *Id.* at 30 (quoting *Meyer*, 486 U.S. at 421).

The League Plaintiffs' contention that voter registration assistance constitutes core political speech (triggering strict scrutiny) fails because they have not shown how voter registration assistance "involves 'interactive communication concerning political *change'*" or a "matter of societal concern." *Buckley,* 525 U.S. at 186 (quoting *Meyer*, 486 U.S. at 422) (emphasis added); *Meyer*, 486 U.S. at 421. Unlike *Buckley* and *Meyer*, the speech at issue here (registering an individual to vote) does not, for example, involve "a discussion of the merits of [a] proposed change." *Meyer*, 486 U.S. at 421. Plaintiffs assisting individuals register to vote is different from the type of persuasion to support or oppose a cause at issue in *Meyer. Id.* This shortcoming is further illustrated by a requirement of the prior USCIS policy—the one that Plaintiffs are requesting effectively be reinstated. One of those requirements, which Plaintiffs do not dispute was constitutional and appropriate, was that their participation *not* include "political activity, partisan or otherwise." *See* ECF No. 27 at 17; ECF No. 53-3, at 14 (2011 Policy); 43 (2017 policy). In other words, Plaintiffs' likelihood of establishing on the merits that

the Ban is subject to strict scrutiny based on their speech constituting "political expression" under *Meyer* is undermined by their acknowledgement that their speech at naturalization ceremonies must *not* include "political activity."

Moreover, regardless of whether voter registration assistance constitutes political speech, administrative naturalization ceremonies are nonpublic forums, *see* § III.B.1.a.1., *supra.*, and thus the government may regulate what, if any, political speech occurs in that forum (so long as it is viewpoint-neutral). *See Minn. Voters*, 585 U.S. at 12. Therefore, the League Plaintiffs' argument that voter registration assistance constitutes "core political speech" and thus the Ban is subject to strict scrutiny on that ground fails.

### (3)   Content-Based Restriction

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. St. Paul,* 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 118 (1991)). However, "the government may impose some content-based restrictions on speech in nonpublic forums." *Minn. Voters*, 585 U.S. at 12.

The League Plaintiffs contend that the Voter Assistance Ban constitutes a content-based restriction and thus is subject to strict scrutiny. ECF No. 21-1 at 30. The government disagrees "because USCIS, in some cases with the assistance of state and local election officials, is continuing to provide information about voter registration to newly naturalized citizens at administrative voter registration ceremonies." ECF No. 42 at 5. It further contends that, as a nonpublic forum, the government may impose

30

restrictions (even if content-based) so long as they are reasonable and viewpoint neutral. ECF No. 33-1 at 33–34 (citing *Minn. Voters*, 585 U.S. at 12).

Because administrative naturalization ceremonies are nonpublic forums, *see* § III.B.1.a.1., *supra.*—and therefore content-based restrictions are permissible so long as they are reasonable and viewpoint neutral, *Minn. Voters*, 585 U.S. at 12—the Court need not decide whether the Ban constitutes a content-based restriction.

### (4)    Speaker-Based Restriction

Generally, courts should be "deeply skeptical of laws that 'distinguish among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777–78 (2018) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)). However, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity as long so the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Goulart v. Meadows*, 345 F.3d 239, 248–49 (4th Cir. 2003) (quoting *Cornelius,* 473 U.S. at 806) (quotations omitted).

Although the government conceded that the Voter Assistance Ban constitutes a speaker-based restriction, ECF No. 49, Transcript of Proceedings, Motions Hearing March 17, 2026 ("Mot. Hearing Trans.") 79:18–20, 79:23–80:2, because the Court has concluded that administrative naturalization ceremonies are nonpublic forums in relevant respect, *see* § III.B.1.a.1., *supra.*—and therefore speaker-based restrictions are permissible so long as they are reasonable and viewpoint neutral, *Minn. Voters*, 585 U.S. at 12—a speaker-based restriction is not a basis upon which strict scrutiny applies.

### (5)    Viewpoint-Based Restriction

Regardless of the forum, any viewpoint-based restriction on speech is subject to strict scrutiny. *Minn. Voters*, 585 U.S. at 12 (citing *Perry*, 460 U.S. at 46); *see also Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) ("The ban on viewpoint discrimination is a constant."). "[T]he test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in judgment) (citing *Cornelius*, 473 U.S. at 806). Viewpoint discrimination is a subset of content-based discrimination, and the distinction between the two is not a precise one. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830–31 (1995); *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 365 (D. Md. 2021).

"[T]he 'principal inquiry' in assessing a claim of viewpoint discrimination 'is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Planned Parenthood of S.C. Inc. v. Rose*, 361 F.3d 786, 795 (4th Cir. 2004) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A restriction discriminates based on viewpoint even if it "discriminate[s] against an entire class of viewpoints"—as opposed to only a particular viewpoint— because not "all debate is bipolar." *Rosenberger*, 515 U.S. at 831; *see Matal*, 582 U.S. at 243 (holding that, even though the prohibition on disparagement at issue there applied equally to "Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it constituted viewpoint discrimination as "[g]iving offense is a viewpoint"). "In *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, the

32

Supreme Court did not rely solely on an 'objective' comparison of included and excluded groups in determining whether a governmental forum access policy was viewpoint neutral." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 385 (4th Cir. 2006) (citing *Lamb's Chapel v. Cntr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Rosenberger*, 515 U.S. 819; *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)). "The history of the forum and a comparison of the characteristics of the included and excluded groups were, of course, relevant to the Court in these cases, but they were not determinative." *Id*. In determining whether "the government's justification for a restriction on speech was actually a pretext for viewpoint discrimination,"

> [r]elevant factors include consideration of statements made by government officials concerning the reasons for an action; disparate treatment towards people or things sharing the characteristic that was the nominal justification for the action; a "loose or nonexistent" "fit between means and ends," the historical background of the decision; the specific sequence of events leading up to the decision; departures from normal procedures or substance; and post hoc rationalization.

*St. Michael's Media*, 566 F. Supp. 3d at 367 (quoting *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004); citing *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365–66 (D.C. Cir. 2018); *Pittsburg League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 297–99 (3d Cir. 2011)) (internal citations omitted).

Plaintiffs contend that the Voter Assistance Ban constitutes viewpoint discrimination because it (1) "singles out voter registration assistance (and the message it sends) for exclusion" while "permitting NGOs to participate in naturalization ceremonies in other ways"; (2) "singles out NGOs as the speakers who cannot provide

that assistance" while "allowing local officials to do so in the same setting," *NCJW*, ECF No. 20-1 at 35 (internal citation omitted); and (3) "discriminates against Plaintiffs based on their views that voter participation by naturalized citizens is fundamental to a healthy democracy." ECF No. 21-1 at 30. They describe the Ban as "precision targeting," operating to "control who may convey a particular message at the moment citizenship begins." *NCJW*, ECF No. 20-1 at 35 (citations omitted); *id.* (quoting *Cornelius*, 473 U.S. at 806) ("The government also discriminates based on viewpoint when it singles out particular speakers for exclusion 'to suppress the[ir] point of view.'").

The government argues that the Ban "is viewpoint neutral" as it "prohibit[s] all nongovernmental organization[s] from participation regardless of any particular views such organizations may have on voting rights." ECF No. 27 at 33–34.

Plaintiffs sufficiently allege that the Ban discriminates against their viewpoint, "that voter participation by naturalized citizens is fundamental to a healthy democracy," to survive a motion to dismiss. ECF No. 21-1 at 30. Similar to cases such as *Lamb's Chapel*, *Rosenberger*, and *Matal*, the fact that the Ban applies to all NGOs equally does not on its own answer the question regarding viewpoint discrimination. Instead, Plaintiffs contend that their specific viewpoint about the right to vote being fundamental—and important for all citizens, including new citizens, to exercise—is being targeted by the Ban. The complaints adequately state claims for viewpoint discrimination particularly in light of other simultaneous changes to the policy and statements by government officials indicating that the purpose for such a change could be animus towards naturalized citizens and a desire for them not to vote. *See, e.g.*, *NCJW*, ECF No. 17-1 ¶¶ 63–65, 79, 84 (referring to statements made by federal governmental officials and referring to newly naturalized citizens as "aliens"). This is

sufficient for Plaintiffs' claim at the pleading stage and for the Court to, for the motion to dismiss, apply strict scrutiny.

The Court, however, is not yet convinced of the likelihood of success on the merits in order to base a preliminary injunction on viewpoint discrimination. USCIS is still providing new citizens with a Form M-767, which explains their right to vote and provides a link to www.vote.gov. That website compiles and directs people to voter registration forms and information for their state. In addition, the current record indicates that USCIS provides a local voter registration form for new citizens to complete on their own. *See* ECF No. 27-2, Young Decl. ¶ 11; Form M-767, *Important Information for New Citizens*,

https://www.uscis.gov/sites/default/files/document/flyers/M-767.pdf

[https://perma.cc/4FUE-A95X] (December 2025). The government acknowledges that it may be discriminating on the basis of speaker identity by requiring that USCIS officials, or state and local election officials, be the source of voter registration information—as opposed to NGOs like Plaintiffs. But such discrimination based on speaker—but not based on viewpoint—is permissible for non-public forums so long as it is reasonable. The current record reveals that the core message—that new citizens have the right to vote and information about how to register to vote—is still being relayed. *See* ECF No. 49 at 79:18–80:12. For these reasons, Plaintiffs have not sufficiently established a likelihood of success on their claim that strict scrutiny will apply based on viewpoint discrimination. Thus, for the motion for preliminary injunction, Plaintiffs' free speech claims will be subject to the reasonableness standard.

### b)    Applying the Level of Scrutiny

#### (1)    Applying Strict Scrutiny for the Motion to Dismiss

As Plaintiffs have sufficiently stated a claim for viewpoint discrimination to survive the government's motion to dismiss, strict scrutiny applies to determine whether Plaintiffs have stated a claim that the Voter Assistance Ban violates the First Amendment. *See Minn. Voters*, 585 U.S. at 12 (citing *Perry*, 460 U.S. at 46). Regulations subject to strict scrutiny "survive only if they are narrowly drawn to achieve a compelling state interest." *ISKCON*, 505 U.S. at 678 (citing *Perry*, 460 U.S. at 45). "'[A] viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review.'" *St. Michael's Media*, 566 F. Supp. 3d at 367 (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 288 (4th Cir. 2013) (en banc)) (cleaned up); *see Burson*, 504 U.S. at 200 ("a law rarely survives such scrutiny.").

Plaintiffs argue that "[t]he Ban cannot survive strict scrutiny because it is not necessary to serve a compelling state interest because there is no rational justification for it." ECF No. 21-1 at 32. They further contend that, "[e]ven if the government had a permissible justification for enacting the Ban, it is not narrowly tailored to achieve any particular interest." *Id*. The government argues only that the Ban is reasonable and viewpoint-neutral but provides no argument as to how the Ban could survive strict scrutiny. *See* ECF No. 27 at 34–35.

As the government has not provided any basis upon which the Court could consider the Ban to survive strict scrutiny and for the same reasons the Court explains in more detail as to the arbitrary-and-capricious claim below, *see* § III.D.2, *infra*.,

Plaintiffs have sufficiently pled that the Ban cannot survive strict scrutiny. Therefore, the motion to dismiss Count Three of *League* and Count III of *NCJW* will be denied.

### (2) Applying the Reasonableness Standard for the Motion for Preliminary Injunction

As the Court is not convinced of the likelihood of success of Plaintiffs' argument that the administrative naturalization ceremonies are public forums and thus will consider them nonpublic forums, *see* § III.B.1.a.1, *supra*, and is also not yet convinced of the likelihood of success of Plaintiffs' argument that the Voter Assistance Ban constitutes viewpoint discrimination (the only basis for strict scrutiny in nonpublic forums), *see* § III.B.1.a.5., *supra*, as to the motion for preliminary injunction, Plaintiffs' free speech claims are subject to the reasonableness standard. *See Minn. Voters*, 585 U.S. at 12 (citing *Perry*, 460 U.S. at 46). "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id*. at 16 (citing *Cornelius,* 473 U.S. at 808–09). "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original).

"The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id*. at 809. Further, the government is only "permitted to restrict speech to the degree reasonably necessary to preserve the forum for its intended use." *Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 162 (4th Cir. 1993). "Much nondisruptive speech—such as the wearing of a T-shirt or button that contains a political message— . . . is still protected speech even in a

nonpublic forum." *Id.* (quoting *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)). The Fourth Circuit has held that a complete ban on newsracks in an airport terminal that still allowed for other commercial activity that was essentially independent of the airport's primary purpose violated the First Amendment as the imbalance between the "important expressive activity" and the airport's reasoning for the ban ("appearance, revenue, convenience, or security") indicated that the airport's positions "represent[ed] nothing more than the 'bureaucratic unwillingness to explore alternatives.'" *Id.* at 163 (quoting *Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 774 F. Supp. 977, 985 (D.S.C. 1991)).

The stated intended purpose of administrative naturalization ceremonies is "to recognize the rights, responsibilities, and importance of citizenship and provide access to services for newly naturalized citizens." ECF No. 53-3 at 57, USCIS Policy Manual Part J., Ch. 5 (Excerpt) (Feb. 3, 2026).

Plaintiffs contend that their longstanding history of providing voter registration assistance at administrative naturalization ceremonies is consistent with the purpose of the forum and thus an outright ban, rather than some justified change in the approval process for NGO participation, "*at best*, 'represents nothing more than the bureaucratic unwillingness to explore alternatives' that would not unreasonably burden Plaintiffs['] First Amendment rights." ECF No. 21-1 at 34–35 (quoting *Multimedia Publ'g*, 991 F.2d at 163). Plaintiffs argue that "[t]he Ban eliminates the single most effective—and arguably, the only—setting where organizations can reach large numbers of newly naturalized citizens at once," and therefore constitutes an unreasonable limit on expression in light of the lack of "alterative channels." *NCJW*, ECF No. 20-1 at 37 (citing *Multimedia Publ'g*, 991 F.2d at 159–60).

The government argues that the Ban is reasonable because (1) the Ban retains from the 2011 Policy the preference for state and local government election officials to provide voter registration assistance; (2) "'ensur[ing] that those nongovernmental organizations who provide voter registration services are nonpartisan' had created an 'administrative burden' for USCIS;" and (3) USCIS had not primarily relied upon NGOs and therefore their participation was "sporadic and varied." ECF No. 27 at 34.

The government has not shown how an outright ban on the NGOs' expressive conduct was instituted "to the degree reasonably necessary to preserve the forum for its intended use." *Multimedia Publ'g*, 991 F.2d at 162. All forms of the policy, including the update pursuant to the Ban, state that one of the intended purposes is to "provide access to services for newly naturalized citizens." ECF No. 53-3 at 57, USCIS Policy Manual Part J., Ch. 5 (Excerpt) (Feb. 3, 2026). Removing one of the avenues for newly naturalized citizens to receive access to voter registration services appears to be contradictory to, rather than in preservation of, the forum's intended use. Although USCIS's preference had always been for state and local election officials to be responsible for voter registration at administrative naturalization ceremonies, Plaintiffs have shown the regularity with which USCIS relied on their services, attending hundreds or thousands of ceremonies each year across the country. Therefore, this preference alone is insufficient to constitute an articulation of "sensible basis" for excluding speech by NGOs. Similar to *Board of Airport Commissioners* and *Multimedia Publishing*, this form of non-disruptive speech is still protected, and an outright ban is not sufficiently limited to align with the government's stated reasons. *See Bd. of Airport Comm'rs of City of L.A.*, 482 U.S. at 576; *Multimedia Publ'g*, 991 F.2d at 162–63.

In addition, as the Court explains in more detail below, *see* § III.D.3, *infra*, the government merely stating that there is an "administrative burden" is insufficient to show a sufficient burden to justify limiting speech, especially where as here the administrative record shows no actual evidence of any such burden—let alone one considered by the government prior to implementing the Ban. Finally, the same reasons that render the Ban arbitrary and capricious (discussed below, *see* § III.D.3, *infra*) also further confirm that the Ban is not a "reasonable[] . . . restriction of access to a nonpublic forum." *Cornelius*, 473 U.S. at 809.

For these reasons, even though Plaintiffs have not shown a likelihood that their First Amendment speech claims will be subject to strict scrutiny, and although the *Cornelius* "reasonable" standard grants substantially more leeway to government restrictions on speech than strict scrutiny does, Plaintiffs have made a very strong showing that they will prevail on the merits of their claim that the Ban is an unconstitutional restriction on their free speech rights.

### 2. Associational Rights

Plaintiffs allege that the Ban violates their First Amendment rights not only based on speech but also because it "restricts and chills Plaintiffs' associational activities with prospective voters at public administrative naturalization ceremonies" as well with their own membership "as assisting new citizens with voter registration is a uniquely motivating and deeply moving form of engagement and service for many of Plaintiffs' members." *League* ECF No. 2 ¶¶ 121–122; *see NCJW*, ECF No. 17 ¶¶ 108–109.

"Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest. However, when regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to

justify reasonable, nondiscriminatory restrictions.'" *Clingman v. Beaver*, 544 U.S. 581, 586–87 (2005) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). Because collecting and submitting voter registration forms "is intertwined with speech and association, . . . [it] comes with the protections of the First Amendment." *League of Women Voters of Fla.*, 447 F. Supp. 2d at 1334; *see also Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1218 (D.N.M. 2010) (quoting *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 1195, 1229 (D.N.M. 2008)) ("Organized voter-registration activities necessarily involve political association, both within the voter-registration organizations and with the citizens they seek to register."). To plead a First Amendment associational rights claim, Plaintiffs must allege "that the challenged law burdened their First [] Amendment rights and . . . that a legitimate state interest cannot justify those burdens." *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1220. "The Court cannot fairly and precisely assess whether the burdens imposed on the Plaintiffs by [a regulation] are massive or minimal or something in between without a careful review of the facts." *Id.* at 1219.

The government broadly states that Plaintiffs' associational rights claim should be dismissed for failure to state a claim, but the remainder of its argument relates solely to the free speech claims. *See* ECF No. 33-1 at 32 ("Accordingly, Counts 3–4 of LWV's Complaint, and Count 3 [of] NCJW[]'s Amended Complaint, should be dismissed.").

As noted above, providing voter registration assistance can constitute an associational right under the First Amendment—both as to the citizens that an organization plaintiff is helping to register and as to the organization's members. *See, e.g., League of Women Voters of Fla.*, 447 F. Supp. 2d at 1334; *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1219. Plaintiffs have adequately alleged that the Ban has

burdened that associational right and the government has not pointed to any case or argument to state otherwise. Therefore, the motion to dismiss Plaintiffs' associational rights claim (*League* Count Four; *NCJW* Count III) will be denied.

In order to meet the standard for the motion for preliminary injunction, Plaintiffs would have needed to show a likelihood of success on the merits that either a severe burden was imposed that cannot be justified under the strict scrutiny standard or that a lesser burden was imposed that was unreasonable or discriminatory. *See Winters*, 555 U.S. at 20; *Clingman*, 544 U.S. at 586–87. Although Plaintiffs assert that "the Ban unlawfully prohibits [them] from associating with new citizens and [their] own members through voter registration at administrative naturalization ceremonies," ECF No. 21-1 at 29, given that a First Amendment associational rights claim is fact-intensive and there currently is not sufficient information in the record regarding the extent of any associational harm to assess the level of burden and thus establish the standard of review, Plaintiffs have not reached the threshold for a preliminary injunction. The motion for a preliminary injunction based on the First Amendment associational rights claim will be denied.

### C. Fifth Amendment Claims

As noted above, NCJW alleges that the Ban not only violates the First Amendment (discussed above) and the APA (discussed below) but also the Fifth Amendment pursuant to equal protection and substantive due process.

#### 1. Equal Protection Claim

Equal protection under the Fifth Amendment forbids the federal government from taking action motivated by discriminatory intent, including on the basis of race or national origin. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (applying the

Fourteenth Amendment equal protection clause to the federal government through the Fifth Amendment due process clause); *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 511 (D. Md. 2019) (same). To establish an equal protection claim, plaintiffs must allege that the challenged government action was, as pertinent here, the product of discriminatory intent or purpose based on the new citizens' national origin; disparate impact alone is insufficient. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). "Challengers need not show that discriminatory purpose was the 'sole[ ]' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265–66) (emphasis in original). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 221 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)) (cleaned up).

Some of the factors relevant to "[d]etermining whether invidious discriminatory purpose was a motivating factor" include whether the impact of the action "bears more heavily on one race than another," *Arlington Heights*, 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242), whether the effect of the action indicates "a clear pattern, unexplainable on grounds other than race," *id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)), "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," "[t]he specific sequence of events leading up to the challenged decision," and "[t]he legislative or administrative history," *id.* at 267 (citations omitted). *See McCrory*, 831 F.3d at 220–21 (citing *Arlington*

43

*Heights*, 429 U.S. at 266–67). This list is not exhaustive. *Id.* at 220 (citing *Arlington Heights*, 429 U.S. at 266–67). "In instructing courts to consider the broader context surrounding the passage of legislation, the [Supreme] Court has recognized that '[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.'" *Id.* at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

When considering statements made by federal government officials, courts must consider whether the statements were "overtly racial" or if they "in substance . . . express[] policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 609 U.S. --, 2026 WL 1825840, at *12 (June 25, 2026). The Supreme Court recently held that statements by President Trump and former Secretary Noem were "insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people" because "one may oppose TPS and favor tighter restrictions on immigration for economic or other reasons that have nothing to do with race." *Id.* The Supreme Court concluded that the plaintiffs in that case were "unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation" and reversed the district court's grant of interim relief. *Id.* at *13.

Here, NCJW has amply shown a likelihood of success on the merits of its claim that the Ban was motivated by discriminatory intent. As NCJW puts it, the Ban "targets naturalized citizens at the precise moment they are poised to enter the electorate[;] [i]t was adopted by officials who cast immigrant voters as a threat[;] [a]nd it arrived as part of a cascade of close-in-time measures premised on unfounded concerns about noncitizen voting that predictably burden naturalized citizens." *NCJW* ECF No. 20-1 at 24–25. The fact that the Ban bars NGOs from assisting with voter registration but allows

44

them to participate in naturalization ceremonies in other ways—and that "other federal facilities that do not primarily serve new citizens continue to allow NGOs on the premises to help people register to vote"—"supports an inference that Defendants instituted the Ban 'because of,' and not 'in spite of' its predictable effects." *See id.* at 25 (quoting *McCrory*, 831 F.3d at 220).

The various statements by government officials leading up to the Ban that NCJW cites further support this conclusion, including USCIS Director Joseph Edlow's statement that immigrants threaten to reshape the nation electorally by becoming citizens.[13] Plus there are the other policy changes that occurred simultaneously with the Ban, such as the elimination of the requirement that new citizens receive a copy of the U.S. Constitution and "A Voter's Guide to Federal Elections" during their naturalization ceremony. *Compare* ECF No. 53-3 at 10–11 (explaining that all new citizens must receive, among other things, "A Voter's Guide to Federal Elections" and that a pocket-sized U.S. Constitution must be made available at the ceremony) *with id.* at 57–58 (removing any mention of "A Voter's Guide to Federal Elections" and making the availability of pocket-sized Constitutions optional, rather than required, at the ceremonies). And USCIS simultaneously replaced the term "naturalization candidate" with "alien" in the policy—not only as a label for before they become citizens, but even after they take the oath and thus become U.S. citizens. *Compare* ECF No. 53-3 at 10 ("A USCIS officer reviews the responses on each naturalization candidate's Notice of Naturalization Oath Ceremony") *with id.* at 57 ("An officer reviews the responses on each alien's Notice of Naturalization Oath Ceremony"); *compare id.* at 9 ("USCIS can

---

[13] Binder, *supra* n.7.

distribute the welcome packet before the naturalization candidate has been administered the Oath of Allegiance") *with id.* at 58 ("During the ceremony, aliens will have access to the Oath of Allegiance and Pledge of Allegiance to repeat during the ceremony")).

"When th[is] evidence is 'viewed cumulatively[,] its direction is too powerful to conclude anything but discrimination.'" *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005). As NCJW puts it, "Defendants may offer various explanations for their recent comments and decisions," but "an intent to discriminate against naturalized citizens—especially in their exercise of the franchise—explains all of them in a single stroke." ECF No. 20-1 at 28 (citing *Arlington Heights*, 429 U.S. at 266).

The government argues that *Arlington Heights* requires that plaintiffs "demonstrate both that the official action was motivated by 'racially discriminatory intent or purpose' *and* has a 'racially disproportionate impact[.]'" ECF No. 27 at 25; ECF No. 33-1 at 37 (quoting *Arlington Heights*, 429 U.S. at 264–65). It thus argues that NCJW has failed to identify "how the [Ban] has disparately impacted newly naturalized citizens in any way [as NCJW] fail[s] to identify any instance in which a newly naturalized citizen has been prevented, inhibited, or even discouraged from voting or registering to vote." ECF No. 33-1 at 37. Although *Arlington Heights* suggested the consideration of racially disproportionate impact in demonstrating whether there was discriminatory intent, it did not state that racially disproportionate impact was *required* as, otherwise, cases such as *Scott*, which focuses on the impact on plaintiffs not within the discriminated group, would not have been able to demonstrate the requisite standard. *See Arlington Heights*, 429 U.S. at 265–67; *Scott*, 716 F.2d at 1415.

Instead, this Court must look at the various factors and context holistically to determine whether NCJW here has sufficiently alleged discriminatory intent (for motion-to-dismiss purposes) and shown a likelihood of success in proving it (for preliminary injunction purposes). For the reasons explained above, it has satisfied both standards. The various simultaneous statements and policy changes as well as the lack of non-discriminatory justification for the Ban point to discriminatory intent being at least one motivating factor for the Ban. Both the updated Policy Manual and the Policy Alert refer to the affected individuals as "aliens" despite the fact that the policy affects individuals at the moment they are becoming citizens. *See* ECF No. 53-3 at 54, 60. Further, government officials made multiple close-in-time statements regarding undermining the voting rights of newly naturalized citizens and pushing for denaturalization of citizens.[14] These factors—particularly when combined with the APA violations explained more below, *see* § III.D., *infra.*—point to discriminatory intent being a motivating factor for the implementation of the Ban. For the same reasons explained under the arbitrary and capricious analysis, *see* § III.D.2., *infra.*, the government has failed to rebut this finding with a reasonable non-discriminatory basis for the Ban. Therefore, NCJW has shown that it is likely to succeed on the merits of the Equal Protection claim and the motion to dismiss Count I of *NCJW* will be denied.

---

[14] *See* Brett A. Shumate, U.S. Department of Justice Memorandum: *Civil Division Enforcement Priorities*, June 11, 2025, https://www.justice.gov/civil/media/1404046/dl?inline [https://perma.cc/Y2EM-MZE6], at 3 (Section 5 entitled "Prioritizing Denaturalization").

### 2.    Substantive Due Process Claim

The Supreme Court "ha[s] emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,'" including "in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), and citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (holding that substantive due process protects against government power arbitrarily and oppressively exercised)). Substantive due process under the Fifth Amendment protects against "arbitrary" executive actions that "shock[] the conscience." *Id.* at 846 (citing *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992); *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "[T]he Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'" *Id.* (quoting *Collins*, 503 U.S. at 126) (cleaned up).

Therefore, discriminatory intent satisfies this standard as courts have consistently held that singling out a group based on race or national origin "constitutes an arbitrary deprivation of [] liberty in violation of the Due Process Clause." *Bolling*, 347 U.S. at 500; *see CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 327 (D. Md. 2018) ("[O]ne can hardly think of a more arbitrary motivation for executive action than racial discrimination."). The term "liberty" has not been defined by the Supreme Court with great precision, but "extends to the full range of conduct which the individual is free to pursue." *Bolling,* 347 U.S. at 499–500 (recognizing the right to desegregated public education); *see Loving v. Virginia*, 388 U.S. 1, 12 (1967) (recognizing the freedom of choice to marry is so fundamental that it can "not be restricted by invidious racial discriminations"); *CASA de Md., Inc.*, 355 F. Supp. 3d at 327 (citing *Hawkins v.*

48

*Freeman*, 195 F.3d 732, 738 (4th Cir. 1999)) (recognizing that, if an executive action "shocks the conscience," then the court must address the nature of the asserted liberty interest and noting the liberty interest at issue being TPS protection from removal to a country without "basic infrastructure to adequately handle their return"). These include "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. East Cleveland, Ohio*, 431 U.S. 494, 503 (1977); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934); *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)).

NCJW contends that "the only plausible basis for the Voter Assistance Ban is to discriminate against new citizens based on national origin" and that "[b]y imposing the [B]an, Defendants make voter registration more difficult for newly naturalized citizens by foreclosing Plaintiff and its members from welcoming these new citizens by helping them register to vote." *NCJW*, ECF No. 17-1 ¶ 105. Specifically, it argues that "Defendants instituted the Voter Assistance Ban to discriminate against naturalized citizens by silencing the voices that encourage and assist their use of the franchise." *NCJW*, ECF No. 20-1 at 31.

The government contends that NCJW's substantive due process claim (Count II in its complaint) does not state a claim on which relief can be granted—let alone entitle NCJW to a preliminary injunction—because "[t]he decision not to seek the assistance of a particular outside organization to disseminate voter registration information or provide assistance at naturalization ceremonies clearly does not rise to this [shocks the

49

conscience] level." ECF No. 27 at 36 (citing *Cnty. of Sacramento*, 523 U.S. at 847 n.8; *Rochin*, 342 U.S. at 172).

The government is correct that, if the substantive due process claim were based solely on the government's decision to not seek assistance from NGOs for voter assistance services, this would likely be insufficient to "shock[] the conscience." But NCJW's claim alleges that the Ban was based on discriminatory intent as evidenced by other simultaneous changes made within the policy as well as public comments by government officials around the time of the passage of the Ban. NCJW has specifically alleged discriminatory intent, which courts have consistently held to be sufficient for a substantive due process claim to continue. *See, e.g.*, *Loving*, 388 U.S. at 12 (holding that substantive due process "requires that the freedom of choice to marry not be restricted by invidious racial discriminations").

Where NCJW's substantive due process claim fails, however, is that NCJW does not claim that any of *its* rights or liberty interests have been violated. *See Lewis*, 523 U.S. at 847 n.8 ("a case challenging executive action on substantive due process grounds, like this one, presents an issue antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed"). The theory of substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720 (citing cases). There is a long line of cases recognizing various "liberties" protected by the Due Process Clause, such as the right to marry, have children, and use contraception. *Id.* (citing cases). Similarly, in the context of a Fifth Amendment substantive due process claim, a plaintiff must have a protected interest in the right that the government is allegedly infringing upon.

The liberty interests NCJW asserts were infringed upon based on the government's discriminatory actions are the newly naturalized citizens' right to vote or right to information about how to vote. *See NCJW*, ECF No. 17-1 ¶ 105 ("By imposing the ban, Defendants make voter registration more difficult for newly naturalized citizens by foreclosing Plaintiff and its members from welcoming these new citizens by helping them register to vote. Taking executive action to reduce naturalized citizens' access to the most foundational right in our democracy is the quintessence of arbitrary conduct that shocks the conscience."). NCJW has not identified any of *its own* freedom or liberty interests (separate from its First Amendment claim) that have been discriminatorily infringed upon. NCJW has also not identified any cases holding that someone other than the person with the protected interest may bring a substantive due process claim. *See e.g.*, *Loving*, 388 U.S. at 2–3 (case brought by the couple that was being denied the freedom to marry); *Bolling*, 347 U.S. at 498 (case brought by African American minors who had been refused admission public schools); *CASA de Md.*, 355 F. Supp. 3d at 316 (case brought by three Salvadoran nationals who had been Temporary Protected Status beneficiaries and a non-profit that served immigrant communities). Critically, it has also made clear that it is not asserting claims based on injuries to newly naturalized citizens but rather its own exclusion from the government forum—in other words, it does not seek to invoke third-party standing. ECF No. 36 at 19 ("[NCJW] does not base its standing on injuries to unnamed third parties. It asserts standing based on *its own* exclusion from a government forum for discriminatory reasons."). Thus, to determine whether NCJW has stated a substantive due process claim, the question is whether NCJW has a protected liberty interest in providing voter registration information to newly naturalized citizens—not whether newly naturalized citizens' right to vote or to

information about voting constitutes a liberty interest protected by the Fifth Amendment (which, because unasserted, the Court need not decide). NCJW has not shown that *its own* interest that has been infringed constitutes a liberty "deeply rooted in this Nation's history and tradition" to constitute a protected interest under the Due Process Clause separate from its First Amendment claim, *Glucksberg*, 521 U.S. at 721 (quoting *Moore*, 431 U.S. at 503). And because NCJW does not invoke third-party standing, the Court need not decide whether the requirements for third-party standing are satisfied.

For these reasons, NCJW has not stated a claim for a substantive due process violation. Therefore, the government's motion to dismiss Count II of *NCJW* will be granted, and NCJW's motion for preliminary injunction based on that claim will be denied.

### D.    APA Claims

The APA governs agency decisionmaking. 5 U.S.C. § 551, *et seq*. Plaintiffs allege that the Voter Assistance Ban violates the APA because (1) USCIS did not conduct notice and comment prior to implementing the rule, (2) the Ban is arbitrary and capricious, and (3) the Ban was "contrary to constitutional rights." The Court will first address two preliminary matters—finality and reviewability—and then will turn to the merits of Plaintiffs' APA claims.

#### 1.    Finality and Reviewability

The APA permits judicial review of a "final agency action." 5 U.S.C. § 704. An agency action is "final" if it "mark[s] the 'consummation' of the agency's decisionmaking process" and "the action [is] one . . . from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman*

52

*S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)); *see also Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 497 (D. Md. 2025) ("*Bessent I*") (actions are final when "[t]here [i]s nothing further for the agencies to do to formalize the decisions."). It is uncontested that the Voter Assistance Ban constitutes a final agency action. *See NCJW*, ECF No. 20-1 at 38; *League*, ECF No. 21-1 at 17–18; ECF No. 49, Mot. Hearing Trans. 89:19–20 ("we agree that this is final agency action."). The finality is also clear from the language within the policy alert that the Ban "is effective immediately and applies to ceremonies held on or after the publication date" and that it "is controlling and supersedes any related prior guidance." ECF No. 53-3 at 52.

As for reviewability, the government contends that the APA precludes judicial review of the Voter Assistance Ban because it is the type of action for which "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2). *See* ECF No. 33 at 28–32. "[T]o give effect to the command that courts set aside agency action that is an abuse of discretion, and to honor the presumption of judicial review, . . . the § 701(a)(2) exception for action committed to agency discretion [is read] 'quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quoting *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)) (cleaned up); *see Pharms. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)) ("Agency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a

53

court would have 'no law to apply.'"). Those "rare circumstances" are generally limited "to 'certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion,' such as a decision not to institute enforcement proceedings or a decision by an intelligence agency to terminate an employee in the interest of national security." *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); citing *Heckler*, 470 U.S. at 831–32; *Webster v. Doe*, 486 U.S. 592, 600–01 (1988)) (internal citations omitted).

There is a two-part inquiry for determining the application of § 701(a)(2): first, whether the challenged conduct "is the kind of agency action that 'has traditionally been committed to agency discretion,'" and second whether the underlying statute "intentionally limits agency discretion by setting guidelines or otherwise providing a limit." *Holbrook v. Tenn. Valley Authority*, 48 F.4th 282, 290 (4th Cir. 2022). If the answer to part one is yes and to part two is no, then the agency action falls under the § 701(a)(2) exemption. This exemption does not include "the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute." *Weyerhaeuser*, 586 U.S. at 23–24.

Here, the government argues that USCIS's decision to adopt the Voter Assistance Ban is "committed to agency discretion by law" because one area of traditionally discretionary decisionmaking is "decisions that involve resource allocation and the need for flexibility to adapt to changing circumstances," ECF No. 33-1 at 30 (quoting *Holbrook*, 48 F.4th at 290), and "the statute directing USCIS to seek the assistance of" NGOs "does not provide any clear guidance or instruction sufficient to overcome the

presumption of unreviewability." *Id.* at 30–31 (citing 8 U.S.C. § 1443(h)). It asserts that 8 U.S.C. § 1443(h) "directs that USCIS 'shall seek the assistance' of outside groups, volunteer agencies, and other organizations, but it is not specific as to *what* information should be provided about citizenship or naturalization, nor *who* should provide it." *Id.* at 31. The government further contends that 8 U.S.C. § 1448 does not provide any enforceable limitations as "Congress left the manner in which ceremonies are conducted entirely to the discretion of USCIS." *Id.* The government contends that "[w]hether USCIS . . . enlists outside authorities to distribute information about voter registration"—like whether it "invites guest speakers" or "plays certain music"—"are matters that fall exclusively within the exercise of the agency's discretion." *Id.*

The government has not shown that the Ban constitutes one of the "rare circumstances," *Dep't of Com.*, 588 U.S. at 772, in which agency action is unreviewable. The government has identified no federal statute that expressly or impliedly precludes judicial review or even hints at an intent to bar review. The Ban is unlike cases involving government actions that involved a complicated balancing of a number of factors peculiarly within the agency's expertise. *Cf. Heckler*, 470 U.S. at 830 (case-specific decision of whether to prosecute is generally committed to agency discretion); *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310 (4th Cir. 2008) (same); *Lincoln*, 508 U.S. at 197 (discussing non-reviewability of "discretionary allocation of unrestricted funds from a lump-sum appropriation"); *Holbrook*, 48 F.4th at 290 (declining judicial review of utility rate-setting). Rather, the Ban constitutes "an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation," which "is subject to review." *Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019)) (citing cases). Moreover, the agency itself

55

appeared to consider its action reviewable, as the text of the Ban includes a section entitled "Additional Considerations[:] Administrative Procedure Act." ECF No. 53-3 at 53–54. And in any event, when a statute "delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently . . . ensur[e] the agency has engaged in 'reasoned decisionmaking' within [the] boundaries [of the delegated authority]." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 750 (2015)).

This is not a one-time enforcement or non-enforcement decision, and the reversal of a broadly applied policy is not a decision that is traditionally unreviewable. Instead, Plaintiffs assert APA claims for which judicial review has regularly applied: Plaintiffs have asserted that the Ban affects their constitutional rights and was procedurally improper. *See Weyerhaeuser*, 586 U.S. at 23–24. Even though USCIS has discretion to determine when and which NGOs may participate in the administrative naturalization ceremonies, that discretion is still subject to review to ensure the agency stayed within its limits under the Constitution and the APA. *Loper Bright*, 603 U.S. at 395.

### 2.     Notice and Comment

"The APA requires that all 'rules' be issued through a statutorily prescribed notice-and-comment process." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 619 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)–(c)). The notice-and-comment process applies only to "substantive or legislative rule[s]," which are those that "ha[ve] the force and effect of law" or "if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Id*. at 620 (quoting *Jerri's Ceramic Arts, Inc. v. Consumer Prod.*

56

*Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989); *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014)) (internal quotations omitted).

"[U]nless another statute states otherwise, the notice-and-comment requirement does not apply to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. § 553(b)(A)). Although the term "interpretive rule" lacks a precise meaning, "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 575 U.S. at 96–97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)); *see also Children's Hosp.*, 896 F.3d at 620. "'[I]nterpretative rules simply state what the administrative agency thinks the statute means, and only 'remind' affected parties of existing duties.'" *Children's Hosp.*, 896 F.3d at 620 (quoting *Jerri's*, 874 F.2d at 207). "A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995) (citing *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987)). "[T]he critical question in distinguishing between legislative rules and general statements of policy is whether the statement is of present binding effect[.]" *Casa De Md. v. United States Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019).

Where an agency amends, modifies, or repeals a substantive rule, then it must go through notice-and-comment. *See Am. Hosp. Ass'n*, 834 F.2d at 1044; *Cal. v. Bernhardt*, 472 F. Supp. 3d 573, 590–91 (N.D. Cal. 2020). Where an agency amends or repeals an interpretive rule, in contrast, it need *not* go through notice-and-comment. *See S.F. Baykeeper v. United States E.P.A.*, 492 F. Supp. 3d 1030, 1038 (N.D. Cal. 2020)

(citing *Perez*, 575 U.S. at 100); *Zirkle Fruit Co. v. United States Dep't of Lab.*, 442 F. Supp. 3d 1366, 1375 (E.D. Wash. 2020) (citing *Perez*, 575 U.S. at 101). An agency's conduct in how it enacted the preceding rule "is highly relevant and shows how the agency classified the rule" such that an amendment to that rule would likely be subject to the same classification. *Coal. for Workforce Innovation v. Walsh*, Case No. 1:21-cv-130, 2022 WL 1073346, at *6 (E.D. Tex. Mar. 14, 2022), *vacated as moot*, 2024 WL 2108472 (5th Cir. 2024).

The government argues that the Ban is a "general statement[] of policy" that "'advised the public prospectively of the manner in which it proposed to exercise its discretionary power' over administrative naturalization ceremonies." ECF No. 27 at 40–41 (quoting *Lincoln*, 508 U.S. at 197) (cleaned up). It argues that the Ban has no binding effect even though it also contends that an individual USCIS office would not be permitted to allow Plaintiffs to participate in administrative naturalization ceremonies or allow them to enter the building to set up a table outside of the ceremony. ECF No. 49, Mot. Hearing Trans. 89:20–21, 90:5–7, 91:9–14. The government also argues that, because the 2011 Policy did not go through formal notice-and-comment, the Voter Assistance Ban, which amended that prior policy, did not need to undergo formal notice-and-comment either. *Id*. at 41.

Plaintiffs contend that the Voter Assistance Ban constitutes a substantive rule because it "substantively alters the legal landscape in ways that have the force and effect of law." *League*, ECF No. 21-1 at 19 (quoting *AFT v. Dep't of Educ.*, 779 F. Supp. 3d 584, 612 (D. Md. 2025)); *see NCJW*, ECF No. 20-1 at 42–43. They note that, "[b]oth on its face and in practice, the Ban has binding effect" as "USCIS field offices have consistently affirmed that they 'must follow the guidance.'" ECF No. 30 at 10 & n.3. They also argue

that, to the extent the Court considers the procedure applied to the 2011 Policy, that policy at least went through informal notice-and-comment, which was not provided here. ECF No. 31 at 13–14. In any event, Plaintiffs argue, the 2011 Policy did not constitute a "'new position inconsistent with existing regulations[] or otherwise effect[ing] a substantive change in existing law or policy'" as it only formalized the "continuation of a nearly decade-long policy . . . consistent with existing statutes." ECF No. 30 at 11 (quoting *Children's Hosp.*, 896 F.3d at 620). Therefore, Plaintiffs argue that, "[b]ecause the Ban is a substantive reversal in agency policy, it is a legislative rule that requires notice and comment rulemaking." *Id.*

While the government's action with respect to a prior rule that is being amended or repealed can be highly relevant in determining whether the new rule is interpretive or substantive, it is not in itself dispositive as the Court must still consider the challenged rule and determine under which definition it fits. Although the government contends that the Ban has no binding effect, it at the same time contends that USCIS offices have no discretion to decide to allow NGOs to provide voter assistance services at their respective naturalization ceremonies. Not only does that clearly appear to be binding upon both USCIS and the NGOs, but the government does not, and cannot, contest that the Voter Assistance Ban constitutes "a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Children's Hosp.*, 896 F.3d at 620. This differs greatly from the 2011 Policy, which, as alleged, was merely a reminder of an existing policy of allowing NGOs to provide voter registration services. *Id.* This also differs from the 2013 and 2017 policy changes, which were merely formatting adjustments or minor changes in words, *see* § I, *infra*. Therefore, it is apparent that the Ban is binding upon USCIS and NGOs and is an

59

inconsistent position and a substantive change from the prior policy and, as such, clearly falls under the definition of a substantive rule.

For these reasons, the Ban was required to undergo formal notice-and-comment procedures. *See* 5 U.S.C. § 553(a)–(c). And it is uncontested that the Ban did not undergo these procedures. Thus, Plaintiffs have shown a likelihood of success on the merits as to Count One of *League* and Count VI of *NCJW* for the motions for preliminary injunction. And the motion to dismiss those counts will be denied as Plaintiffs have sufficiently stated a claim.

### 3.    Arbitrary and Capricious

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "This standard, however, 'does not reduce judicial review to a rubber stamp of agency action.'" *Casa de Md.*, 924 F.3d at 703 (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)). "Rather, '[the court] must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made.'" *Id.* (quoting *Friends of Back Bay*, 681 F.3d at 587).

"To comply with § 706(2)(A), an agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned.'" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286 (1974)). "'But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.'" *Casa de Md.*, 924 F.3d at 703 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). "These principles apply with equal force to a change in agency position." *Id*. (citing *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018)). "The agency's explanation must address the 'facts and circumstances that underlay or were engendered by the prior policy,' including any 'serious reliance interests.'" *Id*. at 704 (quoting *Encino Motorcars*, 579 U.S. at 222). "An unexplained inconsistency in agency policy indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Id*. (quoting *Jimenez-Cedillo*, 885 F.3d at 298) (internal quotations omitted). "But [the agency] need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox Television Stations*, 556 U.S. at 515.

Following the March 17 motions hearing, the Court ordered the government to produce the administrative record and ordered the parties to file supplemental briefs regarding the arbitrary and capricious claim, which they did. ECF Nos. 45, 48, 53–56. The contents of the administrative record are listed above. *See* § I.B., *supra*. The only parts of the record indicating the basis for the Ban are in the 2025 Policy Alert and Leadership Guidance #41-25, both of which were issued on the effective date of the Ban.

According to the 2025 Policy Alert, the guidance was intended to make it "consistent with Executive Order 14148 . . . and Section 9 of Executive Order 14248." *Id*.

61

at 52. It states that USCIS adopted the Ban because "the use of nongovernmental organizations was sporadic and varied based upon the location[,] . . . USCIS [did] not primarily rely on nongovernmental organizations for voter registration services, and the administrative burden on USCIS to ensure that those nongovernmental organizations who provide voter registration services are nonpartisan." *Id.* at 53. It further asserts as follows:

> This change in no way impacts new citizens' access to information and applications to register to vote, as this information will continue to be provided by state or local election officials, or USCIS staff at the end of naturalization ceremonies . . . [and] USCIS does not believe that aliens or nongovernmental organizations have any reliance interests related to representative of nongovernmental organizations being present at naturalizations ceremonies, but even if they do, USCIS interests in judiciously deploying limited agency resources while ensuring fair and impartial voter registrations services at ceremonies outweigh any such reliance interests.

*Id.* at 54. The justification in the Leadership Guidance was "to emphasize the nonpartisan nature of services offered to new citizens." *Id.* at 105.

The government contends that this is sufficient to show that the Ban is not arbitrary and capricious for the following reasons. But for the reasons explained in connection with each, Plaintiffs have shown a likelihood of success on the merits of their claim that the Voter Assistance Ban is arbitrary and capricious.

**Allegedly "sporadic" participation by NGOs**. The government first contends that "USCIS assessed that the participation of nongovernmental organizations was 'sporadic and varied based upon the location.'" ECF No. 55 at 3. But, first, as NCJW points out, "[t]he record lacks *any* documents that reflect internal analysis or deliberations about the Ban—or even a privilege log showing that such documents

exist." ECF No. 56 at 3. The government produced no documentation of any assessment done or even any discussion held prior to its decision that the Ban was needed based on the alleged irregularity of NGO participation. In contrast, the League Plaintiffs provided detailed information on the thousands of administrative naturalization ceremonies at which they provided voter registration assistance prior to the Ban, including just two chapters assisting approximately 2,666 new citizens register to vote in the eight months of 2025 prior to the Ban. *League*, ECF No. 2 ¶¶ 20, 26; *see generally League*, ECF No. 2 ¶¶ 17–26. Second, Plaintiffs have continued to point out and the government has failed to respond about how "that explanation ignored the very purpose of the prior policy: NGOs filled the gaps when state and local officials were unavailable." *NCJW*, ECF No. 20-1 at 39; ECF No. 56 at 6.

An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)) *accord Dep't of Com.*, 588 U.S. at 803 (Breyer, J., concurring). Where there is a "disconnect between the decision made and the explanation given," the "contrived reasons" may be considered "more of a distraction" than "genuine justifications for important decisions." *Dep't of Com.*, 588 U.S. at 784–85 (holding the agency's statements that it was acting on a routine data request was "incongruent with what the record reveal[ed]" as the materials indicating that the agency went to great lengths to request data from any willing agency that provided a different view of "the agency's priorities and decisionmaking process").

Not only has the government not produced any evidence upon which it could have based its assessment that participation was "sporadic," but also has not provided

any evidence of how that by itself is a basis for the Voter Assistance Ban. As the record revealed no evidence of the "sporadic" participation that USCIS asserts as one of the reasons for the Ban, the government has not identified "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotations omitted).

**Alleged administrative burden**. The government next contends that the administrative burden of "[c]oordination and supervision of NGO participation in administrative naturalization ceremonies requires more work and imposes a greater burden on USCIS Field Leadership than relying on state and local government officials who do not need to be vetted." ECF No. 55 at 4. It contends that "[t]he prior policy also required USCIS to address complaints from newly naturalized citizens, their families, or state and local election offices about conduct and performances of NGOs." *Id.* (citing ECF No. 53-3 at 114).

These arguments also fail for two reasons. First, "[t]he record offers nothing to explain how the vetting process was burdensome." ECF No. 56 at 7. While the government is correct that it need only provide a "good reason" for the policy change rather than show that "the reasons for the new policy are *better* than the reasons for the old one," ECF No. 55 (quoting *Fox Television Stations*, 556 U.S. at 515) (internal quotations omitted), a conclusory statement about administrative burden without any factual basis is insufficient. *See State Farm*, 463 U.S. at 43 (holding that there must be "a rational connection between the facts found and the choice made."); *Whole Woman's Health All. v. U.S. Food & Drug Admin.*, -- F. Supp. 3d. --, 2026 WL 2125567, at * 21 (W.D. Va. July 23, 2026) (quoting *Mayor of Balt. v. Azar*, 973 F.3d 258, 276 (4t Cir. 2020)) (explaining that, while agencies are "afforded deference," they "must do more than offer conclusory statements" because "the arbitrary and capricious standard does

64

not permit rulemaking to rest on little more than 'because we said so.'"). Based on the government's reasoning, any agency could write the words "administrative burden" into a policy memorandum to make it immune from judicial review, which is not the standard. On that same basis, the government's contention that addressing complaints added another administrative burden is also without any evidence in the administrative record. If the government had provided in the record evidence of, for example, the number of complaints in a given year that it had to address or the amount of time spent vetting NGOs, the outcome may be different. But based on the record there is no evidence to support any administrative burden, let alone one upon which the Voter Assistance Ban was based.

**The Executive Orders**. Next, the government contends that the Ban contained an adequate and reasonable explanation by referring to Executive Orders 14148 and 14248. ECF No. 55 at 5–6. It contends that because Executive Order 14148 rescinded Executive Order 14019, which directed "agencies to consider involving 'nonpartisan third-party organizations' in 'voter registration services on agency premises,'" "the decision to discontinue NGO participation in administrative naturalization ceremonies was consistent with the directive to stop actions implementing Executive Order 14019." *Id*. at 6. The League Plaintiffs have argued that Executive Orders 14148 and 14248 do not "[r]equire, [s]upport," or "[j]ustify" the Ban. *League*, ECF No. 21-1 at 21. Specifically, they contend that the rescinded Executive Order (No. 14019) "did not address voter registration at administrative naturalization ceremonies" and also was not "the impetus for USCIS's longstanding rules allowing nongovernmental organizations, such as Plaintiffs, to provide voter registration assistance [as] USCIS's efforts to partner

with nongovernmental community organizations," which "had been allowed . . . for years before issuance of EO 14019." *Id*.

The League Plaintiffs are correct. Based on the information in the record, the recission of Executive Order 14019 merely ended the suggestion that agencies consider various ways to further promote voter registration; it was not a mandate to revoke a rule that had been in place formally for ten years prior to the rescinded Executive Order and informally for decades before that. Therefore, the government's argument that the Executive Orders serve as the basis for the Ban is also without merit.

**Reliance interests**. Finally, the government fails to provide any basis for its summary dismissal of any reliance interest of organizations and newly naturalized citizens. First, the 2025 Policy Memorandum refers to the reliance interest of "aliens" despite the fact that this policy has nothing to do with noncitizens and thus the government failed to account for the reliance interest of the proper group of individuals—newly naturalized citizens. *See* ECF No. 53-3 at 54; *League*, ECF No. 21 at 26–27. Second, nothing in the record indicates any consideration of Plaintiffs' own reliance interests based on their assertion that providing voter registration services, particularly at administrative naturalization ceremonies, constitute an activity that is core to their missions, and a core aspect of what attracts some members to join the organizations. Therefore, this basis is also without support.

Because the government has failed to present "'adequate reasons' for [the] agency's decision" or "'to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.'" *Casa de Md.*, 924 F.3d at 703 (quoting *Encino Motorcars*, 579 U.S. at 221). Therefore, Plaintiffs have shown a likelihood of success on the merits as to Count Two of *League* and Count IV of *NCJW*

66

for the motions for preliminary injunction. And the motion to dismiss those counts will be denied as Plaintiffs have sufficiently stated a claim.

### 4.     Contrary to Constitutional Rights

"Finally, the APA requires courts to 'set aside' any final agency action that is contrary to constitutional rights." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 779 F. Supp. 3d 584, 619 (D. Md. Apr. 24, 2025) (quoting 5 U.S.C. § 706(2)(B)). The analysis for these claims "mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ. Assoc. v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 197 (D.N.H. 2025) (citations omitted). Plaintiffs contend that the Ban violated the First and Fifth Amendments to the Constitution and thus violated the APA as well. *See NCJW*, ECF No. 20-1 at 41; *League*, ECF No. 21-1 at 27. Because Plaintiffs have sufficiently stated a claim for violations of both Amendments, *see* §§ III.B.2., III.C.1., *supra*, Plaintiffs have sufficiently stated a claim for an APA violation on this basis as well. Therefore, Defendants' motion to dismiss *League* Counts 5–6 and *NCJW* Count V will be denied. And because Plaintiffs have sufficiently shown a likelihood of success of at least one First Amendment and at least one Fifth Amendment claim, they have also sufficiently shown a likelihood of success of their claim for an APA violation on those bases.

### E.     Remaining Preliminary Injunction/§ 705 Factors

As noted above, Plaintiffs have requested a preliminary injunction or, in the alternative, a stay under § 705 of the APA. Section 705 authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of

a § 705 stay." *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)). After all, § 705 itself provides that a stay should issue only "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Accordingly, the Court proceeds to assess whether Plaintiffs have established irreparable injury and the prerequisites for issuance of a preliminary injunction.

### 1.    Irreparable Harm

In order to establish irreparable harm for the second *Winter* element, "the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.' Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)) (internal citations omitted). A harm is considered irreparable to a mission-driven organization where an action or policy "unquestionably make[s] it more difficult for the [organization] to accomplish [its] primary mission of registering voters" because after registration deadlines, "there can be no do over and no redress." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); citing *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996); *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg., Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)).

68

"'Since an application for preliminary injunction is based upon an urgent need for the protection of [a] [p]laintiff's rights, a long delay in seeking relief indicates that speedy action is not required.'" *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (quoting *Skehan v. Bd. of Trs. of Bloomsburg State Coll.*, 353 F. Supp. 542, 543 (M.D. Pa. 1973); citing *Lydo Enters. v. City of L.V.*, 745 F.2d 1211, 1213 (9th Cir. 1984) (reversing the grant of a preliminary injunction where the plaintiff waited four months after notification of adverse zoning decision to bring suit)) (citations omitted). But a delay "does not as a matter of law preclude a finding by the court of irreparable harm." *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 139 (4th Cir. 2001). This is particularly true where the movant's delay can be at least partially explained and the non-movant "does not contend that the delay resulted in any prejudice to its interests." *Id.*

Plaintiffs contend that their harm has already occurred and is continuing to occur as, "[s]ince August 29, 2025, Plaintiff[s] ha[ve] been barred from providing voter registration assistance at administrative naturalization ceremonies." *NCJW*, ECF No. 20-1 at 44. They explain that, "[o]nce lost, those opportunities cannot be restored" and "[e]ach time Plaintiff misses a ceremony, its opportunity to help those new citizens register to vote at the moment they become eligible is gone." *Id.* at 44. They further argue that the Ban is "already harming Plaintiffs' core organizational missions [as] USCIS's abrupt announcement of its Voter Assistance Ban forced [NGOs] across the country to cancel numerous events and led to the involuntary squandering of significant volunteer and monetary resources." ECF No. 21-1 at 37. Plaintiffs also assert that a less than four-month delay between when USCIS issued the Ban and when Plaintiffs brought the suit is minimal and irrelevant as the government cannot show that it was prejudiced

by the delay and any delay was a result of Plaintiffs first investigating whether any effective alternatives existed prior to bringing suit. ECF No. 30 at 16 & n.7.

Based on these facts, Plaintiffs have sufficiently established irreparable harm. Plaintiffs previously participated in administrative naturalization ceremonies as frequently as three to four times per week prior to the Ban, and each passing ceremony in which they are unable to participate is a new harm that is not redressable after the fact. Plaintiffs cannot go back in time to provide voter assistance services to the new citizens who did not receive those services while the Ban was in place. Moreover, Plaintiffs have shown a strong likelihood of success on their First Amendment claim, and a "prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)); *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). And although the government points to a four-month delay prior to filing, that delay here is immaterial as the gap is at least partially explained and the government does not contend that it suffered any prejudice as a result of the delay.

For these reasons, Plaintiffs have sufficiently established the second *Winter* element.

70

### 2.    Balance of Equities and Public Interest

The final two *Winter* factors are balance of the equities and the public interest. These factors merge when the government is the opposing party. *See Nken*, 556 U.S. at 435. "[T]he balance of the equities favors preliminary relief because '[our] precedent counsels that [the government] is in no way harmed by issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)) (cleaned up). Similarly, "'[t]here is generally no public interest in the perpetuation of unlawful agency action.' And '[t]here is a strong public interest in curing the effects of the government's unlawful acts[.]'" *Bessent I*, 765 F. Supp. 3d at 505 (quoting *Newby*, 838 F.3d at 12; *CACI, Inc.– Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 279 (E.D. Va. 2023)).

The government argues that "granting the preliminary injunction that Plaintiffs seek would disrupt USCIS's efforts to ensure uniformity in the administration of naturalization ceremonies at USCIS Field Offices" and "could lead to confusion with competing federal, state, and nongovernmental entities attempting to provide newly naturalized citizens with voter registration information." ECF No. 27 at 48–49. The Court is unconvinced that requiring the government to apply the same policy it has been applying for decades and has only recently changed would cause any significant disruption or confusion. Further, as the Court has concluded that the Ban is significantly likely to violate both the APA and the Constitution, there is little to no public interest in allowing the continuation of likely unlawful agency actions. As such, the final two factors tip in Plaintiffs' favor.

71

### F.    Remedy

Because Plaintiffs are likely to succeed on the merits of their APA claims, *see* § III.D, *supra*, on their First Amendment free speech claims, *see* § III.B.1.b.2., *supra*, and on the Fifth Amendment equal protection claim, *see* § III.C.1., *supra*, Plaintiffs have shown that they have been and will continue to be irreparably harmed absent preliminary relief, and that the public interest favors preliminary relief, Plaintiffs' motions for preliminary injunction will be granted on these bases. Thus, the Court must determine the form of preliminary remedy to apply.

The appropriate remedy here is a temporary stay of the Voter Assistance Ban, under 5 U.S.C. § 705, pending a final resolution in this matter. Under 5 U.S.C. § 705, when "justice so requires, . . . and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Although the *League* Plaintiffs include a footnote in their supplemental brief that the filing of the administration record establishes that the arbitrary-and-capricious claim is ripe for final adjudication, ECF No. 54 at 5 n.3, no motion for summary judgment has yet been filed in this case. The only relief currently requested by Plaintiffs is a preliminary injunction or stay of the application of the Ban, which, under the APA, amounts to a stay of the agency action. *See NCJW*, ECF No. 20-1 at 45; *League*, ECF No. 21 at 1.

The recent Supreme Court caselaw limiting the application of injunctive relief to only the named plaintiffs or an individual district confirms that a § 705 stay is the appropriate remedy here. *See Trump v. CASA, Inc.*, 606 U.S. 831 (2025). *But see City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 176 (D. Md. 2025) (aligning with courts

across the country that have held that *CASA* does not apply to APA cases) (citing *Drs. for Am. v. Off. of Pers. Mgmt.*, 793 F. Supp. 3d 112, 148 (D.D.C. 2025); *Walker v. Kennedy*, 790 F. Supp. 3d 138, 146 (E.D.N.Y. 2025); *Ass'n of Am. Univs. v. Dep't of Defense*, 792 F. Supp. 3d 143, 182 (D. Mass. 2025); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 104–05 (D.D.C. 2025)); *Am. Fed'n of Tchrs v. Dep't of Educ.*, 796 F. Supp. 3d 66, 119–20 (D. Md. 2025) ("Like every other court to consider this issue since *CASA*, this Court believes the APA has always expressly authorized vacatur, and *CASA* did not change that") (citing cases). In *CASA*, "the Supreme Court explicitly left open 'whether the [APA] authorizes federal courts to vacate federal agency action.'" *City of Columbus*, 796 F. Supp. 3d at 176 (quoting *CASA*, 606 U.S. at 847 n. 10). "APA suits ultimately target the rule, and not necessarily the application of it to a particular person." *Am. Fed'n of Tchrs v. Dep't of Educ.*, 796 F. Supp. 3d at 120 (citing *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) ("[T]he APA . . . empower[s] the judiciary to act directly against the final agency action."). Therefore, "in cases under the [APA], plaintiffs may ask a court to preliminarily 'set aside' a new agency rule." *CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (citing 5 U.S.C. § 706(2)).

In line with various decisions considering the issue following *CASA*, this Court concludes that a stay pursuant to the APA is appropriate. *See e.g., City of Columbus*, 796 F. Supp. 3d at 176; *Drs. for Am.*, 793 F. Supp. 3d at 148 n. 17 ("[A]s this is a case involving APA vacatur, not a universal or national injunction, . . . [*CASA*] does not apply."); *Ass'n of Am. Univs.*, 792 F. Supp. 3d at 182 (finding that "a stay under the APA" is not "subject to the same limitations espoused in *CASA*"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, 793 F. Supp. 3d at 104–05 (noting that binding precedent

73

and the text of the APA plainly authorize vacatur). Further, limiting the stay of the Ban to Plaintiffs only would be impractical, especially in light of the several states and localities in which Plaintiffs provide voter registration services.

Accordingly, pursuant to 5 U.S.C. § 705, the Voter Assistance Ban shall be stayed pending final resolution of this matter.[15]

### G.   Bond

The government has requested that should the Court issue a preliminary injunction, it "should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction." ECF No. 27 at 51.

Under the Federal Rule of Civil Procedure 65(c), a court may order that the movant for a preliminary injunction "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This requirement, however, has no application to stays pursuant to the APA. *See* 5 U.S.C. § 705; *City of Columbus*, 796 F. Supp. 3d at 177 ("The APA has no bond requirement"); *Asylum Seeker Advoc. Proj. v. U.S. Citizenship & Immig. Srvs.*, 808 F. Supp. 3d 708, 722 (D. Md. 2025) (holding that, unlike a preliminary injunction under Rule 65, a stay of agency action pursuant to § 705 of the APA "has no bond requirement"). Because the Court is issuing a stay under § 705, not a preliminary injunction, the Court will not require bond.

---

[15] As the Ban will be stayed pursuant to the APA, the Court need not and will not issue a separate remedy as to the constitutional claims.

## H.    Request for Stay of Injunction

The government has requested that "[i]f the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General." ECF No. 27 at 50 (citing Fed. R. App. P. 8(a)). The League Plaintiffs argue that, "[i]n effect, Defendants shoehorn into their opposition a preemptive stay motion. But the Court should not deprive itself—or Plaintiffs—of the opportunity for full briefing on any subsequent stay motion." ECF No. 30 at 19 n.9.

A stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (quoting *Va. Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). The issuance of a stay is subject to judicial discretion and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34 (citing cases). To determine whether a stay may be warranted, courts are to consider "four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "There is substantial overlap between these and the factors governing preliminary injunctions." *Id.* (citing *Winter*, 555 U.S. at 24).

As Plaintiffs have established a likelihood of success on the merits and each of the other preliminary injunction factors, the government has not met its burden for the issuance of a stay. Therefore, the Court will not preemptively stay its grant of the stay of the Ban without a fully briefed motion.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motions for preliminary injunction or, alternatively, for a stay will be construed as a motion for a stay under 5 U.S.C. § 705 and granted based on Plaintiffs' APA claims and First Amendment free speech claims, and NCJW's Fifth Amendment equal protection claim. Therefore, the effective date of PA-2025-21 and the corresponding updates to the USCIS Policy Manual (the "Voter Assistance Ban") will be stayed pending final resolution of this case, and the USCIS Policy Manual effective on June 28, 2017 (*See* ECF No. 53-3 at 17) shall be reinstated.

Further, Defendants' motion to dismiss will be granted in part and denied in part. Count II of *NCJW* (Case No. 25-cv-3675) will be dismissed without prejudice. The motion to dismiss is otherwise denied as to all other claims.

The parties will be directed to file a joint status report regarding whether they intend to proceed with discovery as to the remaining claims with a proposed schedule for either option as well as a briefing schedule for any motions for summary judgment. A separate order follows.


Date:  August 3, 2026                                    _____*/s/*_____
                                                         Adam B. Abelson
                                                         United States District Judge

76